**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
───────────────────────────────────────

YODI ZIKIANDA, as Administrator of the Estate
of Irene Bamenga,

                    Plaintiff,

      - v -                                Civ. No. 1:12-CV-1194
                                                    (TJM/RFT)

COUNTY OF ALBANY, SHERIFF CRAIG APPLE,
CORIZON, INC., SYED AZAZ HAIDER-SHAH, M.D.,
ANNA J. PAULINO, COUNTY OF ALLEGANY,
SHERIFF RICK L. WHITNEY, CHERYL RALYEA,
DEBRA HARRINGTON, and
CHRISTOPHER DEPNER, M.D.,

                                Defendants.
───────────────────────────────────────

**RANDOLPH F. TREECE**
**United States Magistrate Judge**

## MEMORANDUM-DECISION and ORDER

On July 26, 2012, Plaintiff filed a Complaint alleging causes of action for wrongful death and a survival action on behalf of Irene Bamenga, who died on July 27, 2011. Dkt. No. 1, Compl. Additionally, pursuant to 42 U.S.C. § 1983, Plaintiff alleges that Bamenga's constitutional rights were violated. *Id.* At the time of her death, Ms. Bamenga was in the custody of Immigration and Customs Enforcement (ICE) and incarcerated at Albany County Jail. It is generally alleged that the Defendants failed to provide Bamenga with urgently needed medical care and treatment for her congestive heart failure; principally, they failed to provide the proper medication which eventually resulted in heart failure and Bamenga's death. *Id.*

Immediately after her death, and pursuant to established policies, Defendant Corizon, Inc. (hereinafter Corizon),[1] conducted post-mortem analyses of her death, which were reduced into two specific reports, "The Root Cause Analysis and Action Plan" and "Mortality Review." On November 26, 2012, Plaintiff served a request for production upon Corizon seeking, *inter alia*, "[a]ll documents and communications concerning the care and treatment of [Plaintiff's decedent] Irene Bamenga." Dkt. No. 75, Pl.'s Lt.-Mot., dated Feb. 14, 2013, at p. 1. In responding to Plaintiff's Demand, Corizon lodged a privilege log asserting that these two particular Reports were confidential under the self-critical analysis privilege. *Id*. at p. 1 & Attach. (Privilege Log); Dkt. No. 82, Corizon Lt.-Br., dated Feb. 18, 2013.

On February 14, 2013, Plaintiff filed a Letter-Motion seeking a conference to address this particular non-disclosure. Dkt. No. 75. Pursuant to the Court's direction, and predating a conference, both Plaintiff and Corizon filed submissions that aptly framed the factual and legal discussion regarding the withholding of these Reports. *See* Dkt. Nos. 75, 82, 84, Pl.'s Reply Lt.-Br., dated Feb. 19, 2013, & 86, Corizon's Reply Lt.-Br., dated Feb. 25, 2013. And, on February 27, 2013, a Telephonic Hearing

---

[1] At the time of Bamenga's incarceration at Albany County Jail, medical services were provided by Correctional Medical Services (hereinafter CMS). However, about June 2011, CMS merged with PHS Correctional Healthcare to form Corizon. Dkt. Nos. 82-2, Gloria Cooper Aff., dated Jan. 14, 2013, at ¶ 2, & 82-3, Ex. J, News article about the merger. Because Corizon appears to be the successor in interest, for our purposes, the Court will refer solely to Corizon regarding both entities.

was held on the record, wherein all parties were given the opportunity to expound further regarding their respective positions on this particular matter.[2]

In light of the nature of these Reports and claims that particular harm would be visited upon Corizon should their internal and prospective recommendations be revealed, which would create a disincentive to engage in future evaluative analysis, the Court directed that these reports be produced for an *in camera* review. Realizing that Plaintiff had not specifically addressed concerns that disclosure may create harm to or have a chilling effect upon Corizon's interest in performing these kinds of analyses in the future, Plaintiff was provided with an opportunity to file yet another Letter-Brief. *See* Dkt. No. 88.

**A. Root Cause Analysis and Action Plan and Mortality Review Reports**.

**1. Genesis of the Reports**

The National Commission of Correctional Health Care (hereinafter NCCHC) is "an independent non-profit organization dedicated to [] improving the quality of health care services and assisting correctional facilities in providing effective and efficient care." Dkt. No. 82-2, Gloria Cooper Aff., dated Jan. 14, 2013, at ¶ 3. NCCHC promulgates specific standards relative to medical care, and further accredits

---

[2] Earlier, Corizon had raised other discovery issues, *see* Dkt. No. 82, however these issues were not fully explored during this Hearing, and the Court directed the parties to continue to meet and confer relative to the same.

correctional facilities, of which Albany County Jail was so accredited during the time of Bamenga's incarceration and treatment. *Id*. at ¶ 4. These promulgations include procedures in the event of an inmate's death. With the understanding that preventable deaths can be avoided, those procedures and standards pronounced that "all deaths are reviewed to determine the appropriateness of clinical care; to ascertain whether changes to policies, procedures, or practice are warranted and to identify issues that require further study." Dkt. No. 82-2, Ex. B, NCCHC 2008 Standard J-A-10. In order to comply with these standards, a death review includes both an administrative and clinical mortality review with the primary purpose of identifying where internal policies, procedures, and patient care can be "improved." Cooper Aff. at ¶ 4.

Based upon these NCCHC national standards, Corizon implemented its own policies and criterion in reviewing an inmate's death. Dtk. No. 82-2, Exs. C & D (Corizon's Policies). First, these policies state that a "mortality review will be completed as required." *Id*., Ex. C at p. 1. In this regard, and pursuant to these required reviews, this elaborate "quality improvement function" is blanketed with "confidentiality." *Id*., Ex. D. In accordance with Corizon's policy, Gloria Cooper, who was the Albany County Jail Health Service Administrator at the time of these critical events, prepared both the Root Cause Analysis and Action Plan, which "analyzes the role of various factors in Irene Bamenga's death and outlines risk

reduction strategies," and the Mortality Review. Cooper Aff. at ¶¶ 7 & 8.

## 2. *In Camera* Review of the Reports

When addressing the proposition of confidentiality as to these Reports' findings and recommendations, the Court, during the Hearing, posed that conceptually our analysis as to whether any privilege may have attached could be apportioned between a determination of adequacy or inadequacy of medical treatment during Bamenga's confinement and the series of recommendations to improve the delivery of future medical services. In this respect, the former would have a lesser claim to confidentiality while the latter would have a much stronger argument for confidentiality inasmuch as it would not serve any legal function in assessing liability in this case. *See* FED. R. EVID. 407.[3] And, for this reason, without committing to this legal postulation, the Court decided to conduct an *in camera* review of the documents.[4]

In sum, the *in camera* review reveals that each of these Reports contain, as expected, statements of facts related to Bamenga's treatment and her death, pertinent

---

[3] "When [subsequent remedial] measures are taken that would have made an earlier injury or harm less likely, evidence of the subsequent measure is not admissible to prove negligence [or] culpable conduct[.]" FED. R. EVID. 407. That is not to say that such evidence could not be introduced for other purposes. *Id*.

[4] On March 4, 2013, Corizon submitted to this Court, under seal, the Root Cause Analysis and Mortality Review.

time-lines, and recommendations to be implemented in the care and treatment of inmates.

## B. Self-Critical Analysis Privilege

It is Corizon's position that these Reports are protected from disclosure by a federal self-critical analysis privilege, a position vigorously opposed by Plaintiff in two respects. First, Plaintiff posits that there is no federal self-critical analysis privilege, and, secondly, even if such privilege exists, certain portions of these Reports should still be disclosed, *i.e.*, facts.

The Court commences it analysis by noting that claims of confidentiality, without more, do not immune documents from disclosure. *In the Matter of Fed'n Internationale De Basketball for A Subpoena*, 117 F. Supp. 2d 403, 406-07 (S.D.N.Y. Oct. 2000) (noting it is fundamental to have "every man's evidence" except those protected by constitutional, common law or statutory privileges (citing *Branzburg v. Hayes*, 408 U.S. 665, 668 (1972)). Privileges "are not lightly created nor expansively construed, for they are in derogation of the search for the truth." *Spencer v. Sea-Land Serv., Inc.*, 1999 WL 619637, at * 1 (S.D.N.Y. Aug. 16, 1999) (quoting *United States v. Nixon*, 418 U.S. 683, 710 (1974)). Further, a blanket assertion that a document is privileged, or merely exclaiming that disclosure of a purportedly privileged document would have a chilling effect on such further investigations and reports, without more,

is plainly insufficient to meet the burden of establishing the applicability of the asserted privilege. *E.E.O.C. v. Sterling Jewelers Inc.*, 2012 WL 1680811, at *13 (W.D.N.Y. May 14, 2012).

Where there is a federal question, *i.e.*, 42 U.S.C. § 1983, federal statutory and common law govern, and even when both federal and state claims are asserted, the matter of recognizing privileges is governed by principles of federal law. *Bayne v. Provost*, 359 F. Supp. 2d 234, 238-39 (N.D.N.Y. 2005). Whether or not a self-critical analysis privilege may exist as a matter of state law, neither the United States Supreme Court nor the Second Circuit have recognized such a privilege. *Mitchell v. Fishbein*, 227 F.R.D. 239, 251-52 (S.D.N.Y. Mar. 31, 2005) (citing, *inter alia*, *Franzon v. Massena Mem. Hosp.*, 189 F.R.D. 220, 224 (N.D.N.Y. 1999) (McAvoy, CJ.)). When given the opportunity to recognize a medical peer-review privilege, not only did the Supreme Court state that it was "reluctant to recognize a privilege in an area where it appears that Congress has considered the relevant competing concerns but has not provided the privilege itself," but would not "accept the invitation to create a new privilege." *Univ. of Pennsylvania. v. E.E.O.C.*, 493 U.S. 182, 189 (1990). Whether the Second Circuit has opined specifically on this privilege, none were cited by the parties nor were any found by the Court. Hence, one wonders if such a self-critical analysis privilege would be viable in light of *University of Pennsylvania v. E.E.O.C.*

Notwithstanding the Second Circuit not specifically addressing this privilege, there are several courts within the Circuit that have. And there appears to be either a split amongst the district courts within this Circuit as to whether this privilege exists or, if it does exist, to what context or variations it applies. Nonetheless, the majority of the cases within this Circuit that have addressed the presence of the self-critical analysis privilege have declared its existence doubtless and accordingly have not recognized it. *See e.g., Ravenell v. Avis Budget Group, Inc.*, 2012 WL 1150450 (E.D.N.Y. Apr. 5, 2012) (declining to consider the privilege); *Cruz v. Coach Stores, Inc.*, 196 F.R.D. 228, 232 (S.D.N.Y. 2000) (questioning whether such a privilege exists); *In re Nieri*, 2000 WL 60214, at *4 (S.D.N.Y. Jan. 24, 2000) (discussing how *Univ. of Pennsylvania v. EEOC* decision narrowly constrains a court's ability to create or recognize a privilege in the absence of Congress's direction); *Roberts v. Hunt*, 187 F.R.D. 71, 74-76 (W.D.N.Y. 1999) (in rejecting the existence of a self-evaluative privilege, the court provided a thorough analysis on how the Second Circuit considers creating or extending privileges and concluded that this Circuit would not grant a self-critical analysis privilege considering that it had previously rejected a self-evaluative privilege).

Notably, there have been a few courts within this Circuit that have recognized the self-critical analysis privilege. Yet, for those occasional district courts that have

recognized this privilege, it was found to be qualified and not absolute. *E.E.O.C. v. Sterling Jewelers Inc.*, 2012 WL 1680811, at *13 (survey of prior decisions deeming it to be a qualified privilege). Even still, such privilege was only granted with considerable limitations however. In granting the privilege, those courts weighed whether (1) the information in question results from critical self-analysis undertaken by the party seeking protection, (2) the public has a strong interest in preserving the free flow of the type of information sought, (3) the information is of the type whose flow would be curtailed if discovery was not allowed, and (4) with the expectation it would remain confidential. *Ovesen v. Mitsubishi Heavy Indus. of Am. Inc.*, 2009 WL 195853, at *2 (S.D.N.Y. Jan. 23, 2009) (citations omitted)*; In Re Nieri*, 2000 WL 60214, at *3-4; *Abbott v. Harris Publ'n*, 1999 WL 549002, at *2 (S.D.N.Y. 1999) (the party asserting the privilege has a heavy burden); *Troupin v. Metropolitan Life Ins. Co.*, 169 F.R.D. 546, 548 (S.D.N.Y. 1996) (citing *Flynn v. Goldman, Sachs & Co.*, 1993 WL 362380, at *1 (S.D.N.Y. Sept. 1993) for the proposition that in order to invoke the privilege there must be an intrusion into the evaluative process which would adversely effect the process itself, with a detriment to a cognizable public interest). Once these high hurdles have been met, nonetheless, the privilege would not preclude disclosure of pure facts or even evaluative material that could not have been expected to be confidential. *Troupin v. Metropolitan Life Ins. Co.*, 169 F.R.D. at 550;

*see also, Fed'n Internationale De Basketball*, 117 F. Supp. 2d, at 407.

In this respect, Corizon cites *Francis v. United States*, 2011 WL 2224509 (S.D.N.Y. May 31, 2011), as recognizing a qualified medical peer review privilege that evolves out of the self-critical analysis privilege. But close scrutiny of this case reveals that, "absent a consensus" amongst the district courts, the court could not find that a general federal privilege of medical peer review exists. 2011 WL 2224509, at *4. That court then labored through an analysis under Federal Rule of Evidence 501 to ultimately find such a medical peer review privilege. *Id*. at *4-7. In doing so, however, it did not hold that factual chronologies were protected. *Id*. In the grand scheme of this discussion, it appears that *Francis*'s analysis stands alone among the courts within this Circuit, and this Court is not swayed to adopt its reach with the exception of its discussion relative to the disclosure of factual information.

Here, under both the NCCHC and Corizon's own standards, the Root Cause Analysis and the Mortality Review were mandated. *See supra* Part A.1. Where there is a mandatory review or a document is prepared in the course of a mandatory investigation of an inmate's death, the self-critical analysis has not prevailed. *Powell v. New York City Health and Hosp. Corp.*, 2003 WL 22871908 (S.D.N.Y. Dec. 4, 2003) (finding no privilege where an investigation ensued after an inmate died in custody and it was alleged that he was denied adequate medical care); *see also*

*MacNamara v. City of New York*, 2007 WL 755401, at *4 (S.D.N.Y. Mar. 14, 2007) (citing, *inter alia*, *Tortorici v. Goord*, 216 F.R.D. 256, 258 (S.D.N.Y. 2003)). Thus, the mandated review is a controlling factor in this type of judicial review. Moreover, because there remains an open question as to whether this privilege exists, especially in light of *Univ. of Pennsylvania v. E.E.O.C.'s* ruling, and the Court is not persuaded by those district courts that have found a qualified privilege, this Court does not find that the self-critical analysis privilege exists in the Second Circuit. But assuming that it did, Corizon has not met its heavy burden in establishing the harm, notwithstanding its policy claiming that these Reports remain confidential. *In re Ashanti Goldfields Sec. Litig.*, 213 F.R.D. 102, 104 (E.D.N.Y. 2003) (the party asserting the privilege bears the burden of establishing by a detailed and convincing showing of the harm to the disclosure). Corizon relies upon the conclusion that if these "confidential" Reports are disclosed it will have a chilling effect on future investigations. Conclusory commentary, without more, is insufficient for Corizon to meets its burden. *Ravenell v. Avis Budget Group, Inc.*, 2012, at *5; *Powell v. New York City Health and Hosp. Corp.*, 2003 WL 22871908, at *1. This Court is persuaded that this mandated review will proceed "irrespective of whether the court require[s] that analysis to be disclosed in litigation," *Mitchell v. Fishbein*, 227 F.R.D. at 252, primarily because Corizon would want to maintain, at all costs, its accreditation with NCCHC who

requires such types of investigations and reviews.  As to the evaluations and prospective recommendation, the Court remains "skeptical that disclosure would result in the chilling effect [Corizon] fears." *E.B. v. New York City Bd. of Educ.*, 233 F.R.D. 289, 296 (E.D.N.Y. 2005).  Nor has there been any suggestion that the harm would outweigh the public interest in the free flow of such information or even that the public would want to preserve the flow of such information.  Lastly, the Court's *in camera* review confirms that the bulwark of these Reports are factual and such would be compelled to be disclosed in any event.

Accordingly, the Court directs the disclosure of the Root Cause Analysis and the Mortality Reviews.  To limit the impact of its disclosure, the Court requires that they be disclosed under the previously granted Protective Order. *See* Dkt. No. 64.

In order to preserve the issue should an appeal ensue, the Clerk of the Court is directed to file the Reports under seal until further direction from the Court.[5]

---

[5] During the Hearing, Corizon expressed its strongly held view that there is a federal self-critical analysis privilege, particularly as it relates to post-mortem analytical reviews. Anticipating that its intimation may lead to an appeal of this Memorandum-Decision and Order, it would be prudent to file these particular Reports under seal. Nonetheless, consistent with the Court's direction, these Reports will not be revealed to the public unless and until they may become relevant during the course of this litigation.

**IT IS SO ORDERED**.

March 6, 2013
Albany, New York

Randolph F. Treece
U.S. Magistrate Judge