**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**YODI ZIKIANDA, as Administrator of the Estate of**
**Irene Bamenga,**

                                        **Plaintiff,**

        **v.**                                        **1:12-CV-1194**

**COUNTY OF ALBANY, et al.,**

                                        **Defendants.**
_____


**DECISION & ORDER**

Thomas J. McAvoy, Senior District Judge.

        Plaintiff Yodi Zikianda, as Administrator of the Estate of Irene Bamenga

("Plaintiff") commenced this action pursuant to 42 U.S.C. § 1983 and state law, alleging

that Defendants violated the rights of Irene Bamenga while she was in their custody on

an immigration detainer, causing her death.  Defendants have filed motions for

summary judgment, which are presently before the Court.  The Court has determined

that oral argument on the motions is not necessary and will render its decision based on

the filings.

**I.      BACKGROUND**[1]

        This case arises out of the detention of Decedent Irene Bamenga ("Decedent" or

"Bamenga").   On July 15, 2011, Decedent was taken into custody at the Lewiston

Bridge Port of Entry in Lewiston, New York, by the United States Customs and Border

_____

        [1]The Court offers a general outline of the facts here, but will address the facts
relevant to the parties' motion in more detail when addressing them.

Patrol. Decedent had attempted to reenter the United States after being denied entry into Canada. Officials determined that Decedent had overstayed a visa and was ineligible to remain in the county. While she was in the custody of immigration officials, Decedent advised officers that she had been diagnosed with congestive heart failure ("CHF") and needed to take medication daily.

Decedent had traveled with her husband, the Plaintiff, and another man to Lewiston. The two men were released, but Decedent was transferred to the custody of the Allegany, New York, County Jail. Customs and Border Patrol Officers informed the Jail that Decedent had been diagnosed with CHF, had six different medications with her, and appeared to be in good health.

Decedent arrived that the Allegany County Jail ("ACJ") at around 10:30 p.m. on July 15, 2011. The ACJ officer who took Decedent into custody signed a federal form that indicated that Decedent had CHF controlled by the medications she carried with her. An intake receipt executed by that officer indicated that Decedent was on "lots of" medication. The intake officer delivered the medication that had been in Decedent's possession to the desk of Nurse Practioner Cheryl Ralyea. Ralyea was not present because of the late hour, and no other medical officer was there to receive Decedent.

The next day, Debra Harrington, a registered nurse, conducted an initial screening of decedent. Harrington noticed that Plaintiff had two large medication organizers that contained various medications. Decedent informed her that she had taken her medication the previous day, but she was not sure of the dosages she was to take or the names of the medication. Decedent told Harrington that she was concerned about being able to take her medication. Ralyea saw Decedent on July 18, 2011 and

prescribed a number of medications to be started on that day. Decedent did not actually receive the medication until July 19, 2011.

On July 21, 2011, Customs and Border Patrol officials transferred custody of Decedent to officers from the Albany County Correctional Facility ("ACCF") in Albany, New York. Federal Agents informed ACCF agents of Decedent's medications and heart condition. The Federal Officials transferred Plaintiff and her medications to the Albany County officers. ACCF medical staff reviewed Decedent's health and medications. They continued the medications prescribed at the ACJ, though two of the medications were not started until July 25 and July 26, 2011.

On July 25, 2011, Decedent completed two request forms, complaining that she had not been provided her full dosage of medications and that she had been suffering from shortness of breath, palpitations when lying down, and dizziness when standing. During a medical interview the next day, July 26, 2011, Decedent complained that she had not been receiving her medication.

On July 27, 2011, inmates in Decedent's housing area notified officers that she was sick. When officers entered her cell at around 12:20 a.m., they noted that she was unresponsive. Officers attempted CPR, to no avail. Eventually, emergency medical technicians arrived and transported Decedent to Albany Memorial Hospital. There, she was pronounced dead. The Certificate of Death indicates that Decedent's cause of death was cardiomyopathy. The time of death was 1:17 a.m.

Plaintiff filed the instant Complaint in this Court on July 26, 2012. See dkt. # 1. After the Defendants answered the Complaint, the parties engaged in discovery and extensive motion practice surrounding that discovery. Eventually, the parties agreed

that Plaintiff should be permitted to file an amended complaint.  Plaintiff filed an

Amended Complaint on March 15, 2013.  See dkt. # 109.  The Defendants answered

that Complaint.  Defendants Christopher Depner, M.D., Debra Harrington, County of

Allegany, Cheryl Ralyea, and Rick L. Whitney also filed cross claims against various

Defendants.  See dkt. ##s 112, 114.  After additional discovery and additional extensive

motion practice, Defendants filed the instant motions for summary judgment.  See dkt.

##s 304, 307, 308, 311.[2]

## II.    Legal Standard

Defendants have moved for summary judgment.  It is well settled that on a

motion for summary judgment, the Court must construe the evidence in the light most

favorable to the non-moving party, see Tenenbaum v. Williams, 193 F.3d 581, 593 (2d

Cir. 1999), and may grant summary judgment only where "there is no genuine issue as

to any material fact and ... the moving party is entitled to a judgment as a matter of law."

FED. R. CIV. P. 56(a).  An issue is genuine if the relevant evidence is such that a

reasonable jury could return a verdict for the nonmoving party.  Anderson v. Liberty

Lobby, 477 U.S. 242, 248 (1986).

A party seeking summary judgment bears the burden of informing the court of

the basis for the motion and of identifying those portions of the record that the moving

---

[2]The Court notes that the litigation in this matter has been spirited, as evidenced
by the more than 400 docket entries as of the date of this writing, as well as the
frequent–and sometimes personal--disputes between counsel revealed in the
thousands of pages of deposition transcripts submitted by the parties surrounding the
summary judgment motions.  The Court is certain the parties and their counsel will treat
each other with dignity and respect and that counsel will conduct themselves with the
decorum expected of legal professionals as the case proceeds.

party believes demonstrate the absence of a genuine issue of material fact as to a

dispositive issue.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the movant is

able to establish a *prima facie* basis for summary judgment, the burden of production

shifts to the party opposing summary judgment who must produce evidence

establishing the existence of a factual dispute that a reasonable jury could resolve in his

favor.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  A

party opposing a properly supported motion for summary judgment may not rest upon

"mere allegations or denials" asserted in his pleadings, Rexnord Holdings, Inc. v.

Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994), or on conclusory allegations or

unsubstantiated speculation. Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).

III.  **ANALYSIS**

Various of the Defendants have filed motions for summary judgment.  The Court

will address each in turn, addressing first the facts relevant to each motion, as

appropriate, and then turning to the legal arguments each party makes.

A.  **Motion of Dr. Christopher Depner, M.D.**

I.  **Facts Relevant to the Motion**

Since 2007, Allegany County has used the services of private physicians in the

role of County Medical Director.  (Defendant Christopher Depner's Statement of

Material Facts ("Depner's Statement"), dkt. # 304-4, at ¶ 2).  The Medical Director has a

variety of roles, overseeing the County's family planning clinic, public health clinic,

sexually transmitted diseases clinic, and a number of environmental programs.  (Id. at ¶

3).  Plaintiff emphasizes that the Defendant "specifically contracted to serve as 'Medical

Director for the Allegany County Jail as provided for by law.'" (Plaintiff's Response to Defendant's Statement of Material Facts, dkt. # 337, ("Plaintiff's Response") at ¶ 3). The Medical Director also attends meetings of the County Health Board. (Depner's Statement at ¶ 4). The Director additionally serves as "advisor" to the preschool program, the Medical Director for the Children with Special Needs Program, and the Allegany County Jail. (Id. at ¶ 5). Plaintiff again disputes this language, pointing out that Defendant's title was "Medical Director[,]" not "Advisor." (Plaintiff's Response at ¶ 5). Defendant Christopher Depner, MD, became County Medical Director in October 2007. (Depner's Statement at ¶ 6).

The Allegany County Jail has the capacity to house 164 inmates, but on average holds between 135 and 145 inmates. (Id. at ¶ 7). In addition to inmates from Albany County and surrounding counties, the ACJ also houses federal prisoners on a temporary basis,[3] both for the United States Marshals Service and for Immigration and Customs Enforcement (ICE). (Id. at ¶¶ 8-9). Plaintiff expands on this statement, pointing out that the Jail houses prisoners from a variety of agencies, including other counties, prisoners detained by the United States Marshal's Service and persons in the custody of the Department of Homeland Security ("DHS") and ICE. (Plaintiff's Response at ¶ 8). Allegany County-connected prisoners comprise only about one-third of the jail's population. (Id.). The County is paid a per-diem fee for all other prisoners. (Id.). Further, while the County's population has decreased over the past twenty years, the jail population has increased. (Id.).

_____

[3]Plaintiff objects to the term "temporary," contending that he "does not know what constitutes a 'temporary' basis[.]" (Plaintiff's Response at ¶ 9).

Nurse Practitioner Cheryl Ralyea has provided medical services at the Jail since May 2001. (Id. at ¶ 10). She provides inmates with clinical services, oversees the nursing staff and formulates and implements policies and structures. (Id. at ¶ 11). County policies designated Ralyea as "responsible health authority" at the Jail beginning in March 2010. (Id. at ¶ 12). Defendant contends that this designation appeared because Ralyea "was the person providing the direct care and formulating the policies." (Id.). Plaintiff disputes this characterization; he argues that Ralyea coined the term "responsible health authority" to describe herself, and that no one at the ACJ ever reviewed or approved that term. (Plaintiff's Response at ¶ 12). Plaintiff also points out that "responsible health authority" is a term derived from the National Commission on Correctional Health Care's STANDARD FOR HEALTH SERVICES IN JAILS (2008), Standard J-A-02. (Id.). That standard provides that when the responsible authority is not a physician, "'clinical judgments rest with a single, designated, licensed 'responsible physician.'" (Id.). Plaintiff contends that Ralyea wrote the ACJ's healthcare policies and procedures, deriving them from the National Commission's Standards. (Id.).

Upon becoming County Medical Director, Dr. Depner entered into an agreement with Ralyea regarding her role as Nurse Practitioner at the jail. (Depner's Statement at ¶ 13). Pursuant to this agreement, when Ralyea was on vacation Dr. Depner would be available to medical staff at the Jail when necessary. (Id. at ¶ 14). Plaintiff points out that this evidence could be read to indicate that Dr. Depner was at times unaware that Ralyea was unavailable, and that Depner may not have been available the entire time Ralyea was gone. (Plaintiff's Response at ¶ 14). Moreover, Ralyea's schedule and contact list for the time in question indicate that she would be out of town, but provides

no contact information for Dr. Depner. (Id.). Though Depner is available when needed, Ralyea and the Jail staff rarely contact him. (Depner's Statement at ¶ 15). Plaintiff disputes whether Depner is actually available at all times. (Plaintiff's Response at ¶ 15). Indeed, Depner never actually provided medical services directly to inmates, and his contract did not require him to do so. (Depner's Statement at ¶ 16). Plaintiff disputes whether Dr. Depner's conduct met the essential requirements for prison health care. (Plaintiff's Response at ¶ 16).

At the time when Decedent first entered the Jail, Ralyea was on vacation. (Depner's Statement at ¶ 28). Defendant Dr. Depner was available for consultations. (Id.). Plaintiff disputes that Dr. Depner was actually available to jail inmates at that time. (Plaintiff's Response at ¶ 28). Debra Harrington, a nurse, performed an initial screening on July 16, 2011. (Depner's Statement at ¶ 23). Plaintiff agrees that Harrington examined Decedent to some degree on July 16, 2011, but contends that an "initial screening was performed by a corrections officer at intake." (Plaintiff's Response at ¶ 23). Decedent indicated that she was taking "'a lot'" of medications. (Depner's Statement at ¶ 24). Decedent, Defendant asserts, was unable to provide information about the dosages she was prescribed, the name of the physician who prescribed the drugs, or the pharmacy where Bamenga filled the prescription. (Id. at ¶ 25). Plaintiff denies this claim by pointing to evidence he contends indicates that Decedent contacted her husband to obtain information on dosages and intended to pass that information on to medical staff. (Plaintiff's Response at ¶ 25). The medications were not in prescription bottles, but in a single container. (Depner's Statement at ¶ 26). Plaintiff describes the container holding these pills as a "pill organizer" with the days of

the week printed on the outside. (Plaintiff's Response at ¶ 26). Decedent did not at that point appear to be in any distress, and did not make any complaints. (Depner's Statement at ¶ 27). Plaintiff responds that Decedent was under a great deal of stress "as the result of having been arrested and jailed," and points out that "stress is a significant contributor to decompensation in patients with congestive heart failure." (Plaintiff's Response at ¶ 27). Harrington did not call Defendant Depner to advise him of Decedent's admission. (Depner's Statement at ¶ 29).

Nurse Practioner Ralyea performed a full evaluation of Bamenga and ordered medication on July 18, 2011. (Id. at ¶ 30). Plaintiff disputes that Ralyea's examination was a "full" one. (Plaintiff's Response at ¶ 30). Decedent remained in the Jail from approximately 11:30 p.m. on July 15, 2011 until around 9:30 a.m. on July 21, 2011. (Depner's Statement at ¶ 31; Plaintiff's Response at ¶ 31). Defendant Dr. Depner never met Decedent during this period, nor was he informed of her presence in the Jail. (Depner's Statement at ¶ 32). He was not called for a consultation concerning her care and treatment. (Id. at ¶ 33). He was not aware she had even existed until her lawsuit was filed. (Id. at ¶ 34). ICE transferred Decedent to the Albany County Correctional Facility on July 21, 2011. (Id. at ¶ 35). Defendant contends that Bamenga passed away on July 27, 2011 (Id. at ¶ 36). Plaintiff contends that the medical evidence indicates that Decedent actually died several hours earlier on July 26, 2011. (Plaintiff's Response at ¶ 36). The official cause of death was cardiomyopathy. (Depner's Statement at ¶ 37). Plaintiff points to his expert reports to argue that "medical mismanagement" caused Decedent's passing, not her heart condition. (Plaintiff's Response at ¶ 37).

ii.     **Defendant's Argument**

a.     **Medical Malpractice Claims**

Defendant Depner first seeks dismissal of Plaintiff's medical malpractice claims against him.  These claims consist of two counts, one on behalf of the estate for pain and suffering and one on behalf of the survivors for pecuniary loss.  Defendant notes that the same wrongful acts provide the basis for both claims, and that if one is dismissed, the other must as well.  He contends that Plaintiff cannot prevail on a malpractice cause of action because no patient-physician relationship existed.  Depner had no contact with the Decedent, no knowledge of her presence at the jail and did not provide her with any treatment, and thus he could not have been negligent as a provider.  Defendant also argues that he could not be vicariously liable in his role as medical director because he did not have any supervisory role over those who provided Decedent care, but instead served only as a consultant who was not consulted.  Likewise, he could not be responsible for any County policies that harmed the Decedent, since his role was not to craft those policies.  Even if he were charged with creating the policies, Defendant argues, the policies were adequate and were not the cause of Decedent's harm.  Plaintiff admits that Defendant did not treat Decedent directly, and that no claim for vicariously liability exists here, but points to his expert reports and insists that Dr. Depner violated his duty to the Decedent both as a physician and as medical director of the jail.

The parties appear to agree that Plaintiff raises two potential theories of liability against Defendant Depner: negligence in his role as Medical Director of the Albany

County Jail and negligence in his role as the physician named on Decedent's charts. The Court will address each claim in turn.

Plaintiff's claims sound in medical malpractice. "[T]o establish a claim of 'medical malpractice under New York law, a plaintiff must prove (1) that the defendant breached a standard of care in the community, and (2) that the breach proximately caused the plaintiff's injuries.'" Milano by Milano v. Freed, 64 F.3d 91, 95 (2d Cir. 1995) (quoting Arkin v. Gittleson, 32 F.3d 658, 664 (2d Cir. 1994)). In addition, "except as to matters within the ordinary experience and knowledge of laymen, . . . expert medical opinion evidence is required" to establish these elements. Id. A physician defending a medical malpractice action can meet his burden "'by the submission of affidavits and/or deposition testimony and medical records which rebut plaintiff's claim of [medical] malpractice with factual proof.'" Suib v. Keller, 6 A.D.3d 805, 806, 774 N.Y.S.2d 608, 609 (3d Dept. 2004) (quoting Horth v. Mansur, 243 A.D.2d 1041, 1042, 663 N.Y.S. 2d 703 (1997)). A plaintiff is then required to "rebut defendant's showing by demonstrating, typically through expert medical opinion, a deviation from accepted practice and that the deviation was the proximate cause of the injury." Id.

Defendant's position is that no direct physician-patient relationship existed between Depner and the Decedent, and that no liability can therefore attach. The Court agrees that Plaintiff can establish liability for Dr. Depner only by demonstrating that he was negligent in establishing policies for medical care in the Allegany county jail, and that such negligence was a cause of Decedent's injuries. No physician-patient relationship was ever established between Dr. Depner and decedent, since under New York law such a "relationship is created when the professional services of a physician

are rendered to and accepted by another person for the purposes of medical or surgical treatment." Lee v. City of New York, 162 A.D.2d 34, 36, 560 N.Y.S. 2d 700, 701 (2d Dept. 1990).

Plaintiff does not really dispute that Depner did not provide any direct treatment to Decedent. Indeed, Depner testified that he was not aware of "what transpired with respect ot the care and treatment of Irene Bamenga while she was detained at the Allegany County Jail." Exh. 16 to Affidavit of Michael Lurie, dkt. # 341 ("Depner Dep."), at 45. If Plaintiff is to establish liability against Defendant Depner for negligence, that liability must come on some other basis. In this respect, Plaintiff points to Dr. Depner's role as the Medical Director of the Jail. Courts in New York are clear that a physician in Depner's position cannot be vicariously liable for the failings of other medical professionals at the Jail, and that no liability exists "against the director of a medical department of a hospital without proof of a negligent act or omission on his part, whether acting in a treating or supervising capacity." Ellis v. Brookdale Hosp. Medical Center, 122 A.D.2d 19, 19-20, 504 N.Y.S. 2d 189, 190 (2d Dept. 1986). A physician who has the "authority to establish procedures . . . may be held liable for treatment not personally given by him to the patient." Wilson v. McCarthy, 57 A.D.2d 617, 393 N.Y.S.2d 770, 771 (2d Dept. 1977); see Maxwell v. Cole, 126 Misc.2d 597, 598 482 N.Y.S.2d 1000, 1002 (York Cty. 1984) (finding that "[a] failure on the part of a Chief of Service to supervise residents and interns and to develop and implement rules, regulations and guidelines for treatment and supervision is a claim for breach of duty which rested initially with the hospital but was alleged delegated by the hospital" to the supervising physician); Barker v. Saltzman, 124 A.D.2d 617, 617-18, 507 N.Y.S.2d 878,

878-79 (2d Dept. 1986) (physician who "never saw, treated or consulted with any physicians regarding the plaintiff" could be liable because he was "responsible for providing anesthesia for all surgical patients at the hospital and that he employed assistants whom he supervised in the administration of anesthesia."). In other words, the Plaintiff must show that Depner had a duty to establish policies and procedures for treating inmates like the Decedent, and that he breached that duty.

Plaintiff has submitted the expert report of Randy Wertheimer, M.D., in opposition to Defendants' motions for summary judgment. See dkt. # 347. Wertheimer is a physician and the Jaharis Chair of Familty Medicine at the Tufts University School of Medicine in Boston, Massachusetts. Report, Exh. A to dkt. # 347 at 1. In addition to training and credentials as a Family Practice Physician, Wertheimer is, through her position as Chair of the Department of Family Practice at Tufts and in other positions in her medical career, "involved in direct patient care, supervision of direct patient care and education of multiple groups of providers including medical students, residents in training, nurses and nurse practitioners and non-clinical staff." Id. Wertheimer has experience "in collaborating with non-medical professionals such as legal counsel and administrative chiefs" to address his supervisory issues. Id. She has also been charged with "creating guidelines, establishing protocols and assessing outcomes within [his] department as well as on the local, state, and national level." Id. Having served as a member of the Board of Registration in Medicine in Massachusetts, she has substantial "experience regarding acceptable standards of care, physician behavior, acceptable collaboration and responsibilities in primary care teams." Id. at 1-2.

Dr. Wertheimer's report concludes that the conduct of Dr. Depner and Dr.

13

Haider-Shah, medical directors of the jails involved, "conducted themselves in a manner which not only departed from applicable standards of care in connection with the care and treatment of Irene Bamenga, but which also demonstrated a callous disregard for the likely consequences of their acts and failures to act[.]" Id. at 3. These failings, Dr. Wertheimer concludes, "were a substantial contributing cause to the decompensation of [Decedent's] chronic congestive heart failure that led to her resulting death on July 27, 2011." Id. Both Dr. Depner and Dr. Haider-Shah, Dr. Wertheimer finds, should have been familiar with CHF and versed in treatment of the condition. Id.

In terms of Dr. Depner's conduct, Wertheimer notes that, as the Medical Director of the Allegany County Jail, Depner was "the sole responsible supervising physician in charge of inmates, including newly admitted individuals" at the time of Decedent's admission. Id. at 4. Even though there was documentation of Decedent's medications and heart condition when she arrived at the jail, "no medical personnel were present or called to evaluate" her. Id. Decedent was processed by intake officers when she arrived at the facility. Id. These officers were required to "complete a computerized questionnaire concerning medical issues" that the County provided. Id. Such officers, however, lacked training "to assess the medical needs of arriving prisoners and are expected to exercise their own judgment as to whether any medical attention is required by the arriving prisoner." Id. In Decedent's case, the intake officer knew that Decedent was talking "a lot" of prescription medications, but failed to seek more detailed information on which pills Decedent was taking, "the dose of each, how frequently they were to be administered, or when she had last taken her medications." Id.

Dr. Wertheimer finds that "the failure of Dr. Depner to establish appropriate

triage and admitting protocols to guide the corrections officers in determining when an arriving prisoner required assessment by medical staff demonstrated a complete disregard for the likely consequences of the absence of such protocols." Id. Even though a wide variety of prisoners with various medical conditions enter the jail daily, and many arrive when no medical staff is on site, Dr. Depner did nothing "to provide intake officers with guidelines that would prompt them to involve medical personnel when necessary," instead leaving the decision to act on such conditions to "corrections officers lacking in any basic training that would permit them to make such assessments." Id. at 5. Wertheimer opines that Dr. Depner should have established "protocols including but not limited to clear definitions of intake procedure for both medical and non-medical personnel, explicit protocols about prisoners with medical conditions that needed to be referred out either at time of initial assessment or at time of new complaints or symptoms, explicit protocols on continuity of medications, explicit steps to contact health care providers, including back-up contacts and on-call schedules for physicians and nursing staff." Id. These failings made it "all but inevitable that critical failures in the provision of medical care to inmates would ensue." Id. Leaving the initial assessment of medical needs "to untrained corrections staff reflects the Medical Director's failure to establish appropriate patient safety mechanisms." Id.

Dr. Wertheimer finds that the "relevant standards of medical care" demand that "a supervising physician is never permitted to abdicate responsibility for ensuring proper intake and assessment of patients." Id. Dr. Depner's failure to provide such procedures as part of his "supervisory and managerial responsibilities" caused

15

Decedent to miss critical elements of care for a person with her condition, such as receiving proper medications, proper diagnostic testing, and proper continuity of care. Id. Wertheimer notes that no procedures were in place to ensure that an ill prisoner like Decedent was seen by medical professionals in a timely fashion. Id. at 6. Decedent saw Nurse Harrington only because Harrington came to the jail for an "unrelated" reason. Id. Dr. Wertheimer finds that this meeting with the nurse, which occurred largely by chance, "illustrates the absence of reasonable precautions to ensure patient safety at the Albany jail under Dr. Depner's management." Id. According to Wertheimer, Depner's "failure to develop protocols or policies that would have mandated contact with medical personnel be made when a new prisoner arrives at the facility with a diagnosis of a serious illness and medications for treatment of that illness" points to "a complete abdication of [Depner's] responsibilities as Medical Director[.]" Id.

Wertheimer points to a number of procedures that Depner could have put in place during the intake process to ensure that new prisoners with serious health issues have their conditions evaluated and monitored. Id. at 6-7. Depner's failure to institute any such "protocols, or their functional equivalents" in Wertheimer's opinion "evidences a disregard for the likely serious consequences to patient safety of providing untrained corrections staff with unfettered discretion to determine when medical staff involvement with a new prisoner is necessary." Id. at 7. Another example of this failure to institute proper procedures was that, even after Nurse Harrington saw the decedent and recognized her serious health condition, no protocol required that a medical professional examine Decedent. Id. at 7-8. This lack of standards led to a serious delay in Decedent receiving her medications and contributed to the illness that caused

her death.  Id. at 8.  Indeed, Dr. Wertheimer finds that Depner "fail[ed] to put appropriate policies, protocols and guidelines in place to assist his nursing staff in caring for patients," despite the fact that he served as Medical Director at the Jail and "there was no other physician providing care, or collaborating with the nursing staff resident at the facility."  Id.

Wertheimer contends that Dr. Depner "was obligated to involve himself in establishing policies, protocols, socpe of practice for nurse practitioners and rules that would ensure that patients at the Allegany county jail would receive appropriate, timely treatment for serious medical conditions, and to oversee the manner in which care was provided to ensure that such policies, protocols and rules were actually followed."  Id. Failing to do so, Wertheimer opines, represented "a callous indifference to the serious medical needs of the patients confined at the ACJ."  These failings led to Decedent's demise, as she did not receive proper assessment and treatment.  Id. at 10-12.

In the end, Dr. Wertheimer finds that Dr. Depner and his staff effectively "abandoned" the Decedent.  Id. at 12-13.  She concludes:

> Here, Irene Bamenga had no option but to rely on the physicians in charge of the two facilities where she was involuntarily held to ensure that the systems for medical care would be responsive to her needs.  Dr. Depner, by taking no steps, over many years, to ensure that the medical system at the ACJ could meet the needs of the ever-shifting population detained there completely abdicated his responsibilities.  In Ms. Bamenga's case, Dr. Depner and his nursing team demonstrated a shocking degree of indifference to the complex medical issues of Ms. Bamenga's serious cardiac diagnosis of congestive heart failure and their conduct throughout the period that Ms. Bamenga was under their care directly contributed to her worsening congestive heart failure and death.

Id. at 13.

In responding to Plaintiff's opposition to his motion, Defendant emphasizes that

all agree that Dr. Depner never had a treating relationship with the Decedent. Defendant also argues that Dr. Wertheimer's report overstates the role that Dr. Depner played in providing health care at the jail. Defendant points out that, at the time of the incident in question, Dr. Depner had ceded authority over medical care at the jail to Nurse Practioner Cheryl Ralyea, and argues that she was responsible for establishing policies and procedures at the facility. Because Ralyea, not Depner, supervised at the jail, Dr. Depner cannot be responsible.

The Court finds that the evidence is ambiguous about Dr. Depner's authority at the jail, and that a jury could find him responsible for establishing policies regarding the treatment and care of inmates that contributed to Decedent's injuries. Ralyea testified that she "believed" the Jail's policies for processing medication brought by inmates at the jail were "written down in the policies and procedures manual[.]" dkt. # 311-4 at 23. She also testified that she was responsible for drafting that manual. Id. The jail administrator, Mr. Ivers, reviewed the manual with her before it became effective. Id. She "sent copies" to Dr. Depner, who did not have any comments. Id. While the manual provided that the Jail would confiscate inmates' medications when they arrived, an exception was made for immigration detainees, who were generally unaware of the policy. Id. at 21. Ralyea could not be certain, however, that the policy was in place in July 2011. Id. at 23.

When asked what Defendant Depner did as medical director of the jail, Ralyea explained that "[h]e does peer review. He's available by phone should I need to consult with him. He provides coverage when I'm not available." Id. at 92. Depner did not come to the facility when he covered for her and received "a call to request that he

18

come to the" Jail.  Id.  While Ralyea did not meet with Depner, she "regularly" sent him

"peer review."  Id.  She testified that she sent approximately five percent of her patient

files for review to Depner.  Id. at 95.  She sent him files about which she had questions,

the files of prisoners sent to the hospital, and random files to ensure Depner saw five

per cent of the patient files.  Id.  Depner would view notes on the patients and send

them back.  Id. at 93.  He might write on the form before sending it back; Ralyea also

occasionally discussed the notes with Depner on the phone.  Id.

At her deposition, Ralyea discussed the "practice agreement" that existed

between which had begun when he became the county medical director.  Id. at 114-

117.  The agreement in place in 2011 provided that:

> In accordance with medical protocols agreed upon in advance between the
> nurse-practitioner performing the services and physician of record, the nurse-
> practitioner evaluates test findings, makes initial medical diagnoses and initiates
> appropriate action to facilitate the implementation of the therapeutic plan
> consistent with the continuing health needs of the client.

Id. at 115-16.  Ralyea testified that the Jail had "policies and procedures," though not

"medical protocols for a specific diagnosis."  Id. at 116.  Such policies and procedures

were "agreed upon in advance" by Ralyea and Depner.  Id.  That agreement occurred

when Depner "first took over and read the policies and signed off on them."  Id.  Depner

had not reviewed and approved any amendments to the policies and procedures, and

had not been involved in updating them.  Id. at 117.  Though the agreement provided

that the collaborating physician was to be available at all times by telephone or on site

for consultation, Ralyea testified that he had stopped coming to the Jail for peer review

after the first "couple of months" he was on the job in 2006.  Id. 118.  He had never

come to the jail to examine a patient, and only once had a patient transported to his

office for an examination in his six years as a jail physician.  Id.  at 119.  Depner also

failed to meet his contractual obligation to provide peer review on 20 per cent of the

cases.  Id. at 119-20.  Ralyea found most cases routine and Dr. Depner's comments

unnecessary.  Id. at 120.

Ralyea testified that she had written the Jail's policies and procedures manual.

Id. at 126.  She wrote them when she first began working for the jail in 2001.  Id. at 127.

She based the manual on the National Commission for Correctional Health Care

standards, which provided "standards for jails nationally" and provided "a place to start."

Id.  When Ralyea sought to "promulgate a new policy," she would "send it to Sergeant

Brantley," who was "in charge of the policies and procedures."  Id. at 128.  Brantley

would "send it to Christopher Ivers."  Id.  If Ralyea heard no response to her proposed

policy, she assumed it was approved.  Id. at 129.  In 2007, Dr. Depner "received all the

policies."  Id. at 131.  He did not offer any comments.  Id.

Depner testified that he signed an agreement naming him as Medical Director for

Allegany County in July 2011.  Depner Dep. at 14-15.  Before that, he had a "verbal

contract" with the County.  Id. at 20.  Depner testified that, as county medical director,

he did not have an obligation to review the policies and procedures at the Allegany

County Jail.  Id.  He had never reviewed those policies and procedures, and Ralyea

never requested that he do so.  Id.  He could not recall Ralyea ever sending him a copy

of the policies and procedures to review.  Id. at 21-22.   He made no effort to determine

whether the jail's policies and procedures comported with national standards.  Id. at 38.

He could not recall being asked to review such policies.  Id. at 40-41.  He was unaware

of the procedures to be used when new prisoners arrive at the jail who have

prescription medication, nor did he know about the procedures used by the County to inform the receiving institution about the health needs of transferred inmates.  Id. at 39-40, 42.  Depner had not reviewed any nursing assessment protocols, nor had he performed annual reviews at the jail.  Id. at 43.  He had never attended any administrative meetings in relation to the jail.  Id.

Depner testified that his role was to "review periodically charts of inmates that Ms. Ralyea" saw and to be "available for phone consultation."  Id.  at 22.  Ralyea called him "a couple times a year" for such consultation.  Id.  Shown copies of prison policies at his deposition, Depner could not recall having seen them before.  Id. at 23-25.  Depner testified that he had come to the jail once in has capacity as medical director.  Id. at 29.  He did so to review an incident where an inmate had died; he had never gone to the jail to treat a live patient.  Id.  Depner's role in reference to the jail came largely in his review of inmate patient files.  Id. at 30-32.  He was not aware that he was designated as the physician for the jail's patients.  Id. at 36.  Instead, his role as medical director consisted mainly of "answer[ing] questions at the jail and back[ing] up the nurse-practitioner."  Id. at 42.

The Court finds that a question of fact exists over whether Dr. Depner breached any duty he had to establish policies and procedures that protected patients who, like the Decedent, had serious medical conditions that required medication and careful monitoring of that medication.  The Court recognizes that there is likewise a factual dispute about what responsibility Dr. Depner had to establish those roles.  While there is evidence, particularly in the testimony of Ralyea, that Dr. Depner's role as medical director at the jail did not involve anything but reviewing an occasional chart, there is

21

also evidence a jury could use to determine that he had a larger responsibility than the one he took, and that he should be responsible for the jail's allegedly inadequate policies.   Evidence in the record indicates that, as medical director, Depner was charged with overseeing and reviewing the policies in place at the jail.  Using Plaintiff's expert report,[4] combined with the testimony of Nurse Ralyea about Dr. Depner's supervisory relationship over her and Depner's own understanding of his role, a jury could find that Defendant had a duty to establish policies and procedures for the examination of inmates and the administration of medication to them, and that he breached that duty by failing to provide any proper standards for treating inmates who arrived with Decedent's illnesses and medications.   The jury will have to sort out the precise lines of medical authority at the jail; Ralyea's testimony indicates that any formal labels regarding authority may not have reflected actual practice.  Read in the light most favorable to Plaintiff, the non-moving party, however, the record indicates that a jury could find that Dr. Depner failed to establish proper policies, procedures and supervision of medical care in the jail.  The motion will be denied in this respect.

### b.    Constitutional Violation

Depner argues as well that he cannot be liable for violating Decedent's constitutional rights.  He contends that he is not a state actor and therefore cannot be responsible under 42 U.S.C. § 1983.  Even if he were a state actor, Depner insists, he could not be personally liable because he did not provide any care to the Decedent.  No

---

[4]In reply, Defendant criticizes the conclusions of the expert report with respect to Dr. Depner's role in setting medical policies at the jail.  Defendant's criticism of the report's conclusions is an issue for the jury.

evidence exists to prove Defendant Depner was deliberately indifferent to a serious medical need of the Decedent, nor is there evidence to show a failure to supervise medical care in the Jail.  Depner also asserts a qualified immunity defense.

### i. State Action

Defendant Dr. Depner argues that he cannot be liable for any constitutional violations because he was not a state actor but merely a private party.  Plaintiff brings his constitutional claims pursuant to 42 U.S.C. § 1983.  "To state a § 1983 claim, a plaintiff must establish that the defendant deprived him of a federal or constitutional right while acting under the color of state law."  Cox v. Warwick Valley Cent. Sch. Dist., 654 F.3d 267, 272 (2d Cir. 2011).  No action exists for "'merely private conduct, no matter how discriminatory or wrongful'" Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49-50 (1999) (quoting Blum v. Yaretsky, 334 U.S. 1, 13 (1948)).   To establish state action, Plaintiffs must show that the person who caused their constitutional deprivation "'may fairly be said to be a state actor.'" Grogan v. Blooming Grove Volunteer Ambulance Corps, 768 F.3d 259, 264 (2d Cir. 2014) (quoting Cranley v. Nat'l Life Ins. Co. of Vt., 318 F.3d 105, 111 (2d Cir. 2003)).  State action occurs when "the 'allegedly unconstitutional conduct is fairly attributable to the State.'" Id. (quoting Sullivan, 526 U.S. at 50).  When a plaintiff contends that a private actor violated her rights, the plaintiff proves state action "by demonstrating that 'there is such a close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.'"  Id. (quoting Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. , 288 295 (2001)).

To determine whether the behavior can be attributed to the state, the Court must

"[identify] 'the specific conduct of which the plaintiff complains, rather than the general characteristics of the entity.'" Id. (quoting Fabrikant v. French, 691 F.3d 193, 207 (2d Cir. 2012)). In making this determination, Courts employ a number of factors, including "[t]hree main tests[.]" Fabrikant, 691 F.3d at 207. Those tests are:

> (1) [when] the entity acts pursuant to the coercive power of the state or is controlled by the state ('the compulsion test'); (2) when the state provides significant encouragement to the entity, the entity is a willful participant in joint activity with the sate, or the entity's functions are entwined with state policies ('the joint action test' or 'close nexus test'); or (3) when the entity has been delegated a public function by the state ('the public function test')

Id. (quoting Syblaski v. Indep. Grp. Home Living Program, 546 F.3d 255, 257 (2d Cir. 2008)). The Supreme Court has concluded that "a physician employed . . . to provide medical services to state prison inmates, acted under color of state law for purposes of § 1983 when undertaking his duties in treating petitioner's injury." West v. Atkins, 487 U.S. 52, 54 (1988). The Court found that "[s]uch conduct is fairly attributable to the state." Id. A prison physician is a state actor even if not officially a state employee: "[i]t is the physician's function within the system, not the precise terms of his employment, that determines whether his actions can be fairly attributed to the State." Id. at 55-56.

While the conduct for which the Court finds Defendant Depner potentially liable did not include providing direct treatment to the Decedent, the Court nevertheless finds such conduct "fairly attributable to the state." Depner had a contract with the prison to serve as medical director, and there is evidence a jury could use to find him responsible for establishing the policies and procedures used to treat inmates like the Decedent. While Defendant is correct that "[p]ersonal involvement of the defendant in the alleged deprivation is a prerequisite to recovery of damages under § 1983," courts have also

concluded that an actor can have "personal involvement" if "the defendant (1) created or permitted the continuance of a policy that caused the alleged deprivation, (2) failed to remedy the alleged deprivation after learning of it, or (3) was grossly negligent in managing subordinates who caused the alleged deprivation." K & A Radiologic Tech. Servs. v. Commissioner of the Dep't of Health, 189 F.3d 273, 278 (2d Cir. 1999). As explained above, Plaintiff has submitted evidence by which a reasonable juror could find that Defendant Depner created or permitted the continuance of the policies concerning inmates who arrived with a serious medical condition and who required numerous prescription medications. A juror could also conclude that those policies were inadequate. A reasonable juror could also find that the inadequacies in those policies harmed Decedent. Evidence therefore exists to find that Defendant Depner engaged in the requisite personal involvement in Plaintiff's injuries to be considered a state actor. See, e.g., Brock v. Wright, 315 F.3d 148, 166-67 (2d Cir. 2003) ("While liability may not be established against a defendant simply because that defendant was a 'policy maker' at the time unconstitutional acts were committed, where unconstitutional acts are *the result* of a policy promulgated by the defendant, a valid § 1983 action may lie.") (internal citations omitted) (emphasis in original).

Plaintiff also points to evidence that Dr. Depner, despite responsibilities assigned to him to monitor patient care and ensure that the jail provided adequate medical services, made no efforts to evaluate policies in the jail or insure that medical staff at the prison followed those policies. Plaintiff argues that such conduct is evidence that Depner was "grossly negligent in managing the subordinates who caused the unlawful event." (Plaintiff's Response, dkt. # 335, at 45). Plaintiff's argument, however, does

not point to any particular supervision of any other medical care provider, but instead appears to reference only Depner's alleged failure to craft and monitor policies for managing inmate's medical conditions. As explained above, the evidence is clear that Depner did not provide any direct care to Decedent and no evidence indicates that he had any information about the particular care Decedent received before her death. Plaintiff therefore could not prevail on a claim that Depner was "grossly negligent in managing subordinates who caused the alleged deprivation."

Still, because there is evidence a jury could use to find that Depner created or permitted a policy to continue that caused the alleged deprivation, the motion for summary judgment will be denied on this basis..

### ii.    Deliberate Indifference

Liability here also requires a showing that Depner "deprived [Decedent] of a federal or constitutional right while acting under the color of state law." <u>Cox</u>, 654 F.3d at 272. Plaintiff's claim is that Defendant violated the due process rights of Decedent, an immigration detainee. Courts have found that pre-trial detainees, like the Decedent here not convicted of any crime, making a claim for inadequate medical care have rights "at least as great as those of a convicted prisoner" under the Eighth Amendment's prohibition of cruel and unusual punishment. <u>Weyant v. Okst</u>, 101 F.3d 845, 856 (2d Cir. 1996)[5]; <u>see also</u>, <u>Cuoco v. Mortisugu</u>, 222 F.3d 99, 106 (2d Cir.

---

[5]Plaintiff contends that a recent Supreme Court holding requires the Court to apply a standard other than deliberate indifference here; Defendants disagree. <u>Kingsley v. Hendrickson</u>, decided this year, concerned the standard for determining whether officers used excessive force, violating the constitutional rights of a pre-trial detainee. See <u>Kingsley v. Hendrickson</u>, 192 L.Ed.2d 416 (2015). The Court concluded that–unlike a prisoner after conviction, who must show that an officer

2000)("We have often applied the Eighth Amendment deliberate indifference test to

pre-trial detainees bringing actions under the Due Process Clause of the Fourteenth

---

subjectively knew that the force used was excessive to obtain Eighth-Amendment relief–"a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable" to prevail under the due process clause. Id. at 426. The crucial distinction for the Court was the nature of the detainee's claims: they were Fourteenth Amendment Due Process claims, as opposed to the Eighth Amendment cruel and unusual punishment claims convicted prisoners bring in the excessive force context. Id. at 428-429. The Court did not need to determine under the circumstances whether a "punishment [was] unconstitutional," and thus an objective standard could apply. Id. at 429. Plaintiff asserts that a similar, less demanding, standard should apply to medical treatment claims. He points to no case law that establishes this standard, but instead contends that the Supreme Court's determination that a clear distinction exists between Eighth Amendment and Fourteenth Amendment Due Process claims mandates that a new standard be applied because prisoners are subject to punishment and detainees are not. A case cited by the Plaintiff, Turkmen v. Hasty, No. 13-1002, 2015 U.S. App. LEXIS 10160 at *77 n.34 (2d Cir. June 17, 2015), noted that the "deliberate indifference" applied to both prisoners and pre-trial detainees, but declined to address whether "civil immigration detainees should be governed by an even more protective standard than pretrial criminal detainees." Turkmen was decided a week before Kingsley. The Court is unconvinced that Kingsley mandates a different standard for immigration detainees than for pre-trial detainees. Kingsley did not address that question, and could not have, since the detainee alleging excessive force in that case was "detained in jail prior to trial[.]" Kingsley, 192 L.Ed.2d at 423. Thus, the question for the Court in Kinglsey was how (and whether) to distinguish between excessive-force claims brought under the Eighth and Fourteenth Amendments, not the general standard to be applied to constitutional claims brought by immigration detainees. As explained above, the Second Circuit has already answered the question of whether the deliberate indifference standard applies to pre-trial detainees asserting medical claims and concluded that it does. Nothing in Kingsley undermines that holding. Moreover, the Second Circuit in Turkmen did not decide that civil immigration status disrupted the deliberate indifference standard, and the Court sees no reason to abandon a standard that Courts have determined applies to persons in detention, whether convicted of a crime and thus subject to punishment or held prior to trial, and thus eligible for more extensive protection. The deliberate indifference standard recognizes the unique demands for health care in jails, and the same logic that would apply that standard to pre-trial detainees counsels that the standard apply to civil immigration detainees like the Decedent. In any case, the Court concludes that Plaintiff may prevail under the deliberate indifference standard. The Court will of course permit the parties to argue about the proper standard before trial–any changes in the controlling law should be argued by the parties in proposing jury instructions.

Amendment.").  Under that standard, prisoners are not entitled to "'unqualified access to health care[.]" <u>Hernandez v. Keane</u>, 341 F.3d 137, 144 (2d Cir. 2003) (quoting <u>Hudson v. McMillian</u>, 503 U.S. 1, 9 (1992)).  Still, a prisoner "can nevertheless prevail on an Eighth Amendment claim arising out of medical care by showing that a prison official acted with 'deliberate indifference' to the inmate's serious medical needs."  <u>Id.</u> (quoting <u>Hathaway v. Coughlin</u>, 37 F.3d 63, 66 (2d Cir. 1994)).  "An official acts with deliberate indifference when that official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" <u>Chance</u>, 143 F.3d at 702 (quoting <u>Farmer v. Brennan</u>, 511 U.S. 825, 837 (1994)).

In this case, any deliberate indifference for which Defendant Dr. Depner could be responsible must be connected to the policies which he allegedly promulgated or failed to promulgate.  In <u>Brock v. Wright</u>, cited above, the Second Circuit Court of Appeals found summary judgment inappropriate for the Chief Medical Director of the New York Department of Corrections.  <u>Brock</u>, 315 F.3d at 158.  The plaintiff in <u>Brock</u> was injured when another inmate slashed his face with a knife.  <u>Id.</u> at 160.  Plaintiff alleged that he had been subjected to "painful and disfiguring keloid" because "various DOCS employees . . . wrongfully, and in violation of the Eighth Amendment, prevented him from obtaining the care of a dermatologist."  <u>Id.</u>  Among the defendants was the Medical Director, who had promulgated a policy that declared keloids "among the 'conditions and services which, absent the existence of *collateral symptoms*, are considered prima facie medically unnecessary."  <u>Id.</u> at 165.  The Court found that the policy could be read

as "intended to bar the treatment of a keloid for purposes of alleviating moderate, but persistently chronic, pain in a body part," and did so in plaintiff's case Id. at 166. Since the defendant doctors in the case had "'properly implemented' the policy," the policy was therefore "the reason for their actions[.]" Id. That failure to treat could reasonably be found deliberate indifference, and a reasonable juror could conclude that "unconstitutional acts would then have occurred as a result of the policy promulgated by" the Defendant. Id.

This case is similar. While there is a dispute about whether Depner promulgated the policies that injured the Decedent, there is evidence–as explained above–by which the jury could find that he was responsible for those policies. There is also evidence by which a jury could find that Depner was responsible for policies which were followed by the prison medical staff and caused Decedent to be deprived of essential medication and denied vital examinations which could have detected a need for additional treatment and diagnosis. A jury could likewise find that these failings injured Decedent and played a role in her demise. Because evidence exists that Depner was responsible for policies that led medical staff to ignore Decedent's serious need for proper medication and treatment, and that medical staff followed the policies as designed, the Court must conclude that a reasonable juror could find Defendant Dr. Depner deliberately indifferent to a serious medical need. The motion for summary judgment will be denied on this basis.

### iii. Qualified Immunity

Defendant Dr. Depner also asserts that, even if he could somehow be found liable for violating Decedent's constitutional rights, he should be entitled to qualified

immunity. "Qualified immunity is an affirmative defense that shields government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Stephenson v. Doe, 332 F.3d 68, 76 (2d Cir. 2003) (quoting McCardle v. Haddad, 131 F.3d 43, 50 (2d Cir. 1997)). Qualified immunity also applies when "'it was 'objectively reasonable' for [the officer] to believe that [his or her] actions were lawful at the time of the challenged act.'" Betts v. Shearman, 751 F.3d 78, 83 (2d Cir. 2014) (quoting Jenkins v. City of New York, 478 F.3d 76, 87 (2d Cir. 2007)). A right is clearly established when "'the contours of the right [were] sufficiently clear in the context of the alleged violation such that a reasonable official would understand that what he [was] doing violate[d] that right.'" Iqbal v. Hasty, 490 F.3d 143, 152 (2d Cir. 2007) (quoting Johnson v. Newburgh Enlarged Sch. Dist., 239 F.3d 246, 250-51 (2d Cir. 2001)). At the same time, "for a right to be clearly established for the purposes of a qualified immunity defense, the precise conduct at issue need not previously have been ruled unlawful." Zahrey v. Coffey, 221 F.3d 342, 357 (2d Cir. 2000).

In this respect, Dr. Depner repeats his assertion that he was not a state actor and that no constitutional violation occurred. Moreover, without asserting any particular right or theory of violation, Depner contends that "there is no clearly established right of which a physician such as Dr. Depner could reasonably have known was being violated." (Defendant's Brief, dkt. # 304-3, at 19). Plaintiff responds by arguing that Depner, who was a private citizen working under a state contract, is not entitled to

assert qualified immunity.[6]  Defendant does not address these arguments in reply and

---

[6]The parties have not adequately briefed the issue of whether qualified immunity applies to Dr. Depner, a private physician working under a contract that made him prison medical director, at least at some points in his service.  A question therefore might exist as to whether qualified immunity is even a possibility in this context.  Courts are clear that "private actors are not *automatically* immune (*i.e.*, § 1983 immunity does not automatically follow § 1983 liaiblity)[.]"  Richardson v. McKnight, 521 U.S. 399, 412 (1997).  Courts have found that immunity may be available for a private actor subject to liability under Section 1983 when granting immunity comports with "general principles of tort immunities and defenses applicable at common law, and the reasons [the Superme Court has] afforded protection from suit under § 1983."  Filarsky v. Delia, 132 S. Ct. 1657, 1662 (2012).  In determining whether immunity is available to private persons fulfilling a governmental role, then, the Court is "to look both to history and to the purposes that underlie government employee immunity in order to find the answer."  Richardson, 521 U.S. at 404.  As the Sixth Circuit has described this test, the Court must "determine whether: (1) there was a firmly rooted history of immunity for similarly situated parties at common law; and (2) whether granting immunity would be consistent with the history and purpose of § 1983."  McCullum v. Tepe, 693 F.3d 696, 700 (6th Cir. 2012).  Applying that standard, the Sixth Circuit determined that a prison psychologist employed by a private company could not claim qualified immunity in a case where he failed to provide any treatment to a patient who committed suicide.  Id. at 704.  The court found that "there does not appear to be any history of immunity for a private doctor working for the government, and the policies that animate our qualified-immunity cases do not justify our creating an immunity unknown to the common law."  Id.; see also, Tewksbury v. Dowling, 169 F.Supp.2d 103, 114-15 (E.D.N.Y. 2001) (defendants, private physicians who ordered plaintiff's civil confinement, were not entitled to qualified immunity).  The Court finds that, to the extent that Dr. Depner operated as a private physician working for the prison, he could not claim qualified immunity.  The authority cited by the Court in McCullum in holding that private physicians working for the government did not traditionally enjoy any immunity from suit is persuasive.  Moreover, the policy elements to be examined by the Court–whether immunity would serve the goals of "'(1) protecting the public from unwarranted timidity on the part of public officials'; (2) 'ensur[ing] that talented candidates were not deterred by the threat of damages suits from entering public service'; and (3) guarding against the distraction from job duties that lawsuits inevitably create–weighs against finding immunity applies.  McCullum, 693 F.3d at 704 (quoting Richardson, 521 U.S. at 408, 411).  As with other private prison employees, Dr. Depner's position as a private provider mitigates concerns about potential liability in ways not present for other public employees.  See Richardson, 521 U.S. at 410.  The parties did not fully develop this argument, and Defendant appears to offer no reply on the qualified immunity issue.  In any case, as explained above, even when considered, qualified immunity is unavailable.

does not attempt to expand on his argument that qualified immunity applies. Dr. Depner's argument instead focuses on his role within the prison health-care system and his failure to provide direct treatment to the Decedent.

Assuming that qualified immunity applies to these circumstances, the Court concludes that Defendant Dr. Depner is not entitled to summary judgment on the issue. As the Court has explained, evidence indicates that Dr. Depner failed properly to establish and monitor treatment programs in his role as prison doctor, and that a jury could find that those failings caused Decedent's harm. Plaintiff has produced evidence by which a jury could conclude that Dr. Depner was responsible for Defendants' failure to provide decedent with necessary medical treatment. There can be no doubt that a prisoner's right to adequate medical care is clearly established in federal law, and a qualified immunity defense is unavailing under these circumstances. The motion will be denied in this respect as well.

### c.    Punitive Damages

Defendant Depner next asserts that he cannot be liable for punitive damages under either New York or federal law. None of his conduct in the case, he insists, rises to the level of outrageousness  that would justify such damages. Plaintiff argues that the jury should be permitted to examine the evidence and determine the character of Defendant's conduct.

In terms of Plaintiff's Section 1983 claim, punitive damages may be recovered "'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" Lee v. Edwards, 101 F.3d 805, 808 (2d Cir. 1996) (quoting Smith v. Wade,

461 U.S. 30, 56 (1983). "To be entitled to an award of punitive damages, a claimant must show a 'positive element of conscious wrongdoing.'" <u>New Windsor Volunteer Ambulance Corps., Inc. v. Meyers</u>, 442 F.3d 101, 121 (2d Cir. 2006) (quoting <u>Kolstad v. American Dental Ass'n</u>, 527 U.S. 526, 538 (1999)). Still, for a jury to consider punitive damages, "[t]he plaintiff['s] evidence need only be enough 'to permit the factfinder to *infer* that the responsible official was motived by malice or evil intent or that he acted with reckless or callous indifference.'" <u>Cameron v. City of New York</u>, 598 F.3d 50, 69 (2d Cir. 2010) (quoting <u>New Windsor Volunteer Ambulance Corps.</u>, 442 F.3d at 122)) (emphasis in original). The Court finds summary judgment on Plaintiff's claim for punitive damages under Section 1983 inappropriate at this time. The jury should be permitted to determine whether the evidence indicates that Defendant Depner's alleged failure to act represented reckless or callous indifference.

As to the state-law claim, New York courts have concluded that "punitive damages are available for the purpose of vindicating a public right only where the actions of the alleged tort-feasor constitute gross recklessness or intentional, wanton or malicious conduct aimed at the public generally or are activated by evil or reprehensible motives." <u>Spinosa v. Weinstein</u>, 168 A.D.2d 32, 42-43, 571 N.Y.S.2d 747, 754 (2d Dept. 1991). "Punitive damages are recoverable in a medical malpractice action only where the defendant's conduct evinces 'a high degree of moral culpability,' or constitutes 'willful or wanton negligence or recklessness[.]" <u>Hill v. 2016 Realty Assoc.</u>, 42 A.D.3d 432, 433, 839 N.Y.2d 801, 802 (2d Dept. 2007) (quoting <u>Lee v. Health Force</u>, 268 A.D.2d 564, 702 N.Y.S.2d 108 (2000)); <u>see also</u>, <u>Brooking v. Polito</u>, 16 A.D.3d 898, 899, 791 N.Y.S.2d 686, 687 (3d Dept. 2005) ("In a medical malpractice action, punitive

damages are only recoverable where the conduct in question shows 'a wrongful motive on the defendant's part, willful or intentional misdoing, or a reckless indifference equivalent to willful or intentional misdoing.'") (quoting <u>Frenya v. Champlain Val. Physicians' Hosp. Med. Crt.</u>, 133 A.D.2d 1000, 1000, 521 N.Y.S.2d 150 (1987)).  As with the Section 1983 claim, the Court finds that the evidence is sufficient to permit a jury to characterize Defendant Depner's conduct and determine whether his alleged failures to act and provide training represented willful or wanton negligence or recklessness.  The motion will be denied on this basis as well.

### d.    Conclusion as to Defendant Depner

For the reasons explained above, Defendant Depner's motion for summary judgment will be denied.  A jury could find that Defendant Depner's conduct constituted both malpractice and a violation of the Decedent's ocnsistutional rights.

### B.    Motion of Defendants County of Allegany, Sheriff Rick L. Whitney, Cheryl Ralyea and Debra Harrington

Defendants County of Allegany, Sheriff Rick L. Whitney, Cheryl Ralyea and Debra Harrington (named individually or as "Allegany County Defendants") also filed a motion for summary judgment.  <u>See</u> dkt. # 311.  Defendants offer various arguments and address them to the defense of various Defendants.  The Court will address each in turn.

### i.    Facts Relevant to the Motion[7]

The Court will discuss the facts relevant to Defendant's motion in this section,

---

[7]The facts are taken from the statement of material facts filed by the moving Defendants.  The Court will cite to that statement for facts that are undisputed.  The Court will reference the Plaintiff's response to address facts which are disputed.

but will endeavor to avoid repeating the general facts relayed above.

Decedent Ireme Bamenga arrived at the Allegany County jail at around 11 p.m. on July 15, 2011. (Allegany County Defendants' Statement of Material Facts ("Allegany County Defendants' Statement"), dkt. # 311-1, at ¶ 1). The parties disagree about whether Decedent took her medications as prescribed on July 15, 2011. (Allegany County Defendants' Statement at ¶ 2; Plaintiff's Response to Allegany County Defendants' Statement ("Plaintiff's Response to Allegany Defendants"), dkt. # 336, at ¶ 2). Defendants, pointing to the testimony of Plaintiff, Decedent's husband, insist that Bamenga took her medication as directed on July 15. (Allegany Defendants' Statement at ¶ 2). Plaintiff points to a Department of Homeland Security Detainee Death Report that indicates that Plaintiff took her medication on July 14, 2011 and does not mention that she took such medication the next day. (Plaintiff's Response to Allegany Defendants at ¶ 2; see Exh. G to dkt. # 304-2).

The Defendants contend that when Defendant Debra Harrington examined Decedent on July 16 and 18, she was medically stable, did not show any signs of disease and made no complaints. (Allegany Defendants' Statement at ¶ 3). Plaintiff disputes this claim, pointing to evidence indicating that by July 18, 2011, Plaintiff had not received the appropriate medication and arguing that, under those circumstances, Bamenga was "highly unlikely to be medically stable." (Plaintiff's Response to Allegany Defendants at ¶ 3). Defendants insist that Decedent remained "medically stable" during her entire stay at the Allegany County jail. (Allegany Defendants' Statement at ¶ 4). Plaintiff disputes this, arguing that the jail's medical staff failed to follow proper procedures for monitoring Bamenga's condition, failed to perform basic exams, and

failed perform any follow-up exams. (Plaintiff's Response to Allegany Defendants at ¶ 4). Because of these failings, Plaintiff contends, "it is not possible to conclude in a medically and scientifically reliable fashion that Ms. Bamenga was medically stable" during the time she was detained at the Allegany County Jail. (Id.). Plaintiff likewise cites to his expert reports to dispute Defendants' claim that Decedent "experienced no decompensation relative to her pre-existing heart condition" while detained in Allegany County. (Plaintiffs' Response to Allegany Defendants at ¶ 5; Allegany Defendants' Statement at ¶ 5). Likewise, Plaintiff contends that a failure to perform appropriate tests explains why Decedent "did not exhibit gross signs and symptoms of decompensation prior to July 25, 2011." (Plaintiff's Response to Allegany Defendants at ¶ 6; Allegany Defendants' Statement at ¶ 6).

When Decedent arrived at the Allegany County Jail, an intake officer asked her a number of booking observation questions. (Id. at ¶ 7). He entered the information Bamenga provided into his computer. (Id.). Questions the officer asked included whether Bamenga had any medical problems and whether she was taking medication. (Id.). The intake officer forwarded Bamenga's container of medication to the Jail's medical unit. (Id.). While Plaintiff disputes the adequacy of the examination, the parties agree that Defendant nurse Debra Harrington examined Plaintiff on July 16, 2011. (Id. at ¶ 8; Plaintiff's Response to Allegany Defendants' at ¶ 8). Harrington recorded that Decedent had a prior history of congestive heart failure, hypertension and a positive Tuberculosis test. (Allegany Defendants' Statement at ¶ 9). Harrington's examination included observation, vital signs including pulse and blood pressure, listening to Bamenga's chest and lungs, and "checking" Decedent's ankles for

peripheral edema. (Id. at ¶ 10). Harrington recorded that her findings as normal, showing no peripheral edema, no acute or apparent distress, and no complaints of shortness of breath or chest pains. (Id.). Plaintiff disputes the adequacy of this examination or the documentation accompanying it. (Plaintiff's Response to Allegany Defendants' Statement at ¶ 10). Plaintiff points to Harrington's deposition to argue that she did not record any results of an edema examination or the results of a test for lung sounds. (Id.). Plaintiff also contends that Jail procedures failed to provide for any initial assessment or procedures to be used in such assessment. (Id.).

While the parties agree that Harrington looked over the container that contained Bamenga's medications, they dispute about whether this "examination" represented an exercise of medical or nursing judgment. (Allegany Defendants' Statement at ¶ 11; Plaintiff's Response to Allegany Defendants at ¶ 11). The parties agree that Bamenga provided Harrington with the names of her medications, but did not know the doses or the frequency with which she was to take them. (Allegany Defendants' Statement at ¶ 12). While Defendants contend that Harrington recorded information about the doses in Decedent's "medical chart," Plaintiff points to various affidavits and investigations in disputing this claim. (Allegany Defendants' Statement at ¶ 13; Plaintiff's Response to Allegany Defendants at ¶ 13). According to the Plaintiff, Harrington "made the limited notes she" recorded "on a copy of a booking form used by corrections officers when recording booking information about a new prisoner." (Plaintiff's Response to Allegany Defendants at ¶ 13).

The parties also dispute whether Harrington asked Decedent for the names of her treating physician and the pharmacy. (Allegany Defendants' Statement at ¶ 14;

37

Plaintiff's Response to Allegany Defendants at ¶ 14).  Defendants contend that Decedent could not provide Harrington with any of this information.  (Allegany Defendants' Statement at ¶ 14).  Plaintiff contends, again citing to the Homeland Security Department's Report, that Harrington told investigators in August 2011 that Decedent "was not asked for information on her private provider or when she was last seen."  (Plaintiff's Response to Allegany Defendants at ¶ 14).  Plaintiff does not address whether Bamenga was asked for information about her pharmacy.  (Id.).   Harrington asked Decedent to contact someone to find out her prescription information.  (Allegany Defendants' Statement at ¶ 15).

Defendants contend that Harrington determined that Decedent was stable and feeling well.  (Id. at ¶ 16).  Plaintiff disputes this statement, pointing to alleged inadequacies in Harrington's examination, including failures to take certain measurements or perform certain tests.  (Plaintiff's Response to Allegany Defendants at ¶ 16).  Defendants contend that Harrington made a "nursing judgment" to wait until the following Monday, July 18, 2011, to further evaluate Decedent.  (Allegany Defendants' Statement at ¶ 17).  On that date, Defendants insist, Defendant Cheryl Ralyea, the jail's nurse practitioner, would return, evaluate Bamenga, and order her medication.  (Id.).  Plaintiff responds, citing to various expert reports, that Harrington "had to know" that an "abrupt discontinuation of cardiac medications" would be dangerous for a patient like the Decedent, and even "potentially fatal."  (Plaintiff's Response to Allegany Defendants at ¶ 17).

On July 18, 2011, Ralyea performed a physical examination of Decedent. (Allegany Defendants' Statement at ¶ 18).  Ralyea recorded listening to Bamenga's

heart and lungs, examining her abdomen and extremities, as well as her head, eyes, ears, mouth, throat, neck, respiratory, cardiac, musculoskeletal and neurologic systems. (Id.). Ralyea concluded that Decedent was medically stable, not in acute distress, and had vital signs that were normal. (Id.). Decedent's "physical assessment was entirely normal"; she had warm and dry skin, with good color and turgor. (Id.). Bamenga was alert, oriented and cooperative. (Id.). Plaintiff disputes the accuracy of these findings, and in particular Defendants' claim that the examination was a "complete" one. (Plaintiff's Response to Allegany Defendants at ¶ 18). Plaintiff insists that Ralyea failed to perform proper diagnostic investigations and testified that she did not even consider such tests. (Id.).

During the examination, Decedent reported to Plaintiff that she had a history of prior diagnoses of congestive heart failure, high blood pressure (hypertension) and anemia. (Allegany Defendants' Statement at ¶ 19). Defendants contend that Decedent gave Ralyea the names of her medications, but was uncertain about the doses except that she took one pill twice a day and the rest once a day in the morning. (Id. at ¶ 20). Plaintiff disputes this, pointing out that Ralyea told Department of Homeland Security investigators in August 2011 that the medications she ordered were those reported by the Decedent. (Plaintiff's Response to Allegany Defendants at ¶ 20). Defendants also assert that Bamenga did not provide Ralyea with the name of her treating physician or the pharmacy where she filled her prescriptions. (Allegany Defendants' Statement at ¶ 21). Plaintiff disputes this claim, pointing out that Ralyea told investigators in August 2011 that she had not attempted to verify Plaintiff's medications before ordering them and alleging that Ralyea had not even considered seeking out Bamenga's medical

records before writing prescriptions. (Plaintiff's Response to Allegany Defendants at ¶ 21). The parties agree that Ralyea asked Bamenga to call someone for information about her prescriptions. (Allegany Defendants' Statement at ¶ 22).

Defendants allege that on July 18, 2011, Ralyea prescribed dosages for Decedent which she considered medically appropriate based on the six medications that Bamenga had identified. (Id. at ¶ 23). Plaintiff disputes this statement, pointing out that Ralyea told investigators in August 2011 that she had ordered the medications and dosages as reported by the Decedent. (Plaintiff's Response to Allegany Defendants at ¶ 23). Plaintiff also points to Ralyea's deposition, in which she testified that she had determined dosages by referring to the Nurse Practitioner's Prescribing Reference, particularly for the drugs Spironolactone and Carvedibol. (Id.). Despite Ralyea's testimony that she wrote prescriptions based on this source, Plaintiff alleges that the product label for the generic Carvedibol does not reference a 20 mg dose and clearly directs that the drug be administered twice daily for CHF. (Id.). Plaintiff contends that the dosages prescribed by Ralyea belie her claim that she used "independent medical judgement concerning dose or dosage schedule based on appropriately careful review of prescribing information for the medications she prescribed." (Id.). Ralyea prescribed the following medications for Decedent: (1) Spirolactone, 25 mg twice per day; (2) Lasix, 20 mg once per day; (3) Digoxin, .25 mg once per day; (4) Carvedilol, 20 mg once per day; (5) Lisinopril, 20 mg once per day; and (6) Aspirin, 81 mg once per day. (Allegany Defendants' Statement at ¶ 24). Defendants claim Ralyea chose these doses based on the information she received from Decedent, her examination of the Decedent, her knowledge and experience, and the Nurse Practitioner's Prescribing

Reference.  (Id. at ¶ 25).  Plaintiff disputes this statement, pointing to the errors identified with reference to ¶ 23.  (Plaintiff's Response to Allegany Defendants at ¶ 25).

After establishing these prescriptions and dosages, Ralyea determined that no further workup or consultation was necessary for the decedent at the time.  (Allegany Defendants' Statement at ¶ 26).  Plaintiff, citing to statements from Ralyea that she did not consider ordering any laboratory tests, contends that the decision not to order any additional tests was not based on any "reasoned conclusion[s]" about the need for such examinations.  (Plaintiff's Response to Allegany Defendants at ¶ 26).  The parties dispute whether Ralyea scheduled a follow-up visit with Bamenga for a week later.  (Allegany Defendants' Statement at ¶ 27; Plaintiff's Response to Allegany Defendants at ¶ 27).  Plaintiffs contend that there is no note of such an appointment in the medical file and no calendar entry noting such an appointment.  (Plaintiff's Response to Allegany Defendants at ¶ 27).  Plaintiff therefore disputes Defendants' claim that Ralyea scheduled Bamenga for an appointment as a chronic needs patient on July 25, 2011.  (Allegany Defendants' Statement at ¶ 28; Plaintiff's Response to Allegany Defendants at ¶ 28).

Ralyea filed an electronic request with Immigration and Customs Enforcement ("ICE") for a chest x-ray for Decedent on July 18, 2011.  (Allegany Defendants' Statement at ¶ 29).  The parties disagree whether Ralyea was required to seek approval from ICE before scheduling the x-ray.  (Allegany Defendants' Statement at ¶ 30; Plaintiff's Response to Allegany Defendants at ¶ 30).  While Defendants insist that Ralyea had to contact ICE for approval, Plaintiff cites to the contract between the County and ICE to argue that such approval was necessary only if the County

41

requested reimbursement for the procedure. (Id.). ICE would arrange for the transport of detainees like Decedent. (Allegany Defendants' Statement at ¶ 31).

Decedent began receiving the medications prescribed by Ralyea on the evening of July 18, 2011. (Id. at ¶ 32). She received an evening does of Spironolactone at that time, and then all six of the prescribed medications on the next day, July 19, 2011. (Id.). Plaintiff disputes that Decedent received the proper doses of her medications, and whether simply re-starting the medications after three days of abstention was proper. (Plaintiff's Response to Allegany Defendants at ¶ 32). At the Allegany County Jail, a nurse and/or officer would bring around a medication cart with cards that indicated the medications and times for each inmate. (Allegany Defendants' Statement at ¶ 33). The Defendants contend that officers requested inmates who refused medications to sign a form. (Id. at ¶ 34). Plaintiff disputes that this information is material, that the procedures were followed by guards, or that Decedent refused any medication. (Plaintiff's Response to Allegany Defendants at ¶ 34). Likewise, Plaintiff disputes the materiality of Defendants' description of the procedure inmates used to request medical care, which required inmates to fill out a request form and place it in a box in a common area. (Plaintiff's Response to Allegany Defendants at ¶ 35; Allegany Defendants' Statement at ¶ 35). Plaintiff also disputes the contents of a telephone call he and Decedent had on July 20, 2011; Defendants contend that the call describes the procedure for delivering medication to inmates. (Plaintiff's Response to Allegany Defendants at ¶ 36; Allegany Defendants' Statement at ¶ 36).

ICE informed the Allegany County Jail on July 20, 2011 that Decedent would be transferred the following day. (Allegany Defendants' Statement at ¶ 37). Ralyea

prepared a transfer form, which Plaintiff contends lacked necessary information. (Allegany Defendants' Statement at ¶ 38; Plaintiff's Response to Allegany Defendants at ¶ 38). On the transfer form, Ralyea noted that Decedent suffered from congestive heart failure and other conditions, that medication had been prescribed to her, and that no chest x-ray had yet been performed. (Allegany Defendants' Statement at ¶ 39). Plaintiff points out that the medications on the list were the medications prescribed by Ralyea, and that they listed the prescriptions, not the doses actually administered. (Plaintiff's Response to Allegany Defendants at ¶ 39).

Decedent was transferred out of the Allegany County Jail in the morning of July 21, 2011. (Allegany Defendants' Statement at ¶ 40). The parties dispute whether the transfer came before or after the time when daily medications were administered. (Id.; Plaintiff's Response to Allegany Defendants at ¶ 40). Plaintiff contends that the time listed for transfer came after the 9:00 a.m. medical rounds, and that testimony that the time of transfer explains a failure to administer medication is "speculative on its face." (Plaintiff's Response to Allegany Defendants at ¶ 40). While the medications prescribed to Decedent were transferred with her, the parties dispute whether the medications Bamgena brought with her to the Jail were also transported with her. (Allegany Defendants' Statement at ¶ 41; Plaintiff's Response to Allegany Defendants at ¶ 41).

The parties agree that Decedent never made any written complaints about her health while in the Allegany County Jail, though Plaintiff insists that she did complain about her condition. (Allegany Defendants' Statement at ¶ 42; Plaintiff's Response to Allegany Defendants at ¶ 42). Bamenga never requested to be transferred to the

43

hospital while at the Jail.  (Allegany Defendants' Statement at ¶ 43).  Neither did she fill out any sick slips or sick call requests.  (Id. at ¶ 44).

Defendants contend that since 2007 ICE has inspected the Allegany County Jail, finding the facility compliant with ICE standards.  (Allegany Defendants' Statement at ¶ 45).  Plaintiff responds that the standards to which the facility complied are not stated, but notes that the contract between ICE and Allegany County requires that the County house detainees and provide services "in accord with the most current edition of ICE National Detention Standards."  (Plaintiff's Response to Allegany Defendants at ¶ 45).  Defendants also claim that the Jail has been inspected and certified under ICE's 2000 National Detention Standards since entering into an agreement with the agency.  (Allegany Defendants' Statement at ¶ 46).  Plaintiff disputes this claim.  (Plaintiff's Response to Allegany Defendants' Statement at ¶ 46).  Though Plaintiff disclaims the relevance of such reviews, the parties agree that ICE and the New York State Commission on Correction have reviewed the Jail's policies and procedures on healthcare and found them appropriate.  (Plaintiff's Response to Allegany Defendants' Statement at ¶ 47; Allegany Defendants' Statement at ¶ 47).

The parties also disagree over whether the New York State Commission on Correction approved a staffing plan for the jail that placed a nurse practitioner or registered nurse in charge of "health care administration in correctional facilities[.]"  (Allegany Defendants' Statement at ¶ 48; Plaintiff's Response to Allegany Defendants at ¶ 48).  The Commission's staffing plan permits a nurse practitioner or registered nurse to "'implement a managed care system in the jail and monitors chronically ill inmates,' perform health assessments, and supervise pharmaceutical and medication

delivery." (Albany Defendants' Statement at ¶ 49). The plan also describes the nurse practitioner as a "'mid-level clinician' who 'performs services within the boundaries of her licensure, normally provided by a physician as well as completing tasks performed by registered nurses." (Id. at ¶ 50). Cheryl Ralyea was at the relevant times a licensed and registered Nurse Practitioner who had a collaborative agreement with the licensed physician at the prison, Dr. Depner. (Id. at ¶ 51).

The New York State Commission of Correction's Medical Review Board investigated Irene Bamenga's death. (Id. at ¶ 52). The Review Board determined that the "'case could be closed as a natural death.'" (Id.). Plaintiff responds that the determination of a natural death does not necessarily give rise to a finding that no malpractice or constitutional violation was involved in the death. (Plaintiff's Response to Allegany Defendants at ¶ 52). A review by Dr. Jeffrey Hubbard concluded that Decedent did not have uncontrolled congestive heart failure. (Allegany Defendants' Statement at ¶ 53). Plaintiff points out that Dr. Hubbard also concluded that "'the liver and lung showed congestion, indicating terminal congestive heart failure, but there were no effusions or pulmonary edema which would suggest uncontrolled chronic heart failure.'" (Plaintiff's Response to Allegany Defendants at ¶ 53). The parties dispute, citing both Dr. Hubbard's examination and Plaintiff's expert reports, whether Dr. Hubbard's examination indicates that Defendants' conduct played a role in Decedent's demise, or if the cause was her chronic condition. (Allegany Defendants' Statement at ¶ 54; Plaintiff's Response to Allegany Defendants at ¶ 54).

The parties agree that there is no documentation demonstrating that Decedent complained of pain while she was at the Allegany County Jail. (Allegany Defendants'

Statement at ¶ 55; Plaintiff's Response to Allegany Defendants at ¶ 55).  Irene

Bamenga spoke to Plaintiff, her husband, on the telephone on July 18, 2011.  (Allegany

Defendants' Statement at ¶ 56).  According to the Defendants, Bamenga told her

husband that "It is well" with her.  (Id.).  Plaintiff disputes that she made this statement,

and disputes any characterization of the statement as expressing a lack of concern with

her health.  (Plaintiff's Response to Allegany Defendants at ¶ 56).  According to

Plaintiff, the statements attributed to Bamenga could be interpreted in many ways,

given the setting and audience.  (Id.).  Likewise, the parties disagree about the meaning

and import of a statement allegedly made by Bamenga to Plaintiff on July 18, 2011,

where Defendants allege she told her husband she was "'doing fine[.]'" (Allegany

Defendants' Statement at ¶ 57; Plaintiff's Response to Allegany Defendants at ¶ 57).

Defendant Sheriff Rick L. Whitney does not manage the day-to-day operations of

the Allegany County Jail.  (Allegany Defendants' Statement at ¶ 58).  Sheriff Whitney

did not establish the medical policies at the jail.  (Id. at ¶ 59).  During Decedent's

detention in the Jail, Defendant Whitney was not aware of the events of her stay, did

not become personally involved in her medical care, and did not examine her medical

chart.  (Id. at ¶ 60).[8]

### ii.    Defendants' Motion

The Defendants raise several grounds in support of their motion.  The Court will

address each in turn, as appropriate.  The Court will apply the relevant legal standards

_____

[8]Plaintiff's Response to Defendants' Statement of Material Facts contains
numerous additional facts, supported with citations to the record.  The Court has
considered those portions of the record cited by the Plaintiff and will relate those facts
as appropriate in rendering a decision on Defendants' motion.

as articulated above, explaining any additional standards where necessary.

a.  **<u>Monell</u> Liability for the County**

Defendants first argue that no evidence supports a finding by the jury that Decedent's injuries were the result of an official policy or custom, and any claim brought against the County pursuant to 42 U.S.C. § 1983 must therefore be dismissed. Municipal liability is limited under Section 1983 by <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658 (1978).  In that case, the Supreme Court found that municipal liability existed "where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation."  <u>Segal v. City of New York</u>, 459 F.3d 207, 219 (2d Cir. 2006).  To prevail, a plaintiff must "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury."  <u>Bd. of County Commr's v. Brown</u>, 520 U.S. 397, 403 (1997).  "A government's official policy may be 'made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy.'" <u>Dangler v. New York City Off Track Betting Corp.</u>, 193 F.3d 130, 142 (2d Cir. 1999) (quoting <u>Monell</u>, 436 U.S. at 694).  "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."  <u>Connick v. Thompson</u>, 141 S. Ct. 1350, 1359 (2011).   Claims against the County would thus be proved by showing that Decedent's rights were violated "pursuant to a governmental custom, policy, ordinance, regulation, or decision."  <u>Batista v. Rodriguez</u>, 702 F.2d 393, 397 (2d Cir. 1983).  Plaintiff must demonstrate "(1) an official policy or custom that (2) causes the [decedent] to be subjected to (3) a denial of a constitutional right."  <u>Id.</u>

Defendants contend that Plaintiff's theory of liability is of two parts: (1) that Defendant Debra Harrington, as a nurse, should have acted immediately upon examining the Decedent to have Decedent seen by a nurse practitioner or doctor and provided her with medication before July 18, 2011, and (2) that Defendant Nurse Practitioner Ralyea should have prescribed medication in the exact doses prescribed by Decedent's treating physician in Massachusetts. Defendants insist that these decisions were not made pursuant to any official policy or custom and the County cannot be liable. Moreover, Plaintiff has not identified any other individuals whose rights were similarly violated by the County, and Plaintiff therefore cannot establish injury pursuant to a policy or custom. Plaintiff responds that the County's policies in staffing the jail and supervising medical care meant that there was little practical supervision of Nurse Practitioner Ralyea, and that Dr. Depner's position was so poorly overseen that the Jail Administrator was not even aware that Dr. Depner was paid by the jail or that he had any duties. Moreover, Plaintiff argues, the County did not staff the jail adequately and did not train the staff to recognize and treat conditions like the Decedent's. Indeed, guards with no adequate training often did initial screening of inmates.

The Court agrees with the Plaintiff that evidence exists by which a jury could conclude that Decedent's demise was the result of a policy or custom of Defendant Allegany County. As explained in the factual sections above, the County's policies and procedures did little to ensure that complex cases for inmates like Decedent received any particular attention. Rather than having a policy in place that would ensure that a physician or other highly trained professional were contacted to address the unique medication and health issues presented by a inmate who arrived with a deadly heart

condition and a container filled with a number of medications, the County's system simply relied on an intake officer and a nurse to gather information and perform basic tests. These procedures resulted in interruptions and delays in Decedent's receipt of her medication that Defendants' expert reports contend contributed to her death. As explained above, Plaintiff's expert reports provide additional evidence to support such claims. The motion for summary judgment must be denied in this respect.

Defendants also argue that Plaintiff cannot prove liability for failing to provide proper training in a way that violated the Decedent's constitutional rights. Under this theory of municipal liability, "[t]he existence of an official municipal policy or custom can also be demonstrated by establishing a deliberate government policy of failing to train or supervise its officers." Anthony v. City of New York, 339 F.3d 129, 140 (2d Cir. 2003). Under this theory, "[m]unicipal liability attaches only where the failure to train amounts to deliberate indifference to the rights of persons with whom the policy come in contact.'" Id. (quoting City of Canton, Ohio v. Harris, 489 U.S. 378, 388 (1989)). Liability attaches under this theory only when three "requirements" are met: "[f]irst, the plaintiff must show that a policymaker knows 'to a moral certainty' that her employees will confront a given situation." Walker v. New York, 974 F.2d 293, 297 (2d Cir. 1992). No liability attaches for failing to train "for rare or unforseen events." Id. "Second, the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult, or that there is a history of employees mishandling the situation." Id. Third, "the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." Id. at 298.

The Court first notes that courts have cast failure to provide training as simply an alternative means of proving municipal liability for a deprivation of constitutional rights. The Court finds that the facts in the record would also permit a jury to conclude that a failure to train guards and nurses to take aggressive action to determine the medical care and treatment of incoming inmates with a serious medical condition like Decedent's constitutes a deliberate indifference to the rights of persons presented for intake at the Allegany County Jail. Jail officials developed some medical procedures, and had to know that inmates would arrive with extremely serious medical conditions that required complex treatment regimens, including extensive medication. Second, these complicated medical conditions present intake officers and nurses like Harrington with difficult decisions about what to report, whom to contact, and what to do with the medication that arrived at the prison. A jury could conclude that the County did not provide training in making these decisions. Finally, as with any serious medical condition, a failure to take appropriate action to address medication issues with incoming inmates could quickly turn deadly and thus deprive the inmate of a constitutional right. The motion must be denied in this respect too.

### b.  Individual Defendants

Defendants next assert that the claims against the individual Defendants, Sheriff Whitney, Cheryl Ralyea and Debra Harrington, should be dismissed. They first argue that any claims brought against these individuals in their official capacities should be dismissed, as they are redundant with claims against the County. The Court agrees here. Courts are clear that "[o]fficial-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" Kentucky v.

Graham, 473 U.S. 159, 165 (1985) (quoting Monell, 436 U.S. at 690 n.55). "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." Id. Thus, "[a] claim against an offender in his official capacity is, and should be treated as, a claim against the entity that employs the officer[.]" Mathie v. Fries, 121 F.3d 808, 818 (2d Cir. 1997). As Plaintiff has brought such official-capacity claims, any claims against the Allegany Defendants in their official capacities are a nullity. Wallikas v. Harder, 67 F.Supp.2d 82, 83 (N.D.N.Y. 1999). The motion will be granted in this respect.

Defendants do not deny, of course, that Plaintiff could raise claims against them in their individual capacities. They instead argue that no evidence exists to support such claims. The Court will address the evidence concerning each Defendant.

### 1.    Sheriff Whitney

Defendant Sheriff Rick L. Whitney contends that he cannot be liable in this case because Plaintiff seeks to impose on him *respondeat superior* liability, which is unavailable under Section 1983. Defendant is correct that "liability for supervisory government officials cannot be premised on a theory of *respondeat superior* because § 1983 requires individual, personalized liability on the part of each government defendant." Raspardo v. Carlone, 770 F.3d 97, 116 (2d Cir. 2014). A plaintiff must introduce "[e]vidence of a supervisory official's 'personal involvement' in the challenged conduct." Hayut v. State Univ. of N.Y., 352 F.3d 733, 753 (2d Cir. 2003) (quoting Johnson v. Newburgh Enlarged Sch. Dist., 239 F.3d 246, 254 (2d Cir. 2001)). Personal involvement can include "direct participation by the supervisor in the challenged

conduct." Id. Personal involvement by a supervisor can "also be established by evidence of an official's (1) failure to take correct action after learning of a subordinate's unlawful conduct, (2) creation of a policy or custom fostering the unlawful conduct, (3) gross negligence in supervising subordinates who commit unlawful acts, or (4) deliberate indifference to the rights of others by failing to act on information regarding the unlawful conduct of subordinates." Id.

The facts, as established above and not disputed by the Plaintiff, indicate that Sheriff Whitney did not manage the Jail's day-to-day operations, did not formulate any of the medical policies in place, and had nothing to do with Decedent's care while in the jail. Plaintiff's brief offers no argument as to why summary judgment should not be granted to Sheriff Whitney on these claims, and the additional facts cited in Plaintiff's statement of material facts make no mention of any decisions made or actions taken by Defendant Whitney. The facts agreed to by the parties indicate that Sheriff Whitney was not personally involved in any of the actions, policies or decisions that allegedly harmed the decedent and violated her rights. He did nothing to establish the policies that allegedly harmed Bamenga, and he was not aware of any mistreatment of her while she was in the Jail. He thus could not fail to act after being informed of unlawful conduct, did not formulate any policies that injured Decedent, was not grossly negligent in his supervision of subordinates, and did engage in deliberate indifference to reports of misconduct. Because Plaintiff could not make out any claim of liability against Defendant Whitney under Section 1983, either for his individual or supervisory conduct, the Court will grant the Defendants' motion with respect to any Section 1983 claims raised against Defendant Whitney. As these are the only claims asserted against

Whitney, he will be dismissed from the action.

## 2. Defendants Ralyea and Harrington

Defendants Nurse Cheryl Ralyea and Nurse Practitioner Debra Harrington both argue that they cannot be liable on Plaintiff's Section 1983 claim that Decedent's due process rights were violated by Defendants' deliberate indifference to Bamenga's serious medical need. Defendants argue both that Decedent's heart condition did not represent a serious medical need and that, even if the condition were serious, Plaintiff has no evidence to establish that either defendant was deliberately indifferent to that need. The legal standard recited above with respect to the claims against Dr. Depner likewise apply to the claims against these two Defendants.

### i. Serious Medical Need

Defendants first argue that Plaintiff has presented no evidence to establish that Decedent suffered from a serious medical need when they treated her at the hospital. They argue that their failure to provide Decedent with her medication during the first few days of her stay at the jail "did not create a serious risk to Bamenga's health and she did not exhibit any signs of heart failure until several days after she was transferred from Allegany County Jail." (Defendants' Brief, dkt. # 311-2, at 7). Moreover, when Harrington and Ralyea examined Decedent, she appeared medically stable and did not show any signs of distress nor make any complaints. Medical expert reports also indicate that the doses provided the Decedent were "rational and appropriate under the circumstances," and that Decedent's medical condition while at the jail indicated that drugs kept her medically stable while at the Allegany County Jail. Id. From the Defendants' perspective, then, "plaintiff cannot raise an issue of fact that the 'allegedly

incorrect medical dosage posed an objectively serious risk to [Bamenga's] health.'" Id. at 8 (quoting Price v. Reilly, 697 F.Supp.2d 344, 359 (E.D.N.Y. 2010)).

As a general matter a claim of this sort may proceed if a defendant, "with deliberate indifference, expose[s] [a detainee]" to conditions which "pose an unreasonable risk of serious damage to [her] future health." Helling v. McKinney, 509 U.S. 25, 35 (1993). Thus, "[a] serious medical condition exists where 'the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.'" Harrison v. Barkley, 219 F.3d 132, 136 (2d Cir. 2000) (quoting Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998)). Since medical conditions "vary in severity . . . a decision to leave a condition untreated will be constitutional or not depending on the facts of the particular case." Id. at 136-137. Therefore, "a prisoner with a hang-nail has no constitutional right to treatment, but if prison officials deliberately ignore an infected gash, 'the failure to provide appropriate treatment might well violate the Eighth Amendment.'" Id. (quoting Chance, 143 F.3d at 702). In Harrison, for example, the Second Circuit noted that "[o]rdinarily, a tooth cavity is not a serious medical condition, but this is at least in part because a cavity is so easily treatable." Id. at 137. Immediate treatment is often unnecessary, but "is a degenerative condition, and if it is left untreated indefinitely, it is likely to produce agony and to require more invasive and painful treatment, such as root canal therapy or extraction." Id. "Consequently, because a tooth cavity will degenerate with increasingly serious implications if neglected over sufficient time, it presents a 'serious medical need' within the meaning of our case law." Id.

Under this standard, failing to treat congestive heart failure, which can cause a

patient's heart to stop beating, surely qualifies as a serious medical need. <u>See</u> <u>Hill v.</u> <u>Curcione</u>, 657 F.3d 116, 122 (2d Cir. 2011) ("objective" element requires a showing that "'a condition of urgency, one that may produce death, degeneration, or extreme pain exists.'") (quoting <u>Hathaway v. Coughlin</u>, 99 F.3d 550, 553 (2d Cir. 1996)). Defendants, argue, however, that the failure to treat Bamenga's congestive heart failure was not ongoing, but represented only a brief interruption in treatment that was quickly remedied and did not cause Decedent harm.

Defendants cite to the standards articulated in <u>Smith v. Carpenter</u>, 316 F.3d 178 (2d Cir. 2003). In that case, the plaintiff, who suffered from HIV, did not "[challenge] the defendants' failure to provide medical care to treat [his] medical condition" or "about the general level of HIV treatment that he received" during his incarceration. <u>Id.</u> at 184-185. "Instead," plaintiff's "Eighth Amendment claim is based solely on interruptions in the provision of HIV medication prescribed by [the defendant] doctors as part of his overall HIV treatment." <u>Id.</u> at 185. The Court of Appeals found that "[w]hen the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious to support an Eighth Amendment claim." <u>Id.</u> (quoting <u>Chance</u>, 143 F.3d at 702) (emphasis in original).

The Appeals Court concluded that in cases where a prisoner receives "appropriate on-going treatment for his medical condition" and alleges "a narrower denial of medical care claim based on a temporary delay or interruption of treatment,

the serious medical need inquiry can properly take into account the severity of the temporary deprivation alleged by the prisoner." Id. at 186. A court must consider "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract[.]" Under those terms, the plaintiff's rights are violated when the interruption in treatment "[creates] a substantial risk of injury in the absence of appropriate treatment," but not when "the alleged lapses in treatment are minor and inconsequential." Id. A jury may "consider the absence of adverse medical effects in evaluating the objective sufficiency" of an Eighth Amendment claim. Id. at 187. The jury is to evaluate "the specific factual context of each case," and "in most cases, the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm." Id. In Smith, the Court found that the jury properly considered the "absence of concrete medical injury" as a result of brief delays in HIV treatment in deciding that plaintiff's medical need was not serious. Id. at 189.

Plaintiff does not respond directly to Defendants' argument regarding an interruption in care, instead emphasizing that Decedent's condition was obviously serious, as congestive heart failure is frequently a fatal condition, and one that allegedly lead to Irene Bamenga's death while in the custody of Albany County. The Court finds that this case is different from Smith in significant ways. First, unlike in Smith, the Plaintiff here does not allege that Bamenga received adequate medical care, except for an occasional interruption in the medication she was prescribed for her condition. Instead, Plaintiff alleges, and the expert reports he provides insist, that the medical care

provided to Decedent was inadequate from the moment Bamenga arrived at Allegany County jail. Plaintiff does not contend that Defendants generally provided Bamenga with proper treatment, but injured her by failing to provide her with medication immediately when she arrived in the jail. Instead, Plaintiff contends that Defendants failed to perform appropriate testing when Bamenga arrived at the prison, failed to act in a timely fashion to establish her medical needs, failed to have in place and to follow proper procedures for chronically ill inmates, and failed to engage in basic steps to verify the medications prescribed for Bamenga were the appropriate ones for her condition. Such conduct is much different from that alleged in <u>Smith</u>, where the plaintiff did not have complaints about the general medical regimen established to treat his HIV, but about "interruptions" in the delivery of medication he had been prescribed. <u>See</u> <u>Smith</u>, 316 F.3d at 184-85. Here, Plaintiff's complaint is about the general level of care provided by the Defendants in treating Bamenga's congestive heart failure, which he contends was grossly inadequate from the start. The Court finds that the <u>Smith</u> test is inappropriate for this matter and that the evidence indicates that Plaintiff's congestive heart failure was a serious medical need.

Even applying the test in <u>Smith</u> would lead the Court to conclude that the evidence supports a finding that Plaintiff's condition represented a serious medical need. Defendants contend that, because Harrington's initial assessment of Bamenga on July 16, 2011 and Ralyea's examination on July 18, 2011 indicated that Decedent was in no acute distress and that she made no complaints about her medical condition either to the health professionals or by registering a sick call, Plaintiff cannot demonstrate any adverse medical effects from failing to provide medical treatment.

Defendants therefore contend that Bamenga did not suffer from a serious medical condition. This argument ignores, of course, the fact that Bamenga died less than two weeks after she left the Allegany County Jail, and while she was taking the medication prescribed her by Nurse Practitioner Ralyea. Plaintiff's experts contend that these doses were inappropriate, and that Ralyea failed to follow proper medical procedures in assigning them. These experts find that Bamenga died as a result of these failings.

Plaintiff has submitted the expert report of David DeNofrio, a physician and Director of the Heart Failure and Cardiac Transplantation Center at Tufts Medical Center in Boston, Massachusetts. See dkt. # 346. Dr. Denofrio is also a professor of medicine at Tufts University. Id. He is Board Certified in Internal Medicine, Cardiovascular Disease and Advanced Heart Failure and Transplant Cardiology. Id. His expert report explains:

> Any licensed health care provider–whether L.P.N., R.N. N.P. or M.D.–by virtue of basic education and training knows that continuity of care is essential to maintenance of a compensated status. The lack of continuity of care, and most especially continuity of Ms. Bamenga's pharmacological regimen in light of her underlying disease state, exemplifies an attitude of conscious disregard for the patient's health and safety that lead directly to her death. For example, Ms. Bamenga received no medication whatsoever from Friday evening July 15, 2011 until Monday evening July 18, 2011, a period of approximately 72 hours. To a high degree of medical certainty approaching 100%, this directly contributed to a decompensation of her underlying congestive heart failure . . . Irene Bamenga, at the time of her detention, was a patient with cardiomyopathy and stable, compensated congestive heart failure. The woeful mismanagement of her care at all levels at both facilities was, to a high degree of medical certainty, the cause of the decompensation of her heart failure and resulting death.

(DeNofrio Report, dkt. # 346 at 5-6, 9). A jury could certainly find that the medical need faced by Bamenga was serious considering all of the facts surrounding her condition.

Morever, the Defendant's argument appears to ignore the alleged consequences of the inadequate treatment that Bamenga supposedly received. Defendant's argument

seems to imply that, as long as the party allegedly injured by deliberate indifference to a serious medical need appeared fine at the time of the deliberate indifference, the providers of that treatment cannot be liable.  If that were the case, then the doctors who failed to treat a cavity and then saw no adverse affects from that failure when they next examined the prisoner could not be liable for failing to provide treatment.  That flies in the face of the standard articulated in <u>Harrison</u>, where simple tooth decay "left untreated indefinitely, it is likely to produce agony and to require more invasive and painful treatment, such as root canal therapy or extraction."  <u>Harrison</u>, 219 F.3d at 137. "Consequently, because a tooth cavity will degenerate with increasingly serious implications if neglected over sufficient time, it presents a 'serious medical need' within the meaning of our case law."  <u>Id.</u>

A jury could certainly find that Bamenga's congestive heart failure represented a serious medical need, and the motion will be denied on this basis.

### ii.    Deliberate Indifference

Defendants next argue that, even if Bamenga suffered from a serious medical need, no evidence exists to demonstrate deliberate indifference to that need. Defendants contend that both Ralyea and Harrington offered appropriate care to the Decedent, and that they had no knowledge that their treatment of Decedent could place her in any danger.  They provided standard treatments under the circumstances and based on the information that Bamenga supplied them about her medical condition and the medications she took.  Any failings in that treatment were at worst inadvertent failures, and not activities for which they could be liable.

Proof of deliberate indifference must show that the defendant "act[ed] with a

sufficiently culpable state of mind." <u>Salahuddin v. Goord</u>, 467 F.3d 263, 280 (2d Cir. 2006). "In medical-treatment cases not arising from emergency situations, the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." <u>Id.</u> This "deliberate indifference" is an inquiry into the defendant's "mental state," and is "equivalent to subjective recklessness, as the term is used in criminal law." <u>Id.</u> To be liable, the defendant "act or fail to act while actually aware of a substantial risk that serious inmate harm will result." <u>Id.</u> The defendant can be liable without acting "intentionally and knowingly," and a plaintiff does not need to demonstrate that the defendant "desire[d] to cause such harm or [was] aware that such harm will surely or almost certainly result." Under those circumstances, "proof of awareness of a substantial risk of harm suffices." <u>Id.</u> The awareness of risk by the defendant must be subjective. <u>Id.</u> at 281. A "defendant's belief that his conduct poses no risk of serious harm (or an insubstantial risk of serious harm) need not be sound so long as it is sincere." <u>Id.</u> A plaintiff must therefore show more than negligence by the defendant to prevail. <u>Id.</u> A "mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to a [constitutional] violation." <u>Chance v. Armstrong</u>, 143 F.3d 698, 703 (2d Cir. 1998). "Whether a treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case." <u>Id.</u>

Defendants argue that the mere fact that the doses prescribed by Ralyea for Bamenga differed from those her doctor prescribed does not demonstrate deliberate

indifference.  They contend that Ralyea used her medical judgment and prescribed doses she found appropriate, and she cannot be found deliberately indifferent for such conduct.  Defendants cast this argument in the context of cases where courts have found that mere "disagreements" over medications and treatments and the use of specialists do not constitute deliberate indifference.  See, e.g., Wright v. Genovese, 694 F.Supp.2d 137, 155 (N.D.N.Y. 2010).  In Wright, plaintiff complained of deliberate indifference by prison doctors who treated him after a heart procedure.  694 F.Supp.2d at 156-57.  Plaintiff complained that the doctors failed him because they "did not ensure that he was appropriately excused from strenuous prison labor" failed to "ensure that he scheduled for a follow-up examination with his surgeon" and "did not recommend ro prescribe adequate prescription medication."  Id. at 156.  The Court found that "[p]laintiff's disagreement with particular medical decisions by the defendants and conclusory allegations of deliberate indifference do not negate the extensive evidence that [defendants] reasonably and diligently addressed plaintiff's needs over an extended period of time."  Id. at 156-7.  This case is different, as a jury could find that the Plaintiff and Defendants have more than a simple disagreement over what medical procedures Defendants should have used in evaluating and treating Decedent's congestive heart failure.  Instead, a jury considering all of the facts of Defendants' treatment of Decedent could conclude that Defendants failed to make a legitimate effort to determine the proper treatment to provide Decedent for an extremely serious health condition.  A jury could find that Defendants' efforts to treat Decedent fell below even a minimal standard and amounted to deliberate indifference to an obviously serious condition.

61

A case cited by the Defendants is instructive. In <u>McCloud v. Delaney</u>, 677 F.Supp. 230 (S.D.N.Y. 1988), the plaintiff alleged that his Eighth Amendment rights were violated when the Defendant, a prison physician's assistant, prescribed him penicillin and forced him to take the drug, despite the plaintiff's claim that he was allergic to that medication. <u>Id.</u> at 231. The defendant had examined plaintiff, who sought treatment for nausea, chills and vomiting. <u>Id.</u> Defendant also determined that plaintiff's claimed allergy to penicillin was more likely a sensitivity. <u>Id.</u> He prescribed the drug and kept close watch over the plaintiff for any signs of allergic reaction. <u>Id.</u> None occurred, and plaintiff improved. <u>Id.</u> The court found that plaintiff could not demonstrate deliberate indifference because defendant, "in prescribing penicillin to [plaintiff], used great care." <u>Id.</u> The defendant "took the time to learn" about plaintiff's claimed allergy to penicillin and then "investigated the basis for that belief." <u>Id.</u> at 232-33. The defendant "us[ed] his professional judgment to determine that penicillin was still the best treatment." <u>Id.</u> at 233. He also advised the plaintiff to be aware of signs of an allergic reaction, and informed guards that they should "keep a close watch[.]" <u>Id.</u> Defendant checked on plaintiff "the very next morning, and made an appointment to check him again." <u>Id.</u> Such evidence, the court found, "shows a great concern for [plaintiff's] welfare." <u>Id.</u>

A jury could read the evidence against moving Defendants differently. A jury could conclude that neither Ralyea or Harrington, when informed of Plaintiff's medical condition and shown her numerous medications, made any sort of careful effort to determine the proper (and prescribed) doses of medications beyond asking Decedent to try to discover that information on her own. They placed this burden on Decedent

even though she was incarcerated, with limited access to telephones and other information.  Neither thought to call a physician to inquire about medication, and neither seemed to conclude that Decedent, especially when she lacked access to her medications and was receiving doses prescribed according to a desk manual, was deserving of any special monitoring to ensure that she did not suffer from any adverse reactions from disruptions in her medication.  A jury could conclude that the Defendant's conduct failed to "[show] a great concern for [Decedent's] welfare." McCloud, 677 F.Supp. at 233.    Thus, the motion must be denied in this respect as well.

### c.  Qualified Immunity

Defendants also assert that they are entitled to qualified immunity.  Without providing any detailed analysis, the Allegany Defendants contend that the they have established that "it was objectively reasonable for them to believe that they did not violate Bamenga's rights."

The Court will deny the motion on these grounds as well.  As explained in reference to Dr. Depner above, there can be no doubt that a jail official is aware that an inmate is entitled to adequate medical care.  There are facts here by which a jury could conclude that Defendants were deliberately indifferent to Bamenga's congestive heart failure, failing to provide her with an adequate initial assessment and then failing to make any adequate effort to determine the proper dosages of her medication. Qualified immunity is unavailable under those circumstances.

### d.       Proximate Causation

Defendants also contend that a jury could not find any of the Allegany

Defendants liable because no proof exists that their conduct caused of Bamenga's death. They point out that Decedent did not expire until days after she left Allegany County's custody, and there is no way to show that the alleged failings in the Defendants' treatment were what led to her demise.

In New York, the plaintiff in a negligence action must prove "the existence of a duty, the breach of which may be considered the proximate cause of the damages suffered by the injured party." Becker v. Schwartz, 46 N.Y.2d 401, 410, 386 N.E.2d 807, 810 (1978). "An act is a proximate cause of an injury if it is in clear sequence with the result and if it could have been reasonably anticipated that the consequences complained fo would result from the act." Ouimet v. Humble Oil & Refining Co., 55 A.D.2d 855, 856, 390 N.Y.S.2d 497, 499 (4th Dept. 1976).

To the extent that Plaintiff makes medical malpractice claims, the Court notes that "a plaintiff asserting a medical malpractice claim must demonstrate that the doctor deviated from acceptable medical practice, and that such deviation was a proximate cause of the plaintiff's injury." James v. Wormuth, 21 N.Y.3d 540, 545, 997 N.E.2d 133, 136 (2013). Unless the matter is "'within the ordinary experience and knowledge of laymen" a plaintiff alleging medical malpractice must provide "'expert medical opinion evidence'" with respect to each of these two elements. Milano v. Freed, 64 F.3d 91, 95 (2d Cir. 1995) (quoting Fiore v. Galang, 64 N.Y.2d 999, 1001, 489 N.Y.S.2d 739, 741 (1985)). If a doctor defending a malpractice case produces evidence that he did not divert from the standard of care or plaintiff was not injured by the doctor's conduct, "'the plaintiff must submit a physician's affidavit attesting to the defendant's departure from accepted practice, which departure was a competent producing cause of the injury.'"

Martin v. Siegenfeld, 70 A.D.3d 786, 788, 894 N.Y.S.2d 115, 118 (2010) (quoting

Rebozo v. Wilen, 41 A.D.3d 457, 458, 838 N.Y.S.2d 121 (2007)).  "Where the parties

offer conflicting expert opinions, issues of credibility arise requiring jury resolution."  Id.;

see also, Milano, 64 F.3d at 97 (summary judgment inappropriate when defendants'

"doctors' contentions are again contradicted by the testimony of [plaintiff's] experts at

trial").  As explained above as well, a plaintiff must prove that Defendants' conduct was

the cause of his injury to prevail on a constitutional claim.  Here, the Defendants argue

that Bamenga's death resulted from natural causes, not any of their conduct.

In short, the issue here is whether Defendants' conduct was a proximate cause

of Bamenga's death.  Defendants assert that there is no evidence to support a finding

of proximate cause on any of Plaintiff's claims.  Defendants are mistaken.  As a general

matter, a jury could certainly use evidence that moving Defendants took action to

prevent Bamenga from receiving medication after she first arrived at the Allegany

County Jail, did not perform tests necessary to evaluate her condition, and then did

nothing of substance to ensure that the dosages of medication she received were

proper for her and conclude that Defendants contributed to a disruption in medication

and failures in treatment that eventually caused Bamenga to die.  If the jury came to

that conclusion, they could conclude that Defendants' acts were in "clear sequence with

the result and if it could have been reasonably anticipated that the consequences

complained fo would result from the act[s]."  Ouimet, 55 A.D.2d at 856.

Moreover, Plaintiff has provided the expert evidence necessary both for a jury to

come to this conclusion generally and within the context of a medical malpractice claim.

As explained above, Plaintiff has submitted the expert report of Randy Werthheimer,

M.D., which alleges that the medical professionals who treated Decedent after she entered both jails deviated from the standard of care. Dr. DeNofrio's report likewise concludes that Irene Bamenga died from "decompensated cardiac failure that may also have included a cardiac arrhythmia." DeNofrio at 3. Both the County of Allegany and the County of Albany, DeNofrio finds, "[failed] to provide appropriate care and treatment" to Bamenga while she was in their custody. Id. Bamenga's death "was directly a result of the lack of appropriate care and treatment she received at both facilities." Id. DeNofrio's opinion is based on his examination of "all records from both correctional facilities, prior medical records" pertaining to Bamenga, "autopsy reports and toxicology reports[,]" the ICE Mortality Review and physician review" as well as other medical records and the depositions of Bamenga's health-care providers. Id. DeNofio points specifically to Bamenga's failure to receive any medication during the first days of her custody in the Allegany County Jail and concludes that "this directly contributed to a decompensation of her underlying congestive heart failure." Id. at 6. He explains how the failure to provide specific medications at the appropriate times and doses caused these problems. Id. at 6-8. Incorrect doses of Lasix, for instance, "further contributed to undermining and destabilizing [Bamenga's ] congestive heart failure." Id. at 7. The Allegany County jail ordered this dosage. Id. In addition, DeNofrio finds, failure to properly monitor kidney function by the medical staff at both Allegany and Albany County left them "without information that was absolutely critical to making reasoned decisions about [Decedent's] care." Id. at 8.

Defendants' experts dispute these findings, and Defendants insist that no evidence indicates that Bamenga was in any distress when she left the Allegany County

Jail.  This evidence, moving Defendants argue, indicates that no evidence supports a jury finding of proximate cause with respect to their alleged breach of the standard of care.  The Court disagrees.  While the jury will face the difficult task of determining whether Defendants' conduct was a proximate cause of Bamenga's death, Plaintiff has met his burden of providing evidence that would permit a jury to make that conclusion.  The motion will be denied in this respect as well.

### e.    Conscious Pain and Suffering

Defendants next argue that no evidence indicates that Decedent faced any conscious pain and suffering while incarcerated in the Allegany County Jail, and they therefore cannot be liable for any damages based on such suffering.  They point to two recorded phone calls from the Jail, where Bamenga told her husband (the plaintiff), that "'it is well with me'" and that she was "'doing fine'" in making this argument.

An "award of damages for pain and suffering compensates the victim for physical discomfort and anguish[.]" McDougald v. Garber, 135 A.D.2d 80, 91, 524 N.Y.S.2d 192, 198  (1st Dept. 1988).  Proof of conscious pain and suffering requires a showing of "cognitive awareness" of the injuries.  Id. at 94.  A plaintiff must provide "proof that the injured party experienced some level of cognitive awareness following the injury." Williams v. City of New York, 71 A.D.3d 1135, 1137, 898 N.Y.S.2d 208, 210 (2d Dept. 2010).  Still, "the factfinder is not required to sort out varying degrees of cognition, and the degree of pain is only a factor to be considered in determining the amount of damages, not whether damages should be awarded at all."  Id. at 1138 (internal citations omitted).  As a general matter, "an award of damages is limited to the injuries and pain and suffering caused by the defendant's negligence[.]" Melito v. Genesee

Hosp., 167 A.D.2d 842, 842, 561 N.Y.S.2d 951, 952 (4th Dept. 1990).

To support this position, Defendants point to Naughton v. Arden Hill Hosp., 215 A.D.2d 810 (3d Dept. 1995). The case in Naughton concerned allegations that doctors failed to diagnose "an acute myocardial infraction" and plaintiff sought damages for conscious pain and suffering. Id. at 811. The trial court granted judgment as a matter of law at trial. Id. at 812. The plaintiff had claimed malpractice because doctors failed to diagnose an acute myocardial infraction. Id. at 811. Because "there [was] no proof that had [decedent] been hospitalized" when he first saw a doctor "a heart attack would have been prevented or the risk of such an attack lessened," no proximate cause existed for the malpractice claim. Id. at 812. In addition, the court granted judgment on plaintiff's claim for conscious pain and suffering because "there [was] no indication in the record that [decedent] was in pain from the time he was seen by" his personal physician "until the time of his death." Id. at 813. Moreover, the medications decedent received at the hospital had "alleviated his pain and there is no proof that he was in pain thereafter." Id.

The Court will deny the motion in this respect as well. Defendants' position is that Decedent did not exhibit any pain and suffering during the time she was in Allegany County Jail, and therefore the County cannot be liable for any pain or suffering she experienced later while in the custody of the Albany County Jail. As explained above, however, Plaintiff has presented evidence indicating that Bamenga was harmed by the conduct of the Allegany County Defendants, who failed to provide her with proper medication, failed to properly prescribe medication, and failed to perform necessary medical tests. Plaintiff's expert contends that Bamenga's death was a result

of these improper medical decisions.  A jury could certainly conclude that moving

Defendants' conduct set in motion a process that led to conscious pain and suffering for

Decedent before she passed away, and that this pain and suffering was "caused by the

defendants' negligence."  Melito, 167 A.D.2d at 842.  Naughton is unavailing under

these circumstances, since there is evidence that Bamenga complained of shortness of

breath, chest pain, and other painful conditions before her death, and that such

conscious pain and suffering occurred after the allegedly negligent conduct of the

moving Defendants.

### f.      Breach of Contract

Defendants next argue that Plaintiff's breach-of-contract claims should be

dismissed.  Defendants insist that Plaintiff cannot exercise any rights as a third-party

beneficiary of the contract between the Allegany County and Immigration and Customs

Enforcement ("ICE").  Plaintiff contends that three contracts are at issue in the litigation.

First, a contract between ICE and the County of Allegany to house immigration

detainees.  Second, a contract between the United States Marshal's Service and

Albany County to house federal prisoners, including immigration detainees.  Third, a

contract between Albany County and Corizon, Inc., f/k/a Correctional Medical Services

to provide medical care for prisoners and detainees at Albany.   Decedent was an

intended beneficiary of all three contracts, Plaintiff insists, and can therefore bring a

contract claim against the County of Allegany for a breach.

In New York, "[p]arties asserting third-party beneficiary rights under a contract

must establish: '(1) the existence of a valid and binding contract between other parties,

(2) that the contract was intended for [their] benefit and (3) that the benefit to [them] is

sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate [them] if the benefit is lost.'" Mendel v. Henry Phipps Plaza W., Inc., 6 N.Y.3d 783, 786, 844 N.E.2d 748, 751 (2006) (quoting Burns Jackson Miller Summit & Spitzer v. Lindner, 59 N.Y.2d 314, 316, 464 N.Y.S. 2d 712 (1983)).  In determining whether a third party was an intended beneficiary of the contract, "[t]he focus is on the intent of the promisee, inasmuch as 'the promisee procured the promise by furnishing the consideration therefore[.]'" Logan-Baldwin v. L.S.M. Gen. Contrs., Inc., 94 A.D.3d 1466, 1468, 942 N.Y.S. 2d 718, 720 (4th Dept. 2012) (quoting Drake v. Drake, 89 A.D.2d 207, 209, 455 N.Y.S.2d 420 (1982)).  As such, "'[a] beneficiary will be considered an intended beneficiary, rather than merely an incidental beneficiary, when the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.'" Id. (quoting DeLine v. CitiCapital Commercial Corp., 24 A.D.2d 1309, 1311, 807 N.Y.S.2d 247 (2005)).  When "'performance is rendered *directly to the third party*, it is presumed that the contract was for his [or her] benefit.'" Id. (quoting Drake, 89 A.D.2d at 209) (emphasis in original).

Defendants' argument is premised on the notion that Plaintiff's decedent was not an intended third-party beneficiary of the contract and therefore Plaintiff cannot sue to enforce the contract's terms on her behalf.  Defendants cite to Abu Dhabi Commer. Bank v. Morgan Stanley & Co., 651 F.Supp.2d 155 (S.D.N.Y. 2009), for the proposition that Plaintiff must "put forward . . . contractual provisions that 'clearly evidence an intent to permit enforcement' of that contract by Bamenga" to survive judgment on this claim. (Defendants' Brief, dkt. # 311-2).  That court went on to find, however, that "'[w]hile the third-party beneficiary does not have to establish that it is explicitly mentioned in the

contract, New York law requires that the parties' intent to benefit a third-party be shown on the face of the contract.'" Id. (quoting Synovus Bank of Tampa Bay v. Valley Nat'l Bank, 487 F.Supp.2d 360, 368 (S.D.N.Y. 2007)).  Indeed, the court earlier cited to New York law to establish that "a third-party is an intended beneficiary only if 'no one other than the third-party can recover if the promisor breaches the contract' or the contract language would otherwise clearly evidence 'an intent to permit enforcement by the third party.'" Id. at 175 (quoting Debary v. Harrah's Operating Co., Inc., 465 F.Supp.2d 250, 263-64 (S.D.N.Y. 2006)).

The contract in question consists of an "Intergovernmental Service Agreement" between the United States Department of Homeland Security U.S. Immigration and Customs Enforcement Office of Detention and Removal and Defendant Allegany County.  See Exh. A to Affidavit of Christopher Ivers, dkt. # 313-1.  The agreement states its "purpose" is "to establish an Agreement between ICE and the Service Provider for the detention and care of persons detained under the authority of the Immigration and Nationality Act, as amended." Id. at Art. I ¶ A.  Among the services that the Defendant agreed to provide "detainees" like the Decedent were such "basic needs" as "safekeeping, housing, subsistence, medical and other services in accordance with this Agreement." Id. at Art. III ¶ B.  "The types and levels of services shall be consistent with those the Service Provider routinely affords other inmates." Id. The agreement addresses "medical services" directly, mandating that "[t]he Service Provider shall provide ICE detainees with on-site health care services under the control of a local government designated Health Authority." Id. at Art. VI, ¶ A.  "The Service Provider" is also required to "ensure that ICE detainees receive no lower level of on-site

71

medical care and services than those it provides to local inmates." Id. at Art. VI, ¶ D.

The Provider must provide an initial screening within twenty-four hours of a detainnees

arrival, "sick call coverage, provision of over-the counter medications . . . [and]

treatment of special needs and mental health assessments." Id. A detainee suffering

from a chronic condition "shall receive presecribed treatment and follow-up care." Id.

Decedent was clearly an intended beneficiary of this contract, which requires the

provision of medical care to detainees. Decedent was a detainee suffering from a

chronic condition, and the terms of the contract explicitly require the Defendant County

to provide her with medical services to treat and care for her condition. Since the

contract's "'performance is rendered *directly to the* [decedent], it is presumed that the

contract was for his [or her] benefit.'" Logan-Baldwin, 94 A.D.3d at1468, 720 (quoting

Drake, 89 A.D.2d at 209) (emphasis in original). The motion must be denied in this

respect.

### g        Punitive Damages

Defendants next assert that they cannot be liable for punitive damages. First,

they point out that municipalities are immune from punitive damages under Section

1983 and as such any claims against the municipality and the individual Defendants in

their official capacities must be dismissed. Moreover, none of the individual Defendants

engaged in the type of extreme and outrageous conduct for which punitive damages

are available against them under Section 1983. State law, they argue, likewise does

not permit damages against these Defendants.

Plaintiff agrees with the Defendants that punitive damages are not available

against the County under Section 1983. They are correct. See Newport v. Fact

Concerts, 453 U.S. 247, 271 (1981) ("[A] municipality is immunity from punitive damages under 42 U.S.C. § 1983.").   As the Court has already dismissed claims against the individual defendants in their official capacities, claims for punitive damages against them in their official capacities are likewise dismissed.  In terms of punitive damages against the individual defendants, the Court finds that a jury could use the evidence related above to conclude that Defendants' conduct was outrageous.  The motion for summary judgment on punitive damages will therefore be denied with respect to the individual defendants.[9]

### h.    Conclusion as to Allegany County Defendants

For the reasons stated above, the motion of the Allegany County Defendants, dkt. # 211, will be granted in part and denied in part, as follows:

1.   The motion is granted with respect to Plaintiff's claims against

Defendant Sheriff Rick L. Whitney in his individual capacity;

---

[9]Defendants' citation to Mayo v. County of Albany, 357 Fed. Appx. 339 (2d Cir. 2009) is instructive.  Defendants claim that in that case the court dismissed "plaintiff's breach of contract claim alleging that defendants failed to provide appropriate medical care in jail."  The Second Circuit surely came to the conclusion that the plaintiff could not bring a breach-of-contract claim and that plaintiff could not prevail on his claims of deliberate indifference pursuant to 42 U.S.C. § 1983 and negligence under state law. Id. at 340-343.  With regard to the plaintiff's contract claim, the court found that "[s]ince the Court has already determined that defendants were neither deliberately indifferent nor negligent in the standard of care provided to [plaintiff], we accordingly cannot find that there was a breach of contract due to defendants' alleged failure to provide appropriate care for the reasons stated above."  Id. at 343.  In other words, the Court of Appeals, contrary to Defendants' implication, did not find that the plaintiff had no right to enforce the contract as a third-party beneficiary.  Instead, the court found that the plaintiff had no evidence to prove that the defendant breached the contract.  Indeed, the court ruled explicitly that "[I]t is not disputed that a contract existed between the County of Albany and CMS for the latter to provide medical services to prisons and pretrial detainees.  Nor is it disputed that [plaintiff] was the intended beneficiary of the contract."  Id.

2.  The motion is granted with respect to Plaintiff's claims against all individual Defendants in their official capacities;

3.  The motion is granted with respect to Plaintiff's claims for punitive damages against Defendant County of Allegany pursuant to 42 U.S.C. § 1983; and

4.  The motion is denied in all other respects.

**C.    Motion of Defendants Sheriff Craig Apple and County of Albany**

Defendants Sheriff Craig Apple and the County of Albany also filed a motion for summary judgment.  The Court will address the facts related to that motion and the grounds raised by Defendants for granting the motion in turn.

### 1.    Facts Relevant to the Motion[10]

Decedent was transferred to the Albany County Correctional Facility ("ACCF") by ICE on July 21, 2011.  (Albany Defendants' Statement of Material Facts, dkt. # 307-2, ("Albany Defendants' Statement) at ¶ 16).  ACCF had a contract with ICE to house federal detainees.  (Id.).  She arrived with medications prescribed to her at the Allegany County Jail, including: ASA 81 mg (daily); Spironolactone 25 mg (twice daily); Lasix 20 mg (daily); Digoxin .25 mg (daily); and Lisinopril 20 mg (daily).  (Id.).  The parties dispute whether the daily dose of Cavedilol prescribed for Decedent contained 20 or 25 mg.  (Id.; Plaintiff's Response to Albany Defendants' Statement, dkt. # 338, ("Plaintiff's

---

[10]The Court will state the facts relevant to the motion as raised in the parties' statements of material facts, filed as required by the local rules.  The Court will cite to the Defendants' statement for facts which are uncontested, and will note those facts which are contested by the Plaintiff.  The Court will endeavor to avoid repeating facts already related above and will instead focus on those specifically relevant to the instant motion.

Response to Albany Defendants"), at ¶ 16). Officer Michael Beliveau booked Decedent into the ACCF at 5:58 p.m. and her information entered into the Offenders Management System. (Albany Defendants' Statement at ¶ 16). Decedent was then referred to the medical department for an initial medical screening. (Id.).

Debra Vogel, R.N., performed an initial medical screening at 6:30 p.m. on July 21, 2011. (Id. at ¶ 17). Defendant Corizon, Inc.,[11] had a policy for Receiving Screening. (Id.). The parties dispute whether Vogel followed this policy, and Plaintiff argues that Defendants' description of the policy is incomplete. (Id.; Plaintiff's Response to Albany Defendants at ¶ 17). Plaintiff contends that the policy provides that a detainee should receive "a prompt screening of an inmate who arrives at the facility for the purpose of 'providing continuity of care, to meet the urgent and emergent health needs, and to identify inmates who pose a threat to their own or others' health or safety and may require immediate attention.'" (Albany Defendants' Statement at ¶ 17). In addition, the Defendants assert that the policy provides for screening of suicide risks, mental illnesses, chronic medical conditions, acute medical conditions, potential withdrawl, communicable diseases, and tuberculosis. (Id.). Plaintiff contends that Vogel's screening failed to include such required elements as "recommendations for healthcare issues to follow up on routine, urgent and emergent needs"; failed to place Bamenga on a list for follow-up with a doctor or other provider, despite Bamenga's chronic condition; failed to verify that the medication and doses prescribed to Decedent were proper; failed to refer Bamenga for a chest x-ray; and failed to document her

---

[11]Corizon has filed its own motion for summary judgment.

current medications.  (Plaintiff's Response to Albany Defendants at ¶ 17).  Plaintiff also contends that Vogel failed to follow the demands of Corizon's Management of Chronic Disease Policy by neglecting to schedule an appointment with a doctor for Plaintiff. (Id.).

Vogel recorded that Decedent had a history of congestive heart failure, hypertension and anemia.  (Albany Defendants' Statement at ¶ 18).  She weighed 194 pounds and had a blood pressure of 140/88.  (Id.).  Plaintiff disputes that Decedent made no complaints about her health condition during this screening, pointing out that Bamenga reported that she had "health problems" the Jail should know about, "major medical concerns" about her heart, and that she was "not happy" with her incarceration. (Plaintiff's Response to Albany Defendants at ¶ 18).  Vogel also contacted Defendant Dr. Syed Azaz Haider-Shah[12] to obtain telephone orders for Decedent's prescriptions. (Albany Defendants' Statement at ¶ 18).  Dr. Haider-Shah ordered that the prescription regime from Allegany County be continued, except that he ordered Coreg 25 mg instead of Carvedilol 20 mg.  (Id.).  Plaintiff points out that Dr. Haider-Shah made these orders by telephone from vacation.  (Plaintiff's Response to Albany Defendants at ¶ 18).

Defendants assert that after her initial assessment Bamenga was assigned to the general population in housing unit 8 West, Left Block, cell 6, bed 2.  (Albany Defendants' Statement at ¶ 18).  Plaintiff insists that Bamenga was assigned to a "classification unit," where she was confined to her cell for 23 out of every 24 hours

_____

[12]Dr. Haider-Shah has filed his own motion for summary judgment.

from July 21, 2011 until sometime in the afternoon of July 26, 2011. (Plaintiff's Response to Albany Defendants at ¶ 18). The parties agree that by July 26, 2011 Decedent had obtained medical clearance and been assigned to housing unit 6 West. (Albany Defendants' Statement at ¶ 18; Plaintiff's Response to Albany Defendants' Statement at ¶ 18).

The parties dispute which medications Decedent received on July 21, 2011. Defendants contend that she received "all of her medications" on that day. (Albany Defendants' Statement at ¶ 19). Plaintiff disputes this claim, pointing out that Defendants' reference is unclear; "[i]s this a reference to the medications prescribed by [Defendant] Ralyea, those prescribed by Dr. Haider-Shah or . . . those prescribed by her community physicians?" (Plaintiff's Response to Albany Defendants' Statement at ¶ 19). Plaintiff contends that the evidence shows that Decedent did not receive any medications on the morning of July 21, 2011, and that she received an evening dose of Spironolactone on that day. (Id.). According to Plaintiff, this means that she failed to receive her regularly scheduled doses of carvedilol, lisinopril, furosemide, digoxin and aspirin on the 21st. (Id.). On July 22, 2011, Bamenga received all of her morning doses of medication, but was recorded as a "no show" for her evening doses. (Albany Defendants' Statement at ¶ 19). She therefore did not receive her evening dose of Spironolactone and was not prescribed a second dose of Coreg. (Id.). Plaintiff disputes that Decedent was at fault for not receiving this medication; Plaintiff insists that Defendants had a duty to investigate and determine why Decedent failed to show up for her medication call. (Plaintiff's Response to Albany Defendants at ¶ 19).

The parties agree that Decedent received the medications prescribed for her by

Dr. Haider-Shah on July 23, 2011, though they dispute whether the medications were appropriate or in line with the treatment regime prescribed for her by her own doctors. (Albany Defendants' Statement at ¶ 19; Plaintiff's Response to Albany Defendants' Statement at ¶ 19). Plaintiff also points out that Decedent did not receive an evening dose of carvedilol on any day during which she was confined in the ACCF. (Plaintiff's Response to Albany Defendants at ¶ 19). Plaintiff alleges that Dr. Haider-Shah incorrectly prescribed that medication, ignoring instructions on the packaging directing twice-daily doses. (Id.).

Plaintiff received all of the required doses of her medications as prescribed on the mornings of July 24 and July 25, 2011. (Albany Defendants' Statement at ¶ 19). She did not receive her evening medication on those dates. (Id.). Defendant contends that she was a "no show." (Id.). Plaintiff agrees that Bamenga did not receive doses in the evening, but points out again that the Carvedilol was improperly prescribed, and that Defendants did not follow proper procedure when Decedent did not show up for her medication. (Plaintiff's Response to Albany Defendants at ¶ 19).

Defendants point out that Corrections Officers, per policy, do not administer medications at the ACCF. (Albany Defendants' Statement at ¶ 19). Instead, medical staff are to perform this task pursuant to Corizon, Inc.'s policy for monitoring medication compliance. (Id.). Moreover, inmates have a right to refuse medication. (Id.). Plaintiff responds by pointing out that the Medication Administration Policy ("MAR") in place at the ACCF set out procedures for recording the administration of medications at the Jail. (Plaintiff's Response to Albany Defendants' Statement at ¶ 19). That procedure set out rules for signing the MAR and the codes to be recorded on the form when an inmate did

not receive prescribed medication. (Id.). Codes existed to state the reason for the failure to receive medication, but staff at the jail failed to follow this policy when Bamenga did not show up to receive her medications. (Id.). Plaintiff also points out that there is no documentation showing that Decedent ever explicitly refused any medication while at the ACCF. (Id.). No such refusals are recorded in the MAR. (Id.).

On July 25, 2011, a change was made to Decedent's MAR which ordered that an apical pulse be taken prior to the administration of Digoxin. (Albany Defendants' Statement at ¶ 20). The MAR directed that Digoxin should not be given with a pulse less than 60, and that if the pulse were less than 60 a physician should be notified. (Id.). On July 25, Bamenga's apical pulse was 88 and she received a dose of Digoxin. (Id.). Plaintiff points out that no record was made of the provider who ordered this change, and that failure to record such information in the MAR violated Corizon's policy. (Plaintiff's Response to Albany Defendants at ¶ 20). Plaintiff also contends that security footage indicates that Bamenga went to the medical unit on the morning of July 25, 2011, but that medical staff failed to document this interaction. (Id.). Later that day, prison officials recorded a conversation between Decedent and her husband. (Id.). The transcript of that recording, Plaintiff claims, indicates that Decedent complained to her husband that medical staff would not address her medical complaints unless she first returned to her cell and completed a request for a medical services form that could be processed. (Id.).

The parties agree that Bamenga completed two Correctional Medical Services Health Service Request Form on July 25, 2011. (Albany Defendants' Statement at ¶ 21; Plaintiff's Response to Albany Defendants at ¶ 21). The parties call these forms

"sick call slips." (Id.). The first slip indicates that Decedent was not provided with the complete dosages of her medications. (Albany Defendants' Statement at ¶ 21). The second slip stated that she was experiencing shortness of breath, palpitations when lying down, and dizziness when standing. (Id.). The parties agree that no evidence indicates how the sick call slips made their way to the bin in the nurses' station on that date. (Id. at ¶ 22). The slips coudl be given to the evening medication nurse on rounds, to a corrections officer, or to anyone working on the tier where the inmate was housed. (Id. at ¶ 22). The slips are brought to a designated "bin" in the nurses' station and the nurse on duty is tasked with triaging them. (Id.) That nurse also logs the slips into a sick call tracking log. (Id.). Once the slips are triaged, the inmate's chart is pulled and the inmate place on a list to be seen by the nurse practitioner or a physician that day or the next. (Id.). Robert LaVenutre, R.N., triaged the slip that indicated that Decedent was not receiving her medications. (Id. at ¶ 23). He did not, however, triage the slip that indicated Decedent's shortness of breath and other symptoms. (Id.). Instead, he found that second slip after Bamenga died. (Id.).

At approximately 9:40 a.m. on July 26, 2011, Nurse Practitioner Anna Paulino performed a physical assessment of the decedent. (Id. at ¶ 24). At the time, Paulino was an employee of Defendant Corizon, Inc., working pursuant to a collaboration agreement with Defendant Dr. Haider-Shah. (Id.). Paulino performed this assessment within five days of Decedent's arrival at the ACCF, which complies with Correctional Medical Service's ("CMS") policies regarding initial health assessments. (Id.).[13] Plaintiff

---

[13]CMS contracted with the County to provide medical care at the ACCF in December 2006. (Albany Defendants' Statement at ¶ 54). The parties later extended

disputes that the exam Paulino gave actually complied with the policy. (Plaintiff's Response to Albany Defendants, at ¶ 24). Plaintiff alleges that, contrary to the policy: the examination did not include certain laboratory and diagnostic tests; the results of the exam were not reviewed with a physician; no treatment plan was developed or implemented; Decedent was not referred to a physician for evaluation of her chronic condition; no detailed medication history was elicited; no physician ordered a chest x-ray and none was obtained; and, though clinically indicated, no EKG was done. (Id.). Plaintiff further argues that the examination Paulino performed was "perfunctory at best," and failed to comply with ICE standards, particularly in failing to develop any written treatment plan for Bamenga. (Id.).

Paulino testified that she reviewed Decedent intake screening form, which contained a medical and surgical history, along with other notes and documents, during that assessment. (Albany Defendants' Statement at ¶ 25). Paulino recorded that Bamenga suffered from CHF and hypertension. (Id.). The parties dispute whether Paulino documented that Decedent had failed to receive full doses of two of her medications. (Compare Albany Defendants' Statement at ¶ 25 and Plaintiff's Response to Albany Defendants at ¶ 25). Paulino also documented that she examined Bamenga's eyes and ears, listened to her heart and lungs, and took her body temperature, blood pressure and pulse rate. (Albany Defendants' Statement at ¶ 25).

---

this contract to run from January 1, 2009 to December 31, 2009, and then again from January 1, 2010 to December 31, 2010 and January 1, 2011 to December 31, 2011. (Id. at ¶ 56). On June 3, 2011, CMS and Prison Health Services merged to form Defendant Corizon, Inc. (Id. at ¶ 58). "As such, Corizon was the vendor performing health services at ACCF in July 2011[.]" (Id.).

Paulino concluded that Decedent's measurements were within normal limits. (Id.). Paulino also claimed that she was unaware of Bamenga's second sick call request, and that Decedent did not complain of any shortness of breath or chest pain during the examination or have any signs of swelling or difficulty walking a the time. (Id.). Plaintiff disputes this claim, pointing out that he had visited he Decedent at the ACCF prior to this examination, and she complained of swelling in her feet and legs. (Plaintiffs' Response to Albany Defendants at ¶ 25). Plaintiff also complains that Paulino missed a "classic sign of decompensating heart failure": the fact that Decedent had gained six pounds in five days. (Id.). Paulino assigned no clinical significance to that fact. (Id.). Moreover, Plaintiff insists, Paulino failed to perform several important tests that would have signaled Decedent's distress and which were recommended both by medical standards and CMS policies. (Id.). Paulino concluded the exam by increasing Plaintiff's dose of Coreg to twice per day and ordering Decedent to return to the Chronic Disease Clinic within 90 days. (Albany Defendants' Statement at ¶ 25). Plaintiff points out that this dose amounted to twice the dosage of carvedilol that Bamenga had been prescribed prior to her incarceration. (Plaintiff's Response to Albany Defendants at ¶ 25).

On July 26, 2011, Decedent received morning doses of all her medications. (Albany Defendants' Statement at ¶ 26). Plaintiff disputes whether these doses were appropriate for a person in Decedent's condition. (Plaintiff's Response to Albany Defendants at ¶ 26). Her apial pulse was recorded as 82 at that time. (Albany Defendants' Statement at ¶ 26). Nurses recorded Plaintiff as a no show for her evening doses of Spironolactone and Coreg on that day. (Id.).

At approximately 12:15 a.m. on July 27, 2011, Corrections Officer Thomas Alund was informed by inmates in 6 West Left Bay 3 at ACCF that Decedent was ill. (Id. at ¶ 27). Alund called for a relief officer, which would allow him to take Bamenga for medical assistance. (Id.). At 12:19 a.m., Alund notified his unit supervisor that Decedent was non-responsive. (Id.). He entered the Bay in an attempt to rouse Bamenga, but she did not respond. (Id.). Alund then called medical staff via radio and left the Bay to activate the units alarm system. (Id.). A nurse and a licensed practical nurse responded to the call. (Id.).

These nurses entered the bay at approximately 12:24 a.m. (Id. at ¶ 28). They placed the Decedent on the floor and began CPR. (Id.). The nurses used a defibrillator to no effect and then again attempted CPR. (Id.). At about 12:35 a.m., Colonie Emergency Medical Services ("EMS") arrived and took over attempts to revive Bamenga. (Id.). At 12:53 a.m., EMS transported her to Albany Memorial Hospital, where she was pronounced dead at 1:15 a.m. (Id.). Plaintiff adds that when staff first examined Decedent in the Bay they found no signs of life, no pulse, no respiration and that her pupils were fixed and dilated. (Plaintiff's Response to Albany Defendants at ¶ 28). They also found that her eyes were dry, her extremities cold and stiff, her skin cyanotic and that her temperature was 91.2 degrees. (Id.). Plaintiff asserts that this evidence indicates that Bamenga had died several hours before ACCF staff noticed her condition, and that this notice came only because other prisoners altered them. (Id.).

Dr. Jeffrey D. Hubbard performed an autopsy at the Albany Medical Center Mortuary on July 27, 2011. (Albany Defendants' Statement at ¶ 29). The parties dispute the findings of this autopsy and their significance. (Compare Albany

Defendants' Statement at ¶ 29 with Plaintiff's Response to Albany Defendants at ¶ 29).

Defendants contend that the autopsy did not reveal any effusions, pulmonary edema, peripheral edema or dependent edema, all of which would suggest uncontrolled CHF. (Albany Defendants' Statement at ¶ 29). They note that Dr. Hubbard found the cause of death as cardiomyopathy, and that he discovered no evidence of decompensation or Digoxin toxicity. (Id.). Plaintiff contends that Dr. Hubbard testified that Decedent likely died as a result of arrhythmia, which cannot be observed at autopsy and can be caused by digoxin. (Plaintiff's Response to Albany Defendants at ¶ 29). The death certificate, Plaintiff points out, was completed before Hubbard received the results of any toxicity screening for digoxin. (Id.). The results of such testing, Plaintiff contends, did contain higher-than-normal concentrations of digoxin. (Id.).

Defendant County of Albany is a New York municipal corporation. (Albany Defendants' Statement at ¶ 30). The County receives per diem compensation for any immigration detainees housed in the ACCF. (Id.). Defendant Sheriff Craig Apple was appointing Acting Sheriff of the County in June 2011 and held that position through December of that year. (Id. at ¶ 31). He was elected Sheriff in January 2012 and currently holds that position. (Id.). Defendant Apple spent about 20-25% of each eight hour day on operating the ACCF and was involved in issuing policies for the jail. (Id. at ¶ 32). These policies were shaped by the minimum standards set by the New York State Commission of Corrections. (Id.). Plaintiff points out that Sheriff Apple testified at his deposition that "policymaking at the jail 'completely falls underneath the Sheriff.'" (Plaintiff's Response to Albany Defendants at ¶ 32).

Defendant Apple testified that he learned of Bamenga's death at around 5 or 6

a.m. on July 27, 2011 when he received a phone call from Christian Clark, the Assistant Superintendent. (Albany Defendants' Statement at ¶ 33). Apple then notified the Criminal Investigations Unit, which is the standard response to such events. (Id.). According to Apple, assistants kept him informed of the situation, and he was ultimately advised that Decedent had a heart problem and died of natural causes. (Id.).

Thomas Wigger served as superintendent of the ACCF at the time of Bamenga's death. (Id. at ¶ 34). Wigger was charged with operating the facility, overseeing those operations, developing policies and procedures, and ensuring that the medical provider performed its duties. (Id.). He reported to the Sheriff. (Id.). Corrections Officers are required only to have training in First Aid and CPR. (Id.). Plaintiff points out that the medical care Wigger supervised included more than the First Aid and CPR that Corrections Officers practiced. (Plaitniff's Response to Albany Defendants at ¶ 34). From 2007 to 2011, Superintendent Wigger had daily contact with the medical unit at the ACCF. (Id. at ¶ 35). Wigger testified that he had daily contact with that unit, and the unit participated in daily department head meetings where operations were discussed. (Id.). Gloria Cooper, the Health Services Administrator, and Jill Harrington, the Director of Nursing, participated in these meetings. (Id.). Dr. Syed Azaz Haider-Shah, the Medical Director, attended occasionally. (Id.). Wigger also toured the medical unit frequently and spoke with staff about operations. (Id.).

Defendants allege that after Decedent's death, ACCF followed the jail "protocol." (Id. at ¶ 36). Each department brought its records, property and personal belongs to the jail administration. (Id.). ACCF did not collect any medications, however. (Id.). The ACCF jail administration conducted an investigation and produced an Investigative

Report, Facility Incident Report and a Facility Supplemental/Continuation Report. (Id.). Charles Higgins conducted an investigation on behalf of the Sheriff's office and found that Bamenga died of natural causes. (Id.). Plaintiff disputes that proper procedures were followed and disputes that the investigations were thorough, alleging that no witnesses were interviewed, no evidence gathered, and evidence of toxicology ignored. (Plaintiff's Response to Albany Defendants at ¶ 36).

The parties dispute the adequacy of correctional and medical staffing at the ACCF, citing to New York requirements. (See Albany Defendants' Statement at ¶¶ 37-38, Plaintiff's Response to Albany Defendants at ¶¶ 37-38). During the period in question, Albany County contracted with CMS to provide medical care at the jail. (Albany Defendants' Statement at ¶ 39). Pursuant to the agreement between CMS and the County, CMS was charged with "developing staffing plans for the medical unit." (Id.). CMS could decrease the medical staff if the inmate population experienced "a sustained decrease . . . for thirty days or longer." (Id.). Plaintiff points out that the CMS is the former name of Defendant Corizon, Inc. (Plaintiff's Response to Albany Defendants at ¶ 39). Plaintiff disputes that Albany County had no role in determining staffing levels for medical services, pointing out that the County agreed to the staffing levels proposed by CMS and that the staffing level helped determine the contract price for medical services, which was of great interest to the County. (Id.).

Defendants point out that the average daily population of the ACCF declined over the course of the contract with CMS and Corizon. (Albany Defendants' Statement at ¶ 40). The County estimated an inmate population of 850-950 at the time it solicited proposals. (Id.). By 2010, the inmate population had decreased to an average of

726.31 and was 646.87 in July 2011. (Id.). Defendants contend that staffing levels decreased in 2011 to reflect this decreased inmate population. (Id.). Plaintiff points to evidence he claims indicates that physician staffing levels were decreased by 25%, which was greater than the decrease in inmate population. (Plaintiff's Response to Albany Defendants at ¶ 40). This evidence indicates that the County "prioritized" cost reduction over medical care from physicians. (Id.). Plaintiff points to evidence that "the medical unit was 'overwhelmed'," which made it impossible for physicians to provide proper care. (Id.).

The County of Albany retained CMS to provide medical treatment to inmates and to train, supervise and staff the ACCF between 2007-2011. (Albany Defendants' Statement at ¶ 41). Wigger was in daily contact with the medical unit during this period and supervised daily meetings with medical staff. (Id.). Wigger also toured the medical facilities frequently. (Id.). Plaintiff notes that the agreement between CMS and the County provided that CMS was to provide "a program for the provision of comprehensive health care services for Albany County." (Plaintiff's Response to Albany Defendants at ¶ 41). The program was required by that agreement to meet "constitutional, correctional and community standards" and comply with applicable law. (Id.).

Defendants contend that their safety and security policies in the ACCF required that guards perform safety checks every half hour. (Albany Defendants' Statement at ¶ 42). Logs indicate that guards performed the safety checks every half hour on the evening of July 26, 2011 and the early morning of July 27, 2011. (Id.). Decedent was not classified as a special needs inmate requiring greater supervision. (Id. at ¶ 43).

87

Plaintiff points out that Bamenga apparently became more sick during the evening of July 26, 2011 and received no aid until it was too late.  (Plaintiff's Response to Albany Defendants at ¶ 42).  Plaintiff points to evidence that indicates that at 9 p.m. on July 26, 2011, a corrections officer came to Decedent's bed, yelled at her to get up and, upon receiving no response from Bamenga, asked other inmates if she had died.  (Id.).  The officer left.  (Id.).  Later, when inmates realized that Bamenga was unresponsive, they yelled for a guard to come and examine her.  (Id.).  The officer on duty came near the cell and told the women to "shut up."  (Id.).  Ten minutes later, when the inmates continued to yell for help, the officer finally examined Decedent and realized that she was non-responsive.  (Id.).  Only then did the emergency response begin.  (Id.).  Plaintiff also argues that Decedent was improperly classified given her condition, and a question of fact exists for the jury to determine whether Defendants provided proper monitoring for her.  (Id. at ¶ 43).

The ACCF had a classification procedure during the relevant time.  (Albany Defendants' Statement at ¶ 44).  According to the procedure, inmates were screened by building and medical staff and by mental health, if necessary.  (Id.).  An inmate was then placed in a housing unit and confined for 23 hours a day.  (Id.).  Such inmates were supposed to have access to medication rounds; the medication nurse distributes medication on the housing unit and the inmate is let out of her cell to take medication in the nurse's presence.  (Id.).  Within five days of booking, the inmate was to meet with the Intake Services Unit for an interview and the file sent to classification once a medical clearance form is received.  (Id.).  The classification officer used a computer to process information from the inmate's file and determines the proper classification.  (Id.

at ¶ 45).  The supervisor could override this determination, as could the medical and mental health departments.  (Id.).  The system had four levels of classification: Level 1 was a sentenced inmate classified as a "worker"; Level 2 was a non-violent offender with no disciplinary history in the ACCF; Level 3 was a medium-security inmate; and Level 4 was a high-security inmate.  (Id.).  Two other levels existed: Medical Level 5, which was determined by medical staff and Level 6, an "old designation" reserved for inmates in an intensive drug program.  (Id.).  Immigration detainees did not have a default classification.  (Id. at ¶ 46).  Inmates were to be classified within five days of their booking.  (Id.).  Plaintiff disputes whether these policies were followed in Decedent's case, pointing out that Bamenga had reported a previous positive test for tuberculosis and did not receive a chest x-ray to rule out that condition, but was still assigned to a dormitory-style housing unit.  (Plaintiff's Response to Albany Defendants at ¶ 44).  Still, Plaintiff agrees that Decedent went through the general screening process.  (Albany Defendants' Statement at ¶ 47; Plaintiff's Response to Albany Defendants at ¶ 47).

During the time period at issue, ACCF assigned an Assistant Superintendent to monitor the medical unit.  (Albany Defendants' Statement at ¶ 48).  This Assistant Superintendent, along with Richard Peters, the contract monitor, were charged with ensuring that Corizon, Inc., fulfilled its contractual obligations.  (Id.).  Peters reviewed approximately 1 per cent of patients' charts to check that tuberculosis tests and physical assessments were timely performed and providers worked their assigned hours.  (Id.).  Defendants insist that such monitoring was not designed to check the quality of care or adequacy of staffing.  (Id.).  Peters also attended CMS/Corizon Inc.'s quality assurance

meetings, but was likewise not required to assess medical staff's compliance with procedures.  (Id. at ¶ 49).  Plaintiff agrees that the testimony indicated that the monitoring was not aimed at the quality of care, arguing that "oversight was limited to those items that had a financial consequence to the County[.]" (Plaintiff's Response to Albany Defendants at ¶ 48).  Plaintiff contends that the contract with CMS/Corizon required the provision of quality care, and failing to check on the care's quality represented a failure of the County's duties.  (Id.).  Plaintiff likewise argues that Peters' attendance at quality assurance meetings served only to monitor Corizon's performance "in financial terms."  (Id. at ¶ 49).

Defendants describe means by which inmates could complain about medical care, either through the ACCF grievance process or complaints to outside figures like family, legal counsel or the County Legislature.  (Albany Defendants' Statement at ¶¶ 50-52).  Decedent did not file a grievance or other complaint regarding her care, other than filing sick slips.  (Id. at ¶ 53).  No evidence indicates that the Albany Defendants saw these slips before Bamenga's death.  (Id.).  Plaintiff points out that ACCF officials had recorded and monitored Decedent's telephone conversations, where Plaintiff alleges she expressed concern about her health condition.  (Plaintiff's Response to Albany Defendants at ¶ 53).

### 2. Albany Defendants' Argument

The Albany Defendants seek summary judgment on several grounds, which the Court will address in turn.

### a. Constitutional Claims

Defendants insist that no evidence supports Plaintiff's Fourteenth Amendment

claims against the them.  They address their argument to the two-part deliberate indifference standard related above.

### i.  Serious Medical Need

Defendants first contend that Plaintiff cannot prove that their conduct caused Decedent any harm in the objective sense and thus Plaintiff cannot prove that Decedent had a serious medical need.  The Defendants, describing this element as the "objective prong" of a deliberate indifference claim, contend that Decedent suffered two separate objective failures in treatment during her incarceration.  First, though Decedent received the same medications for her CHF and other conditions at the ACCF as she had been prescribed before her incarceration, Defendants admit that the doses she received of Lasix, Lisinopril and Coreg differed from those prescribed by her physician.  Defendants also admit that Plaintiff did not receive any evening doses of Coreg on July 22nd, 24th and 25th.  Pointing to medical screenings given at the ACCF and to their expert reports, however, Defendants contend that no evidence exists to support a claim that the failure to give the previously prescribed dosages and the denial of medication on three occasions caused Decedent to expire.   This argument is unavailing.  Whatever Defendants' experts may argue, Plaintiff has produced admissible expert reports which indicate that the failure to provide Bamenga with proper doses of medication and the failure to provide her with medication on several occasions while in the ACCF caused her death.  See, e.g., Expert Report of David DeNofrio, M.D., Exh. A to dkt. # 346, at 4; Expert Report of Monika Pilichowska, M.D., Ph.D, Exh. A to dkt. # 368 at 3-4.   Taking all inferences in the non-moving party's favor, the Court finds that exists by which a reasonable juror could conclude that Defendant's conduct meets

this element of the analysis.[14]

### ii. Deliberate Indifference

Defendants also insist that no evidence supports a claim that they acted with deliberate indifference to a serious medical need. They insist that, because the medical care received by Decedent was provided by Defendant Corizon, Inc., by virtue of a contract, Albany County and Sheriff Apple cannot be liable for the medical defendants' conduct on a theory of *respondeat superior*, but must be shown to be liable under the Monell theory of municipal liability recited above. Defendants' argument here is a bit mis-jointed: Defendants offer case law concerning the deliberate indifference standard, and then point out that they cannot be liable on a *respondeat superior* theory of liability. Next, Defendants offer a multi-part argument explaining a number of reasons why municipal liability pursuant to Monell cannot apply.[15] The Court will rely on the case law set forth above concerning municipal liability, supplementing that case law where appropriate. The Court notes, however, that Courts have concluded that a municipality can be liable for violating a plaintiff's constitutional rights in a number of ways, including: "(1) that the [municipality's] failure to train its employees amounted to deliberate

---

[14]The Court notes that Defendants' argument here is similar to that raised by Defendants Ralyea and Harrington, discussed above. The argument here fails for the same reasons as those explained above, in addition to the reasons stated here.

[15]For reasons that will become clear, the Court will not address separately each element of the Defendants' motion. The Court finds that Plaintiff has produced evidence sufficient to support a claim that Defendants' conduct amounted to deliberate indifference to a serious medical need, which is sufficient to support a 14th Amendment cause of action. The Court's opinion in this respect will largely address that evidence. Most of Defendants' argument address specific evidentiary matters–such as whether Defendants' prison policies complied with New York regulations and statutory law–that are not conclusive as to deliberate indifference.

indifference to constitutional rights; . . . (2) that there was a persistent and widespread unconstitutional governmental policy or custom; . . . or (3) that a [municipal] policymaker approved any constitutional violation." Carter v. Inc. Vil. of Ocean Beach, 759 F.3d 159, (2d Cir. 2014) (citing City of Canton v. Harris, 489 U.S. 378, 392 (1989); Monell, 436 U.S. at 691; and Roe v. City of Waterbury, 542 F.3d 31, 37 (2d Cir. 2008)).

Defendants argue that Plaintiff cannot provide any evidence to support a claim that Defendants had a policy and/or practice of limiting the medical care available to ACCF detainees in a way that violated Decedent's constitutional rights. Defendants argue that the County's medical policies were adequate and in fact exceeded minimum standards promulgated by the State of New York and the National Commission on Correctional Health Care ("NCCHC"). Since the County's policies met New York standards and the evidence indicates that the medical staff at the ACCF followed them, Defendants claim that no evidence exists by which a jury could find that Decedent's constitutional rights were violated by an Albany County policy or practice.[16] Defendants

_____

[16]Defendants' argument appears to some extent to be that, because Defendants' policies complied with state law and a national standard, they cannot have violated Decedent's constitutional rights. Defendants cite to only one case to support this proposition: Mayo v. County of Albany, 367 Fed. Appx. 339 (2d Cir. 2009), quoting a portion of the opinion that concludes that the National Commission on Correctional Health Care's standards "'which,'" according to the Defendants, are "'understood to represent the applicable standard of care for inmates.'" Id. at 343 n.3. That portion of the opinion, however, does not address any constitutional standard, but instead evaluates the issue of whether the defendants in Mayo could be found negligent for failing to prevent a suicide attempt. Id. at 342-43. The Circuit Court found that "we cannot find that [the inmate's] suicide attempt was a reasonably foreseeable consequence of defendants' actions, and we accordingly cannot find that defendants were negligent." Id. at 342. The citation provided by the Defendants here is a footnote (which Defendants do not acknowledge) to the Court's finding that "none of the tools employed indicated that [the inmate] posed a suicide risk;" which itself was one of five pieces of evidence that showed a lack of foreseeability. Id. Defendants here ask the

93

also insist that no evidence exists to support Plaintiff's claim that Defendants deprived

Plaintiff of necessary and adequate medical care, or that Defendants did not provide

emergency medical care. Defendants point to evidence and policies which they

contend demonstrate that Defendants supplied Decedent with the care necessary.

The Court will deny the motion on this basis. Plaintiff's expert reports,

particularly the report of Dr. Robert Cohen, M.D., provide evidence a jury could use to

conclude that Decedent's constitutional rights were violated by policies and/or customs

put in place by the Defendants. (See Cohen Report). Dr. Cohen, who has an extensive

background in correctional medical care, lays out a basic set of standards for intake

and screening of new inmates, and described how such policies should be crafted and

implemented. (Id. at ¶¶ 8-15). After summarizing Bamenga's condition upon arrival at

the ACCF as that of "a very complex patient" with a "very serious medical condition

[who was] receiving multiple complex medications with high toxicity and a great risk for

dangerous, life-threatening drug interactions," Dr. Cohen points to several failings in the

policies and procedures created and followed by the ACCF and Corizon, Inc., blaming

those failings for Bamenga's ultimate demise. (Id. at ¶¶ 66a-66j). Among these policy

mistakes were a failure to see a physician within 24 hours and the lack of "an intake

system that identified that a patient with multiple medical problems needed to to be

_____

Court to conclude that a footnote to a case not published in the official reporter
addressing proof of negligence mandates a finding of no deliberate indifference if any
evidence shows Defendants followed NCCHC standards. That is not the holding of
Mayo, and, as explained infra, is not the standard to be applied in this case. The
question here is whether Plaintiff has evidence a jury could use to find Defendants
liable, not whether any evidence exists to support a defense to negligence claims.

seen urgently." (Id. at ¶¶ 66a-66c). Cohen further notes that Albany and Corizon policy permitted a 14-day delay in examining patients with a chronic illness, a thirty-day delay in obtaining a chemistry panel from such patients, and a 90-day delay in obtaining an EKG." (Id. at 66c). While such delays in obtaining a chemistry panel and scheduling an EKG "places the patient at clinical risk," such delays "[decrease] the financial risk [to] Corizon and ACCF." (Id.). Dr. Cohen opines that "[t]he failure of Corizon nursing and medical staff to identify that [decedent] required urgent medical attention represents a terrible failure of their intake screening system." (Id. at ¶ 66b). A delay of 90 days between intake and examination by a physician is mandated by the ACCF/Corizon contract, but "inconsistent with the needs of many patients with chronic medical problems, including Irene Bamenga." (Id. at ¶ 75).

Moreover, the expert report concludes that policies were often ignored in practice. Dr. Cohen finds that, even though the Defendants had a policy for managing chronic diseases, "it was routinely not followed." (Id. at ¶ 68). Corizon did not provide protocols for managing cardiac illnesses that the Company recognized were necessary, and "no materials related to the appropriate evaluation and management of cardiac disease [were] present in the ACCF manuals" that Cohen reviewed. (Id. at ¶ 69). Cohen points out that Nurse Paulino failed to assess severity of Decedent's condition or order any diagnostic testing, which contradicted the alleged policy. (Id.). Moreover, though a chronic care system existed at the Jail, the system was "dysfunctional" (Id. at ¶ 74). Despite stated policy, few patients were actually seen and few of the required laboratory studies were completed. (Id.). In the end, Dr. Cohen concludes that Decedent's death was a result of both "the conscious disregard of her medical needs by

95

the physicians and nurses charged to care for her and blatant deficiencies in the system established by Allegany County, Corizon and County of Albany to provide medical care to prisoners at the ACCF."  (Id. at ¶ 82).  Plaintiff has therefore produced evidence that would allow a jury to conclude that Defendants violated Decedent's constitutional rights pursuant to an official policy and/or custom.  (Id.).

Other evidence in the case, summarized *infra*, could also be used by a reasonable juror to conclude that Defendants did not have in place proper procedures to ensure that inmates who needed medication received that medication in proper doses.  Jurors could also find that the procedures in place for medical illnesses and emergencies were inadequate to a level that gives rise to a constitutional claim.   As Dr. Cohen states it, Irene Bamenga had "multiple serious medical problems" when she was taken into custody.  (Id.).  Bamenga was "aware of her problems, she had medications with her, she was cooperative, and sought desperately to receive necessary medical care."  (Id.).  Despite the need for "careful and urgent monitoring" of her condition, "her life threatening medical problems were ignored."  (Id.).  Defendants "denied medications, denied basic necessary diagnostic testing, and, when she complained of life threatening symptoms and shortness of breath, she was ignored."  (Id.).   As explained above, despite Defendants' knowledge of Decedent's chronic condition and her need for medication, the evidence could be read to conclude that a policy or practice existed of ignoring or delaying a response to medical complaints, even by an inmate in Decedent's condition.  Similarly, a jury could conclude, given the amount of time between reports of Decedent's condition on the night of her death and an actual medical response, that Defendants had a policy and/or practice in place that led guards

and other staff to ignore medical emergencies. The motion for summary judgment will be denied on this basis as well.

Defendants also argue that Plaintiff has not produced evidence to support claims that Defendants failed to properly staff, supervise and train the medical staff at ACCF. Defendants point out that the staffing levels at the ACCF complied with New York law and staffing analyses that directed a particular level of staffing. In addition, medical staffing at the Facility was ceded in part to Corizon by the terms of the contract between the County and the company. Any decrease in staff came because of a decrease in inmate population.

In responding, Plaintiff points to policies adopted by County in 2010 that reduced the hours of the Medical Director by 25%, and which Plaintiff contends led to an inability on the part of Dr. Haider-Shah to properly monitor patients. Additionally, Albany County's contract with Corizon, Inc., made Corizon responsible for the cost of patient care and created an incentive to cut that care. These reductions, Plaintiff insists, were designed as a money-saving measure, and were not justified by any decrease in services used. Plaintiff's brief does not address the issue of inadequate training for prison staff.

Dr. Cohen points out that in 2010 the hours for Dr. Haider-Shah, the ACCF Medical Director, were reduced from 40-30 per week. (Cohen Report at ¶ 72). During 2011, Dr. Haider-Shah averaged more than 100 visits to inmates per week, while also being required to review records and laboratory studies, counter-sign verbal orders, review policies, participate and oversee quality assurance activities, and supervise Paulio, the Nurse Practitioner. (Id.). The limited time that Dr. Haider-Shah had to see

patients was inadequate to provide them with proper care: "Dr. Haider-Shah did not have the time requried to review, in a timely manner, the charts of complex patients whose admissions he had 'approved' over the weekend when he was on call."  (Id.). The Court finds that the evidence recited above and in this sections provides evidence a jury could use to conclude that Albany County's policy of reducing physician staffing at the prison caused a violation of Decedent's constitutional rights.  If a jury were to believe the Plaintiff's evidence, the cut-back in Dr. Haider-Shah's hours was motivated by the County's desire to save money, not by actual staffing needs.  Reducing those hours, moreover, led to a lack of adequate care of patients.[17]  Defendant's motion will be denied on this basis.[18]  The Defendants' motion with respect to Plaintiff's

---

[17]Defendants offer a good deal of argument concerning staffing levels, citing to New York law to argue that the medical staff at the ACCF was adequate.  Plaintiff's claims about staffing, however, appear to be confined to the cut-back in Dr. Haider-Shah's hours, and Plaintiff does not point to any other incidents of inadequate staffing in their argument.  Likewise, Plaintiff points to inadequacies in policies guiding the examination and treatment of chronically ill inmates, but does not specifically argue that training was inadequate.  These claims are more specifically related to policies and procedures than training, and Plaintiff has not pointed to any evidence of inadequate training per se.  The relevance of any evidence on these issues is one for trial, not this motion.

[18]Defendants additionally contend that Sheriff Apple cannot be liable, using arguments similar to those offered by the Allegany County Defendants concerning Sheriff Witney.  The same rules apply here.  Unlike the Allegany Defendants, the Defendants here have not argued that Sheriff Apple had no role in designing and implementing policies with respect to medical care at the jail, and thus have not argued that he could not be liable based on that role.  The jury will have to decide that issue. Defendants do argue that Sheriff Apple cannot be liable for any unconstitutional acts by the Corizon Defendants because Sheriff Apple had "no actual or constructive notice of any unconstitutional acts on the part of the medical staff and deliberately failed to take corrective action."  (Defendants' Brief, dkt. # 307-1, at 21).  The Court agrees that no evidence indicates that Sheriff Apple played any role in directly supervising the medical staff and he could not be liable on that basis.  Liability for Sheriff Apple will be dependent on the Plaintiff convincing the jury that Sheriff Apple was responsible for "creation of a policy or custom fostering the unlawful conduct[.]"  Hayut, 352 F.3d at

constitutional claim of deliberate indifference to a serious medical need will therefore be denied.[19]

### iii. Qualified Immunity for Sheriff Apple

Defendants argue that Sheriff Apple is entitled to qualified immunity because he had no knowledge or notice of any constitutional violations. Defendants' argument does not address the actual issue of qualified immunity, since Defendant argues that Sheriff Apple did not violate Decedent's constitutional rights, not that he is entitled to immunity for violating those rights because a reasonable person in his position would not clearly know that his conduct violated rights. As stated previously, "qualified immunity is an affirmative defense that shields government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Stephenson, 332 F.3d at 76. Qualified immunity also applies when "'it was 'objectively reasonable' for [the officer] to believe that [his or her] actions were lawful at the time of the challenged act.'" Betts, 751 F.3d at 83. A right is clearly established when "'the contours of the right [were] sufficiently clear in the context of the alleged violation such that a reasonable official would understand that what he [was] doing violate[d] that

753. Defendants also argue that Superintendent Wigger likewise played no role in any violation of Decedent's rights. As Wigger is not a Defendant, this is of no matter.

[19]Defendants' brief also contains sections that address alleged negligence clams against the County of Albany and violations of New York Corrections Law § 500. See dkt. # 307-1 at 28-29. Both these sections are addressed to the question of violations of Decedent's constitutional rights, however. As the Court has determined that evidence supports Plaintiff's claims that Decedent's rights were violated, the Court will not address these arguments, which simply point to other ways of proving those violations. The Court takes no position on whether Defendants could raise those arguments at trial.

right.'" Iqbal v. Hasty, 490 F.3d 143, 152 (2d Cir. 2007) (quoting Johnson v. Newburgh Enlarged Sch. Dist., 239 F.3d 246, 250-51 (2d Cir. 2001)).  At the same time, "for a right to be clearly established for the purposes of a qualified immunity defense, the precise conduct at issue need not previously have been ruled unlawful." Zahrey v. Coffey, 221 F.3d 342, 357 (2d Cir. 2000).

Defendants do not even argue that the right to medical care for a detainee was not  clearly established, or that a reasonable person in Sheriff Apple's position would not know that failing to craft and implement policies and practices to treat and protect an inmate with a chronic medical condition would amount to deliberate indifference to a serious medical need.  The Court finds that, since this right was clearly established and the Defendants do not argue otherwise and the conduct of the Defendant Apple in failing to craft and implement such policies was not objectively reasonable, the qualified immunity defense is unavailable to Sheriff Apple.  The motion will be denied on this basis as well.

### c.  Contract Claim

Defendant argues that Plaintiff cannot prevail on his claim that Decedent was a third party beneficiary of a contract to provide medical care to detainees at the ACCF, and that Defendants breached that contract.  Defendant's argument is that the County did not have a contract with Immigrations and Customs Enforcement, but instead contracted with the United States Marshals Service to house ICE detainees.  Moreover, even if the Court were to permit the contract claim to go forward based on the existence of a contract to deliver medical services to ICE detainees between the County and the Marshals Service, no evidence supports that claim because the ACCF delivered the

level of care required by the Contract.  Plaintiff contends that the Bamenga was an intended beneficiary of the contract, and that Defendants breached that contract by failing to provide appropriate medical care, causing her death.

For substantially the reasons stated with respect to the Allegany County Defendants, the Court will deny the Albany Defendants' motion in this respect as well. Bamenga was clearly an intended beneficiary of a contract to which the Defendant County was a party, wherein the parties agreed that Albany County would provide detainees with "a full range" of medical care.  A jury could certainly find evidence to support a claim that Defendants did not provide medical care.  Plaintiff has produced evidence from a jury could conclude that the medical care provided was grossly inadequate, and that the Albany Defendants were deliberately indifferent to the needs of a detainee like Bamenga.

### d. Wrongful Death Claim

Defendants also seek summary judgment on Plaintiff's wrongful death claim against the County.  Defendants apparently concede that the County could be vicariously liable for the conduct of Dr. Haider-Shah, Nurse Vogel and/or Nurse Practitioner Paulino, but they contend that the no evidence exists to support a claim that those Defendants breached the standard of care or that their actions caused Bamenga's death.  Rather than offer their own arguments, the Albany Defendants adopt the arguments of those Defendants and seek judgment on those bases. Since–as will be explained below–the Court finds that evidence exists to support Plaintiff's wrongful death claim against those Defendants, the Court will deny the Albany Defendants' motion for the same reasons.

101

### e. Conscious Pain and Suffering

Finally, Defendants argue that Plaintiff cannot produce any evidence to support a claim for conscious pain and suffering. The Court has already found that evidence exists to support such a claim. For the same reasons as stated above, the Court will deny that portion of the motion as well.

### 3. Conclusion as to the Albany Defendants

For the reasons stated above, the Albany Defendants motion for summary judgment, dkt. # 307, will be denied.

## D. Motion of Corizon, Inc., Syed Azaz Haider-Shah, M.D., Anna J. Paulino and Debra C. Vogel

Defendants Corizon, Inc., Syed Azaz Haider-Shah, M.D., Anna J. Paulino and Debra C. Vogel ("Corizon Defendants") have also filed a summary judgment motion, which the Plaintiff opposes.

### 1. Facts Relevant to the Motion[20]

At the times relevant to this dispute, Defendant Corizon, Inc., provided healthcare services to the ACCF pursuant to a contractual agreement. (Corizon Defendants' Statement of Material Facts, dkt. # 308-3, ("Corizon Defendants' Statement) at ¶ 2). Defendants Syed Azaz Haider-Shah, M.D., Anna J. Paulino, and Debra C. Vogel were at all relevant times employees of Defendant Corizon, Inc. (Id. at ¶¶ 3-5).

As described more fully above, Defendant Debra Vogel, a registered nurse,

---

[20]To avoid repetition, the Court will recite only the facts directly and uniquely relevant to deciding the Corizon Defendants' motion.

completed the medical screening of Decedent on July 21, 2011. (Id. at ¶ 67). Plaintiff

contends that Vogel's screening did not comply with ACCF policies for screening and

management of chronic diseases. (Plaintiff's Response to the Corizon Defendants'

Statement of Material Facts, dkt. # 339, ("Plaintiff's Response to Corizon") at ¶ 67).

Defendants contend that Bamenga did not voice any concerns about her health

condition to Vogel. (Corizon Defendants' Statement at ¶ 68). Plaintiff disputes this

claim, pointing out that "[i]mmediately prior to her encounter with Ms. Vogel," Bamenga

went through a booking screening. (Plaintiff's Response to Corizon at ¶ 68). In that

encounter, Decedent expressed that she was "very worried" about her medical

condition. (Id.). Plaintiff contends that this earlier statement supports an inference that

Decedent informed Vogel of her concerns and Vogel failed to record them. (Id.).

Plaintiff points to alleged failings by Vogel to record Plaintiff's diagnoses of

hypertension and anemia in her chart as evidence of her failure to record all relevant

information. (Id.). Plaintiff also alleges that Vogel violated ACCF policy by checking a

box for "no referrals," even though ACCF policies required a doctor's appointment for

any new inmate with a chronic condition. (Id.). According to Plaintiff, Vogel also

ignored certain medication requirements, meaning that Decedent was not administered

her digoxin correctly and did not have her apical pulse checked at appropriate times.

(Id.). The parties also dispute whether Vogel ordered a screening x-ray for

tuberculosis. (Corzion Defendants' Statement at ¶ 69; Plaintiff's Response to Corizon

at ¶ 69).

When Decedent arrived at the ACCF she had medications contained in blister

packs. (Corizon Defendants' Statement at ¶ 70). Those medications included: ASA 81

mg daily; Spironalactone 25 mg twice daily; Lasix 20 mg daily; Digoxin 0.25 mg daily; Lisinopril 20 mg daily; and Carvedilol 25 mg daily.  (Id.).

Defendant Dr. Haider-Shah served as medical director of the ACCF in July 2011.  (Id. at ¶ 71).  Haider-Shah was on vacation on July 21, 2011.  (Id.).  Dr. Elizabeth Kulesza was covering for him, though Dr. Haider-Smith remained on call.  (Id.).  Vogel contacted Haider-Shah concerning Decedent.  (Id.).  She informed Defendant Haider-Shah of Bamenga's diagnoses and read him the medications and dosages printed on the blister packs Decedent brought to the jail.  (Id.).  Dr. Haider-Shah ordered that these medications be continued.  (Id.).  Thus, the medications Decedent had received in Allegany County were continued at the ACCF, dispensed from the same packs as used in Allegany County.  (Id. at ¶ 72).

The parties dispute whether Decedent received all of her prescribed medication on July 21, 2011.  (Corizon Defendants' Statement at ¶ 73; Plaintiff's Response to Corizon Defendants at ¶ 73).  The Corizon Defendants note that Bamenga's records indicate that she received all of those medications at the ACCF on July 21, 2011, even though she was not present at the ACCF in the morning on that date, when the medication record states she took those drugs.  (Corizon Defendants' Statement at ¶ 73).  Without pointing to any evidence to support these claims, the Defendants speculate that either Bamenga reported to Vogel that she had taken the medication or that Vogel administered the medication later in the day.  (Id. at ¶ 74).[21]

---

[21]Corizon points to the Medication Administration Record ("MAR") completed at the ACCF concerning Bamenga.  See Dkt. # 309-32 at 3-5.  That MAR states that Bamenga received her morning medications on July 21, and a health-care provider initialed the record to show that she received them.  The record does not explain,

After her initial screening, Bamenga was held in a cell twenty-three hours a day awaiting classification. (Id. at ¶¶ 76-77). In the ACCF, medications were administered four times per day in a procedure known as the "pill pass." (Id. at ¶ 80. Two pill passes occurred in the morning, at 8 or 9 a.m. and 1 p.m., and two in the evening, at 5 p.m. and 8 or 9 p.m. (Id.). As a general matter, medications were placed on a medication cart and transported around the facility. (Id. at ¶ 81). When the cart reached a tier, a corrections officer would announce that it was time for medication rounds. (Id.). Inmates lined up to receive their medications, which would be administered by a medication administration nurse. (Id.). The medication nurse would make a record for the medications taken on each inmate's individual record. (Id.). Plaintiff points to testimony from corrections officers and other medical staff that indicates that this procedure was not uniformly followed. (Plaintiff's Response to Corizon Defendants at ¶ 81). These witnesses indicated that procedures varied for dealing with inmates who did not respond to the pill pass, and that staff often failed to take steps to investigate why an inmate did not appear for medication distribution. (Id.). Some witnesses claimed that no policy existed requiring staff to insure that individuals took their medication. (Id.). Likewise, Plaintiff disputes Defendants' claim that the floor where Decedent was initially housed was inaccessible to the medication cart, requiring that guards check to see that all inmates were able to exit their cells to obtain medication. (Corizon Defendants' Statement at ¶ 82; Plaintiff's Response to Corizon Defendants at ¶ 82).

_____

however, when these medications were administered, and, given that the medications were ordered for the morning, when Bamenga had not yet arrived at the ACCF, a jury could conclude Defendants' claims that she did take the medications in the morning are mere speculation unsupported by any actual evidence.

Plaintiff points to the testimony of the Chief of Corrections that the cells were accessible to the cart and argues that no consistent policy of opening cells to allow access to medications existed.  (Plaintiffs' Response to Corizon Defendants at ¶ 82).

Decedent received all of her morning medication doses on July 22, 2011. (Corizon Defendants' Statement at ¶ 83).  She did not receive her evening dose of Spironolactone.  (Id.).  Stephen Wallace, a nurse, marked Bamenga as a "no-show" on that date.  (Plaintiff's Response to Corizon Defendants at ¶ 83).  Plaintiff contends that recording Plaintiff as a "no show" violated the policies of the ACCF and Corizon  (Id.). Plaintiff received medication in the morning of July 23, 2011 from Nurse Genovese. (Corizon Defendants' Statement at ¶ 84).  The parties dispute Bamenga's demeanor when she received that medication.  (Id.; Plaintiff's Response to Corizon Defendants at ¶ 84).  Defendants contend Decedent was happy and responsive on that date, but Plaintiff contends that Decedent's demeanor was due not to good health but to a pending visit from her husband, and not because of good health.  (Id.).

Bamenga received all of her morning medication on July 24, 2011.  (Corizon Defendants' Statement at ¶ 85).  She was listed as a "no show" for evening medication. (Id.).  Defendants contend that Decedent received all of her medication in the morning and evening on July 25, 2011.  (Id.).  According to Defendants, Nurse Debra Vogel administered the evening dose.  (Id.).  Pointing to an ICE investigation, Plaintiff claims that no one administered the evening medication to Decedent.  (Plaintiff's Response to Corizon Defendants at ¶ 85). Plaintiff contends that the ICE report finds that nurses did nothing to seek out Decedent and administer medication on those days when she did not appear.  (Id.).  The parties dispute whether the doses Bamenga missed mandated

106

that she be counseled under Corizon's written policies, and they dispute whether Corizon actually followed those policies. (Corizon Defendants' Statement at ¶ 86; Plaitniff's Response to Corizon Defendants at ¶ 86). They parties also dispute whether Defendants properly monitored Bamenga's apical pulse and digoxin levles. (Corizon Defendants' Statement at ¶ 87; Plaintiff's Response to Corizon Defendants at ¶ 87). Plaintiff cites to his expert reports to allege that Defendants' monitoring in this level fell below the standard of care. (Plaintiff's Resposne to Corizon Defendants at ¶ 87).

Decedent reported to her husband in a telephone conversation on July 25, 2011 that she was having trouble breathing when lying down. (Corzion Defendants' Statement at ¶ 88). Plaintiff contends that in this conversation Bamenga also informed her husband she was worried she would die in prison and complained that she was not receiving her medication as prescribed.[22] (Plaintiff's Response to Corizon Defendants at ¶ 88). Decedent complained that jail staff did not listen to her complaints about difficulty breathing and did not meet her requests to take additional medication. (Id.). The parties agree that Bamenga filled out two "sick call slips," and that only one of the slips was actually processed by a nurse before she died. (Corizon Defendants' Statement at ¶¶ 89-93; Plaintiff's Response to Corizon Defendants at ¶¶ 89-93). Plaintiff contends that the failure to process the second slip represented a failure to follow Corizon's procedures and health-care standards, as well as a failure to respond to Bamenga's repeated complaints about her health condition. (Plaintiff's Response to

---

[22]The parties in this case dispute the accuracy and admissibility of translations. Those translations are not dispositive to the instant motions. The parties may choose to raise such issue at an appropriate point later in the proceedings.

Corizon Defendants at ¶¶ 91-93).

Nurse Practitioner Anna Paulino examined Bamenga on the morning of July 26, 2011.  (Corizon Defendants' Statement at ¶ 94).  Defendants contend that this examination, undertaken five days after Bamenga entered the ACCF, complied with jail standards and ICE requirements.  (Id. at ¶ 95).  Paulino reviewed Decedent's intake screening form, medical history, surgical history and medications.  (Id. at ¶ 96).  She listened to Bamenga's heart and lungs, examined her eyes and ears, and then took her body temperature, blood pressure and pulse rate.  (Id.).  Decedent reported she suffered from CHF and hypertension.  (Id.).  All of these tests were within normal limits.  (Id.).  Paulino did not report that Decedent complained of shortness of breath or chest pain during the examination and did not record that she had swelling or difficulty walking.  (Id.).  Paulino likewise reported that Bamenga understood her medication requirements.  (Id. at ¶ 98).  Bamenga complained that she had not received two types of medication.  (Id.).  Paulino testified that she increased Decedent's dosage of Carvedilol to twice per day.  (Id.).  Paulino also reported that she observed that Bamenga had missed two doses of Spironalactone and told Decedent not to miss any more doses.  (Id.).  According to the Defendants, "Nurse Paulino prescribed Carvedilol for twice per day as Ms. Bamenga reported that this was the proper administration."  (Id. at ¶ 99).  Moreover, Defendants insist, "[t]here is no evidence that Bamenga requested that her doses be altered, or that she informed Nurse Paulino that any of the dosages of her medications were not correct."  (Id.).

Plaintiff disputes many of the facts of this examination.  First, Plaintiff contends that the evidence demonstrates that Paulino saw Bamenga because she had

complained about the dosing of her medications, and not because of any scheduled initial assessment. (Plaintiff's Response to Corizon Defendants at ¶ 94). Plaintiff points out that the evidence is unclear as to why Paulino saw the decedent, and that the eight-minute duration of the examination indicates that the appointment did not serve as a formal examination. (Id.). Nor did such a brief examination constitute enough time to perform all of the tests Paulino recorded. (Id. at ¶ 97). In any case, Plaintiff contends that the examination Paulino recorded was insufficient to assess a person with a major health condition, like Decedent's CHF. (Id. at ¶ 95). Plaintiff also points out that Paulino testified she had not read Decedent's medical file before the exam; failed to assign any medical significance to a rapid weight gain, despite clinical guidelines; failed to assess whether Bamenga had (i) an enlarged heart, (ii) reduced ventricular ejection fraction, (iii) a laterally displaced apical pulse, (iv) a positive hepatojugular reflex, or increased venous jugular pressure. (Id.). All of those examinations were recommended by Corizon's policies for dealing with patients who suffered CHF. (Id.). Paulino did not consider performing any additional tests, and did nothing to assess the severity of Decedent's heart condition. (Id.). She did not address any of the symptoms Decedent had complained of in her sick call slip of the previous day, and did not notice the edema that Plaintiff saw on his visit to Decedent on July 23. (Id.). Plaintiff also disputes Defendants' claims about the Decedent's complaints concerning and knowledge of her medications. (Id. at ¶¶ 98-99). The parties dispute whether Decedent complained of shortness of breath, palpitations or dizziness during Paulino's assessment, as well as the significance of any statements about medication during that encounter. (Corizon Defendants' Statement at ¶ 100; Plaintiff's Response to Corizon

Defendants at ¶ 100). Paulino ordered that Bamenga return to the chronic disease clinic in 90 days. (Corizon Defendants' Statement at ¶ 101). Plaintiff contends that this schedule violated the standard of care and ignored the need to monitor changes in Decedent's medications. (Plaintiff's Response to Corizon Defendants at ¶ 101).

Decedent received her morning medications on July 26, 2011. (Corizon Defendants' Statement at ¶ 102). She was classified that day by Corrections Officer Nancy LaFontaine. (Id. at ¶ 105). Officers assigned Bamenga to Section 6W, Block L3, Cell 09, Bed 1. (Id.). Decedent was classified as Level III, a "medium" security level. (Id.). Plaintiff disputes that this classification was proper, given Decedent's health condition and her expressed concerns about that condition. (Plaintiff's Response to Corizon Defendants at ¶ 105). Following this classification, Decedent was transferred to 6W. (Corizon Defendants' Statement at ¶ 106). The parties dispute the meaning of film of Bamenga taken that day in the unit: Defendants contend that they show her moving normally; Plaintiff contends that the videos supplied by Defendants distort Bamenga's actually condition, particularly because as submitted they play at a faster rate than when they were recorded and are of too low a resolution to accurately reflect her situation. (Corizon Defendants' Statement at ¶ 108; Plaintiff's response to Corizon Defendants at ¶ 108).

The parties also dispute Bamenga's condition during the afternoon and early evening of July 26, 2011 in the 6W unit and conversations she had about it with others. Defendants claim that Plaintiff spoke with her husband around 4:07 p.m. and told him she was "fine." (Corizon Defendants' Statement at ¶ 110). They also contend that another inmate in 6W, Karrie Stefanik, testified that she witnessed two medication

rounds that occurred on July 26, 2011.  (Id. at ¶ 109).  At some point, probably between 4:30 and 5:00, Stefanik testifed that she overheard a conversation between Bamenga and a nurse about medication.  (Id.).  Bamenga asked about her medications, and the nurse told her that she had none for her.  (Id.).  According to the Plaintiff, Defendants' statement misstates these two conversations.  First, though Plaintiff does not dispute that Bamenga told plaintiff she was fine at 4:07 p.m. that day, Plaintiff points out that a conversation recorded at 12:18 p.m. on July 26 reveals that Bamenga complained at length to her husband about her difficulty breathing and difficulty in obtaining her medications, as well as receiving improper doses.  (Plaintiff's Response to Corizon Defendants at ¶ 110).  Second, Plaintiff points out that Stefanik also testified that Bamenga, who was wrapped in a blanket, complained to Nurse Vogel that she was not feeling well, and that her chest was hurting.  (Id. at ¶ 109).  After informing Decedent that she had nothing for her, Vogel "'told her to drink eight to ten ounces of water and lay down [because] she's probably dehydrated.'" (Id.).

The parties offer different explanations of Bamenga's behavior after this meeting with the nurse.  According to Plaintiff, Stefanik testified that Decedent went to bed shortly after dinner.  (Corizon Defendants' Statement at ¶ 111).  Plaintiff points out that Stefanik testified that, shortly after speaking with Nurse Vogel, Decedent went to lie down on her top bunk.  (Plaintiff's Response to Corizon Defendants at ¶ 111).  Decedent did not eat any dinner, but instead gave her food away.  (Id.).  Stefanik testified that, at dinner time, Bamenga "was walking around warpped up in the wool blanket they give you.  She was really cold.  And, pretty much, from when we got our food, we all sat down to eat, she hopped up in bed and went to sleep." (Id.).   Later,

around 8:30 p.m., when a guard came to make a live inspection, Decedent did not get out of bed, though instructed to do so by the guard.  (Id.).  Despite yelling from the guard, Stefanik testified that Plaintiff "'didn't even flinch.'"  (Id.).  Lights started to go down at 10:00 p.m.; Stefanik noted that between 5:00 p.m. and 10:00 p.m., Bamenga "'hadn't moved a beat.  She hadn't gotten up to go to the bathroom.  She [was] in the same position.  Her arm was in the same position.  Like she was literally in the same position.'"  (Id.).  The pod lights were finally turned off at 11:00 p.m.  (Id.).  Plaintiff was listed as a no-show for her evening medications on that day.  (Corizon Defendants' Statement at ¶ 112).

Thereafter, as related above, Decedent was discovered unresponsive in her bed and taken to the Albany Memorial Hospital, where she was pronounced dead.[23]

### B.  Argument of Corizon Defendants

The Corizon Defendants seek summary judgement on various grounds, which the Court will address in turn.

### 1.  Constitutional Claims

Defendants first argue that no evidence exists to support Plaintiff's claims that Defendants violated Irene Bamenga's constitutional rights by acting with deliberate indifference to a serious medical need.  The legal standard related earlier applies to this portion of Defendants' argument.

### a.  Serious Medical Need

---

[23]Defendants supply numerous additional material facts related to the individual Defendants and their training and experience, as well as their roles in the treatment of the Decedent.  The Court will relate these facts as necessary in deciding the motion as it relates to those Defendants.

Defendants first argue that the interruptions in Decedent's prescription medication schedule pointed to by Plaintiff would not have had a substantial effect on Decendent's CHF.  Defendants point to the testimony of their experts, who contend that no evidence supports a finding that missed medication dosages caused Bamenga's death.  As explained above, however, there is evidence by which a jury could find that the Decedent suffered from a serious medical need.  For the reasons explained previously by the Court, the motion will be denied on this basis.

### b.  Deliberate Indifference

Defendants next contend that, even if Decedent's condition did represent a serious medical need, no facts exist to support a finding of deliberate indifference to that serious medical need.  Moreover, none of the named Defendants acted with any deliberate indifference.  Defendants offer a variety of arguments, contending both that the general care provided by the Corizon Defendants did not amount to deliberate indifference, and that for a variety of reasons the individual Corizon Defendants cannot be liable.  The Court will first address the Defendants' general arguments on this element of Plaintiff's claim, and then address the arguments related to each of the individual Corizon Defendants.

### i.  General Medical Care

Defendants first argue that a failure to provide medication in itself does not constitute deliberate indifference, and that no evidence supports a claim that Nurse Practitioner Paulino or Dr. Haider-Shah refused to provide Decedent with medication. Nurse Vogel, who was simply assigned to administer medications on one occasion, likewise did nothing to prevent Decedent from receiving that medication.  Defendants

also argue that Plaintiff's allegations against the Corizon Defendants are simply complaints about a failure to employ particular treatments or perform specific tests and do not arise to the level of constitutional violations, even if true. Defendants' expert testimony, Defendants argue, demonstrates that no evidence supports a claim that discrepancies in Decedent's medications were not the result of any error by the moving Defendants, much less deliberate indifference. Defendants additionally argue that they cannot be seen as deliberately indifferent for relying on the dosages assigned to Decedent at the Allegany County Jail. They were entitled to rely on those prescriptions.

Applying the same reasoning and case law as the Court applied with reference to the Allegany Defendants, the Court finds that evidence exists to support the Plaintiff's claims against the Corizon Defendants in this instance. Plaintiff does not simply quarrel with the treatments that the Defendants provided to the Decedent or insist that she should have received different doses of medication. Instead, Plaintiffs' experts argue that the Defendant health-care professionals failed to follow basic medical procedures necessary to protect the health of a severely ill inmate.[24] In failing to do so, the experts

---

[24]The Corizon Defendants have objected to the Court's consideration of two of the Plaintiff's expert reports, those of Robert Cohen, M.D., and Monika Pilichowska, M.D. See dkt. # 352. Plaintiff wrote the Court on January 3, 2015, after filing responses to the motions for summary judgment, to request permission to file two affidavits related to those reports. See dkt. # 351. Plaintiff contended that the affidavits were not substantive and pertained to copies of reports put into the record as part of the Defendants' summary judgment motions. Id. The Corizon Defendants objected to the Court's accepting such affidavits, arguing that Federal Rule of Civil Procedure 56(c)(4) makes inadmissible an unsworn expert report. See FED. R. CIV. P. 56(c)(4) (stating that "An affidavit or declared used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."). The Court will consider the reports. While the Plaintiff agreed that the expert reports had to be sworn to be considered, Plaintiff provided affidavits to comply with that requirement. Moreover, the

contend, the medical professionals who treated the Decedent were indifferent to the risks their treatment provided, and that the Defendants made no legitimate effort to determine whether the medication provided to the Decedent was appropriate tor her medical needs. Dr. Cohen's report, for instance, notes that, despite the fact that Dr. Haider-Shah and other medical professionals were aware of the need to perform various laboratory studies to evaluate Decedent's condition and determine whether her

---

reports were already part of the record. Defendants' objection is simply that counsel had "already begun preparing my reply affidavit under the assumption that affidavits by Dr. Cohen and Dr. Pilchoswka would not be submitted in support of plaintiff's opposition. The Court notes that this objection does not assert that Counsel was unaware of the reports. Indeed, Defendants' moving papers include as exhibits the expert reports of Dr. Cohen and Dr. Pilichowska and the transcripts of their depositions.. See Declaration of Molly C. Casey, dkt. # 308-1. Moreover, the affidavits submitted do not alter the reports in any way, but simply affirm that the reports were prepared by the experts and represent their opinions. See dkt. ##s 367, 368. Defendants' arguments that they were somehow prejudiced by the late filing of affidavits is wholly unconvincing. The Court finds that the Defendants suffered no prejudice from the Plaintiff's late filing of affidavits related to the Cohen and Pilichowska reports. Defendants also argue that all of Plaintiff's expert reports are inadmissible because the experts' deposition testimony was inconsistent with their reports. They claim that the expert reports amount to evidence which his inadmissible under the "sham affidavit" doctrine, "which prohibits a party from defeating summary judgment simply by submitting an affidavit that contracts the party's previous sworn testimony." Secrest v. Merck, Sharp & Dohme Corp., 707 F.3d 189, 193 (2d Cir. 2013). The experts' depositions occurred after they authored reports and it is unclear that the doctrine would apply under those circumstances. The affidavits in question provide only a certification that the experts authored the attached reports. In any case, "a sham issue of fact exists only when the contradictions in the expert witness's testimony are inescapable and unequivocal[.]" Id. at 194. Defendants state that "[d]ue to space constraints, defendants are unable to provide a comprehensive list of contradictory testimony[,] however, specific examples are contained throughout this Reply." Dkt. # 398 at 3. The Court has examined both the expert reports and the experts' deposition testimony. The Court finds that any contradictions between the report and testimony are not so inescapable and unequivocal that the reports must be rejected altogether. Defendants will certainly have an opportunity to expose any flaws in the experts' reports or in their testimony at trial. The jury will ultimately decide which evidence is believable and persuasive.

medications were properly dosed, Dr. Haider-Shah "consciously chose not to order these critically necessary tests." (Cohen Report at ¶ 49). Dr. Cohen also alleges that Decedent's condition required several specific tests, evaluations, and examinations, and that failure to order these procedures was not simply a different medical approach, but failing to undertake these required procedures meant that the Defendants "ignored" Decedent's needs. (Id. at ¶ 66, 82; see also, Wertheimer Report at 13-14 (Dr. Haider-Sha's failure to order tests came despite his knowledge of Decedent's condition and the deadly potential consequences of failing to order the tests and procedures). Similarly, Nurse Practitioner Alexandra Schneider's Report concludes that the nursing professionals in this case, including the Corizon Defendants, "engaged in patterns of conduct that no reasonable nurse could engage in without the expectation that injury to the patient was highly likely to result." (Exh. A to dkt. # 348 ("Schneider Report") at 23). The report details the specific Defendants' failings in this respect. Such conduct, as explained above, can amount to deliberate indifference to a serious medical need. The motion will be denied on this basis.

### iii. Individual Defendants

The Defendants also contend that the individual Defendants did not commit any constitutional torts.

### a. Debra Vogel

Nurse Vogel argues that, as a nurse she cannot be liable for administering medications prescribed by a doctor or for failing to order particular tests and thus cannot be liable under the circumstances.

The Court will deny the motion on this basis. Plaintiff's expert report from

Alexandra Scheider does not simply allege that Vogel failed to deliver the proper doses of medication or failed to order particular tests.  (See Schneider report at 22-23).  Schneider contends that Vogel failed to take a detailed history from Decedent in her initial intake interview.  (Id. at 22).  Vogel therefore did not obtain any information concerning Decedent's prescription regimen or whether she had missed any medications.  (Id.).  Vogel, who had information indicating that Plaintiff suffered from CHF, also failed to elicit any information on her past disease history.  (Id.).  Vogel failed to obtain this information, even though the Defendant acknowledged that she was a aware that a person in Decedent's condition suffered from a serious medical condition.  (Id. at 23).  According to Schneider, "Nurse Vogel's failure to seek additional history and diagnostic testing results, to contact community prescribers or pharmacy, or to put Ms. Bamenga on the list to be seen by the physician covering Dr. Haider-Shah while he was on vacation . . . demonstrate Nurse Vogel's indifference to her patient's well-being and continued safety and survival."  (Id. at 20).  In other words, "[f]aced with a patient she knew was being treated with multiple medications for a very serious illness, Ms. Vogel made no effort to obtain the information necessary to care for her patient."  (Id.).  Such indifference, Schenider contends, is also demonstrated by Vogel's failure "to make any effort" to get Bamenga her evening medication dose and failure to record an explanation for that failing, in violation of written policies on the issue.  (Id. at 21).   If a jury adopts these conclusions, Plaintiff could prevail against Nurse Vogel, and the motion must be denied in this respect.

### b.  Nurse Practitioner Anna Paulino

Defendants contend that Plaintiff cannot make out a deliberate indifference claim

by pointing to disagreements about proper dosages of medications or a failure to prescribe the appropriate dosage. Indeed, when Decedent complained to Nurse Practitioner Paulino about receiving improper doses of the medication, NP Paulino changed the dosage. Defendants likewise argue that Plaintiff's complaint about failure to perform specific tests and provide specific treatments does not support a claim of deliberate indifference.

Plaintiff uses Schenider's expert opinion to support his claim that Nurse Paulino's treatment of Decedent amounted to deliberate indifference to a serious medical need. (See Exh. A to dkt. # 348 ("Schneider Report")). Scheider finds that Paulino's conduct in changing the dosages of Decedent's medication represented the sort of conduct that constitutes abandonment of a patient. (Id. at 11). Paulino did not perform any diagnostic tests, and did not consider performing any. (Id.). Instead, "new orders for carvedilol . . . doubling the dose were, according to Nurse Paulino's testimony, made as an accommodation to Ms. Bamenga's insistence that she receive a carvedilol dose twice daily." (Id.). Paulino did not change the dosage because of "a determination that the change was medically indicated," but simply because of the Decedent's complaints and then scheduled her for a 90-day follow-up appointment. (Id.). Schneider finds this "inexplicable," especially given the length of time between changing the medication and ordering new testing. (Id.). The expert concludes that, "Nurse Paulino had to have been aware that, having ordered no diagnostic testing, she could not make a reliable assessment" about the stability of Decedent's condition. (Id.). In effect, Schneider finds, "Nurse Paulino abandoned Irene Bamenga, leaving her survival to blind luck." (Id.). These failings led to Bamenga's death. (Id.).

118

The Court finds that, for reasons substantially similar to those stated in reference to the other health professionals, Nurse Practitioner Paulino's conduct could be viewed by a reasonable juror as deliberate indifference. The motion will be denied in this respect as well.

### c. Dr. Haider-Shah

Defendants contend that Dr. Haider-Shah cannot be liable simply because he held a position of authority. Vicarious liability is not available under Section 1983. Defendants assert that no evidence indicates that Dr. Haider-Shah was aware that a substantial risk of serious harm existed, or that he was directly involved in any of the alleged constitutional violations. He did not create any policies that caused constitutional violations, nor was he aware of any such violation. Dr. Haider-Shah simply engaged in a telephone consultation with Nurse Vogel and ordered the continuation of medications from the Allegany County Jail.

Again, Plaintiff's expert reports paint a different picture, which if believed by the jury could lead to verdict against the Defendant. Dr. Wertheimer finds that Dr. Haider-Shah acted in a manner "[indifferent] to the safety and well-being of Ms. Bamenga" during her confinement at the ACCF. (Wertheimer Report at 13). Her report argues that Dr. Haider-Shah failed to "order an appropriate initial work-up, appropriate history, physical examination, laboratory testing and confirmation of cardiac pharmacologic regime," even though he knew that failing to order any of these procedures could lead to Bamenga's death. (Id. at 13-14). According to Wertheimer, "Dr. Haider-Shah knew Ms. Bamenga had a potentially life-threatening diagnosis; and knew that she was on a regime of medications that he himself described as 'dangerous.'" (Id. at 14). Despite

119

this awareness, Haider-Shaw, in Wertheimer's telling, deliberately failed to order appropriate tests.  (Id.).  This evidence indicates more than a simple disagreement about procedures, but conduct that a jury could conclude represented an indifference to the consequences of determining proper treatment for a seriously ill patient.  Dr. Cohen's report likewise faults Dr. Haider-Shah for failing to act in light of Decedent's serious needs.  (See Cohen Report at 14-15).  Despite being aware of Decedent's condition and the need for such tests to guide her treatment, "he consciously chose not to order these critically necessary tests."  (Id. at 15).  A jury could therefore find that Dr. Haider-Shah was deliberately indifferent to a serious medical need based on this evidence.[25]

### d.  Corizon, Inc.

Defendants note that Defendant Corizon, Inc., cannot be vicariously liable on a

---

[25]Defendants also argue that Dr. Haider-Shah could not be liable for any constitutional violation in his capacity as a supervisory official at the jail.  Defendants are correct that "a defendant in a § 1983 action may not be held liable for damages for constitutional violations merely because he held a high position of authority."  Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996).  Instead, a plaintiff must demonstrate "personal involvement" in the violation, which can "mean direct participation, or failure to remedy the alleged wrong after learning of it, or creation of a policy or custom under which unconstitutional practices occurred, or gross negligence in managing subordinates."  Id. Liability can also occur when a supervisory official has "'exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.'"  Vincent v. Yelic, 718 F.3d 157, 173 (2d Cir. 2013) (quoting Colon v. Coughlin, 58 F.3d 865, 873 (2d cir. 1995)).  The Court has already found that evidence supports a conclusion that Dr. Haider-Shah was personally involved in the constitutional violation, as he acted in a fashion deliberately indifferent to a serious medical need, and that summary judgment in his favor is unwarranted.  See Provost v. City of Newburgh, 262 F.3d 146, 155 (2d Cir. 2001) (defining "'direct participation [as] personal participation by one who has knowledge.").  Plaintiff has therefore produced evidence to avoid summary judgment on this claim.  Addressing Defendants' additional arguments is unnecessary at this point.

constitutional claim, and argue that none of Corizon's policies and/or practices caused a violation of Decedent's constitutional rights. Defendants admit that Corizon could be liable if the Defendant had a policy or custom which caused a constitutional violation, but insist that their policies were adequate in a constitutional sense. They likewise contend that no evidence supports a claim of that the ACCF had insufficient staffing levels.

Defendants correctly point out that "[p]rivate employers are not liable under § 1983 for the constitutional torts of their employees unless the plaintiff proves that 'action pursuant to official . . . *policy* of some nature caused a constitutional tort.'" Rojas v.Alexander's Dep't Store, 924 F.2d 406, 408 (2d Cir.1990) (quoting Monell, 436 U.S. at 691) (internal citations omitted) (emphasis in original). Plaintiff has introduced evidence, however, that a jury could use to determine that Decedent's constitutional rights were violated by a Corizon policy or practice.

The expert report of Dr. Cohen identifies numerous policies and practices instituted by Defendant Corizon, Inc., which he claims caused Decedent's injuries. Corizon's policies that encouraged a lengthy delay before a physician or nurse practitioner saw an inmate who arrived suffering form a chronic disease and performed appropriate tests. (Dkt. 367 at ¶ 65(c)). The policies for dealing with hypertension were severely lacking, and numerous basic tests were never performed. (Id. at ¶¶ 65(e-h). Moreover, practice did not meet the basic policies in place. The Corizon, Inc., policy required that inmates with chronic diseases have a care plan, but only 56% of inmates with chronic diseases had one. (Id. at ¶ 68). Likewise, Corizon had a stated policy requiring protocols for management of cardiac illness, but those policies were never

implemented.  (Id. at ¶ 69).  As explained previously, the cardiac care system at the ACCF fell far short of these standards, with the Cardiac Care Clinic consistently failing to provide assessments and laboratory tests as required by the policy.  (Id. at ¶ 74).  In the end, Dr. Cohen blames the death of Irene Bamenga, in part, on the "blatant deficiencies" in the health care system created and operated by Corizon, Inc.  (Id. at ¶ 82).  Thus, Plaintiff has provided sufficient evidence–through Dr. Cohen's report, as well as other testimony of health-care providers at the ACCF–to establish that the constitutional tort that caused Decedent's injuries was the result of an official policy of custom established by Corizon, Inc.  The motion will also be denied in this respect.

### c.  Wrongful Death Claims

The Corizon Defendants also seek summary judgment on Plaintiff's wrongful death claims against them.  The Defendants contend that no evidence supports any claim of negligence against them.  They assert that Plaintiff has no evidence that they deviated from the standard of care or that such deviations injured the Decedent. Even if such evidence existed, Defendants insist that no evidence exists to prove that Plaintiff suffered any pecuniary loss. Moreover, Defendants argue that no evidence exists to support liability against the individual Defendants.  The Court will address each Defendant's position in turn, as appropriate.

### i.  Legal Standard for Wrongful Death

"To succeed on a cause of action to recover damages for wrongful death" in New York, "the decedent's personal representative must establish, inter alia, that the defendant's wrongful act, neglect, or default caused the decedent's death."  Eberts v. Makarczuk, 52 A.D.3d 772, 772-73, 861 N.Y.S.2d 731, 732 (2d Dept. 2008).  The

elements of such a claim are: "(1) the death of a human being, (2) the wrongful act, neglect or default of the defendant by which the decedent's death was caused, (3) the survival of distributees who suffered pecuniary loss by reason of the death of decedent, and (4) the appointment of a personal representative of the decedent." Chong v. New York City Transit Authority, 83 A.D. 2d 546, 547, 441 N.Y.S.2d 24, 25-26 (2d Dept. 1981). Defendants here argue that the Plaintiff cannot satisfy the second and fourth elements of such a claim.

The parties agree that the wrongful acts, neglect or default alleged by the Plaintiff against the moving Defendants are claims of negligence and medical malpractice. The parties agree here that to prove his claims in this respect, the Plaintiff must demonstrate "(1) the existence of a duty on defendant's part to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result[.]" Akins v. Glens Falls City School Dist., 53 N.Y.S.2d 325, 333, 424 N.E.2d 531, 535 (1981). A medical malpractice claim requires a showing of "(1) a deviation or departure from accepted practice, and (2) evidence that such departure was a proximate cause of plaintiff's injury." Frye v. Montefiore Med. Ctr., 70 A.D.3d 15, 24, 888 N.Y.S.2d 479, 486 (1st Dept. 2009). When a defendant physician moves for summary judgment in such cases, the physician "must make a prima facie showing of entitlement to judgment as a matter of law by establishing the absence of a triable issue of fact as to his alleged departure from accepted standards of medical practice." Id. The plaintiff must then "produce expert testimony regarding specific acts of malpractice, and not just testimony that alleges "'[g]eneral allegations of medical malpractice, merely conclusory and unsupported by competent evidence tending to establish the essential elements of

malpractice.'"  Id. (quoting Alverez v. Prospect Hosp., 68 N.Y.2d 320, 325, 501 N.E.2d 572 (1986)).  "In most instances, the opinion of a qualified expert that the plaintiff's injuries resulted from a deviation from relevant industry or medical standards is sufficient to preclude a grant of summary judgment in defendant's favor."  Id.  If, however, the expert's opinion is "'speculative or unsupported by an evidentiary foundation,'" the opinion "'is insufficient to withstand summary judgment.'" Id. (quoting Diaz v. New York Downtown Hosp., 99 N.Y.2d 542, 544, 748 N.E.2d 68 (2002)).

### ii.    Conduct of the Various Corizon Defendants

The Court has already explained how the evidence supports a finding that Defendants acted in ways that were deliberately indifferent to a serious medical need of the Decedent.  In some sense, that finding, which employs a more stringent standard than medical malpractice, should lead the Court to find that Plaintiff has evidence of medical malpractice against all of the Defendants.  In any case, all of the Plaintiff's expert reports conclude that Defendants Haider-Shah, Vogel and Paulino violated the standard of care and injured the Decedent.  Schneider details the care provided by both Vogel and Paulino and concludes that they "repeatedly and consistently deviated in significant ways from accepted standards for providing reasonable and prudent nursing care."  (Schneider Report at 26).  Such failings helped cause Bamenga's demise.  (Id.). Likewise, Dr. Werthheimer relates the nature of Dr. Haider-Shah's care and finds that it "fell below the minimal standard of care at all points[.]"  (Wertheimer Report at 13). Such failings included failure to order specific tests, prescription of inappropriate dosages of medication, and a failure to investigate past medical history.  (Id. at 16-17). This conduct, Werthheimer concludes, caused Bamenga's death.  (Id. at 18).  Indeed,

124

with reference to Defendants Haider-Shah and Paulino, Defendants simply cite to their own expert reports and argue that the Court should accept those findings. As the Defendants brought the instant motion for summary judgment, the motion must be denied in this respect. The Court cannot grant the motion for summary judgment based solely on the evidence supplied by the moving party if evidence exists to support the position of the non-movant. Since such evidence exists, the Court must permit the jury to decide the wrongful-death claims with respect to these two Defendants. The motion is denied with respect to both Defendant Haider-Shah and Defendant Paulino.

Defendants' argument with respect to Defendant Vogel is slightly different, but no more persuasive. Defendants argue that summary judgment should be granted to her because Vogel had no responsibility to verify that the medications ordered at the ACJ were accurate. The Plaintiff's expert report, however, finds failings by Vogel far beyond her provision of medication, and that report helps create questions of fact on this issue. The report alleges that her basic examination failed to ask necessary questions and did not elicit important information, and in that way violated the standard of care. (Schneider report at 19-20). The report thus offers a basis for liability beyond ordering tests and correcting doses, and the motion is denied in that respect. Defendants also contend, however, that their expert and Nurse Vogel's own testimony establish that she did not violate the standard of care in her treatment of the Decedent. Whatever this testimony states, of course, that testimony—contradicted, as here, by other admissible testimony, provides no basis for summary judgment. Defendant's further contend that Vogel cannot be liable because under New York law she is permitted to order medications, testing or consultations. Liability against Vogel here is

premised not on her failure to order particular tests, but her failure to ask certain questions and perform certain basic examinations indicated for a person in Bamenga's condition. (<u>See</u> Schneider Report at 20). Plaintiff also points to liability based on Vogel's alleged failure to ensure that Bamenga received an evening dose of her medication on July 25, 2011 and to Vogel's conduct the following evening, when she allegedly did nothing to act on Decedent's health concerns. (<u>Id.</u> at 21). The motion will be denied in this respect as well.

### iii.    Proximate Cause

Moving Defendants' argument that their conduct was not a proximate cause of Decedent's injuries is unpersuasive for the same reasons state above in reference to the other Defendants. Plaintiff has submitted evidence a jury could use to conclude that Defendants' conduct caused Bamenga's injuries. The motion must therefore be denied on this basis.

### iv.    Pecuniary Loss

Defendants next argue that no evidence exists to support a claim for lost wages on the part of the decedent, or that the Plaintiff suffered any pecuniary loss as distributee of the Decedent's estate. Defendants claim Plaintiff has not produced any record of wages earned by the Decedent in the United States, but offered only his own testimony concerning Decedent's work under an assumed name at a Whole Foods Market. Moreover, because Decedent was working without legal authorization, Defendants insist that Plaintiff cannot raise a claim for potential future earnings.

In New York,"[d]amages in an actions for wrongful death are the fair and just compensation for the pecuniary injuries resulting from the decedent's death to the

persons for whose benefit the action is brought." <u>Brooks v. Siegel</u>, 52 A.d.2d 1003, 383 N.Y.S.2d 439, 440 (3d Dept. 1976) (citing N.Y. EPTL § 5-4.3). "The standard by which to measure the value of past and future lost earnings is the decedent's gross income at the time of death." <u>Plotkin v. New York City Health & Hosps. Corp.</u>, 221 A.D. 2d 425, 426, 633 N.Y.S.2d 585,. 586 (2d Dept. 1995). "Pecuniary loss includes medical and funeral expenses of the decedent paid by the distributee." <u>Gabriel v. County of Herkimer</u>, 889 F.Supp.2d 374, 406 (N.D.N.Y. 2012) (quoting N.Y. Est. Powers & Trust § 5-4.1).

Plaintiff Yodi Zikianda testified that he paid a portion of the funeral expenses of the decedent. (<u>See</u> dkt. # 309-14 at 108). Because pecuniary loss includes funeral expenses paid by the distributee of the estate, the Plaintiff has produced evidence to satisfy this element of the wrongful death claim as well. The motion must be denied in that respect.

As to whether Plaintiff may recover for lost wages, the Court finds that the question of whether such damages are available is a factual one to be resolved by the jury. The parties agree that Decedent did not have legal authorization to work in the United States, and had previously worked in this country using another person's social security number. The Plaintiff insists, however, that Decedent may have gained authorization to work in the United States at some future point.

The New York law cited by the Defendant does not automatically preclude a Plaintiff from recovering for lost wages potentially earned by a person not legally permitted to work in the United States. In the case cited by the Defendants, <u>Collins v. New York</u>, 201 A.D. 2d 447, 607 N.Y.S.2d 387 (2d Dept. 1994), the Defendant had

"moved for partial summary judgment to preclude the plaintiff from seeking to recover any lost earnings of the decedent based on his employment in the United States or upon United States wage rates, and to preclude plaintiff from offering evidence of the decedent's employment qualifications." Id. at 447. The decedent was an "illegal alien from India." Id. The lower court granted the motion in part, "limiting any evidence of lost earnings to the amount which the decedent lawfully could have earned in India." Id. The Appellate Department reversed, finding a question of fact "with regard to the decedent's lost earnings" because "the record fails to establish as a matter of law that any wages which the decedent might have earned would have been the product of illegal activity." Id. at 448. Instead, "this question, as well as the length of time during which the decedent might have continued earning wages in the United States, and the likelihood of potential deportation, are factual issues for resolution by the jury under all of the circumstances of the case as developed by a full trial." Id. at 448. The Court reads this law to establish that a recovery of lost wages requires proof of some sort that a decedent who at time of death was not authorized to work in the United States could earn money, whether in the United States or in some other country.

In their statement of facts, Defendants contend that the only employment documents produced by the Plaintiff were from Whole Foods Market, where Decedent began working in 2007. (Corizon Defendants' Statement at ¶ 22). To obtain this job, Bamenga used the working papers of Plaintiff's aunt, who was reportedly living in England at the time. (Id.). Decedent received W-2 forms each year for that aunt. (Id.). In discovery, Plaintiff produced these documents for the years 2009 through 2011, and all were addressed to the aunt, not the decedent. (Id. at ¶ 23). Defendants do not

deny, however, that Decedent actually performed the work under the name of Plaintiff's aunt. Defendants also admit that, though Bamenga had overstayed her tourist visa, which expired in October 2005, her husband had acquired a Green Card and sought "legal citizenship" for "Bamenga "as the spouse of a resident alien at some point in 2009 or 2010." (Id. at ¶ 21). Plaintiffs also admit that "[t]his request was approved some time in 2010." (Id.).

The Court further finds that a question of fact exists as to Decedent's lost wages. The Defendants admit that Bamenga may have been a legal resident at the time of her death. At the very least, then, a question of fact exists as to her capacity to work in the United States. Moreover, Defendants do not even argue that Bamenga lacked the capacity to work if she were deported. To the extent that Plaintiff can provide evidence which convinces the jury that Bamenga's legal status was about to be resolved, or that she had good prospects for employment even if deported, Plaintiff could prove a pecuniary loss. Summary judgment is unwarranted on the issue.

### v.    Corizon, Inc.

Defendants' only argument with respect to Corizon, Inc., is that only vicarious liability can apply and thus "[t]o the extent that the Court grants summary judgment with respect to any of the above defendants, summary judgment must also be granted with respect to defendant Corizon, Inc." (Corizon Defendants' Brief, dkt. # 308-2 at 29). As the Court has found that evidence supports wrongful death claims against all of the individual Defendants, the Court also finds that a jury could conclude that Corizon, Inc., was vicariously liable for Decedent's injuries. The motion will be denied in this respect as well.

129

### d.      Contract Claims

Defendants next contend that no evidence exists to support Plaintiff's breach-of-contract claims against Corizon, Inc.  Defendants do not dispute that Decedent was an intended third-party beneficiary of the contract between Corizon, Inc., and its predecessors and the County of Albany.  Instead, Defendants argue that "the level of care provided to Decedent at the ACCF was within the applicable standard of care" and the policies in place at the facility met applicable guidelines and the standard of care in that respect.  Thus, Defendants contend, no evidence exists that Corizon, Inc., breached the contract and injured the Decedent.

The Court notes that a large portion of Defendants' argument here is based on the notion that Corizon, Inc., and Corizon's employees delivered the level of care promised in the contract with Albany County because no evidence supports a claim that Corizon breached a standard of care.  As explained above, there is evidence to support such a claim, both in terms of the care provided by Corizon employees and in terms of policies developed by Corizon.  As such, the motion must be denied on these grounds as well.

### e.  Conscious Pain and Suffering

Defendants also seek judgment on any claim by Plaintiff for conscious pain and suffering.   For the reasons stated above in reference to the other Defendants, that portion of the motion will also be denied.

### f.  Cross Claims

Defendants finally argue that the cross claims of Defendants Allegany County, Sheriff Rick Whitney, Cheryl Ralyea, Debra Harrington and Christopher Depner should

be dismissed against them if the Court grants the Corizon Defendants' motion for summary judgment. As the Court has denied the Corizon Defendants' motion, there is no basis for granting the motion on the cross claims. That motion will be denied as well.[26]

### g. Conclusion as to Corizon Defendants

For the reasons stated above, the Corizon Defendants' motion for summary judgment, dkt. # 308, will be denied.

## IV. CONCLUSION

For the reasons stated above, the Defendants' motions for summary judgment will be **GRANTED** in part and **DENIED** in part, as follows:

1.  The motion for summary judgment of Defendant Christopher Depner, M.D., dkt. # 304, is hereby **DENIED**;

2.  The motion for summary judgment of Defendants Craig Apple and County of Albany, dkt. # 307, is hereby **DENIED**;

3.  The motion for summary judgment of Defendants Corizon, Inc., Syed Azaz Haider-Shah, M.D., Anna J. Paulino, and Debra C. Vogel, dkt. # 308, is hereby **DENIED**; and

4.  The motion for summary judgment of Defendants County of

---

[26]Defendants also argue that no Corizon Defendant can be held liable for violating any statute. They contend that none of the statutes mentioned in the Plaintiff's Complaint apply to them. Even if they did, the Defendants contend that no evidence would support any claims against them under those statutes. The question here is whether Defendants violated Decedent's constitutional rights or committed medical malpractice. Whether Defendants violated any laws or regulations does not answer that question.

Allegany, Sheriff Rick L. Whitney, Cheryl Ralyea, and Debra

Harrington, dkt. #311, is **GRANTED** in part and **DENIED** in part, as

follows:

    a.   The motion is granted with respect to Plaintiff's claims

against all individual Defendants in their official capacities

and Defendant Rick L. Whitney is dismissed from the case;

    b.  The motion is granted with respect to Plaintiff's claims for

punitive damages against Defendant County of Allegany

pursuant to 42 U.S.C. § 1983; and

    c.  The motion is denied in all other respects.

IT IS SO ORDERED.

Thomas J. McAvoy
Senior, U.S. District Judge

Dated: September 15, 2015.